**No. 24-1958**

# United States Court of Appeals for the Federal Circuit

**CAUSAM ENTERPRISES, INC.,**
*Appellant,*

**v.**

**ECOBEE TECHNOLOGIES ULC,**
*Appellee*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2022-01339*

## OPENING BRIEF FOR APPELLANT

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(571) 208-0186
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant Causam Enterprises, Inc.*

NOVEMBER 26, 2024

**REPRESENTATIVE CLAIM**
**PATENT 10,394,268**

1. A method for managing an electric power flow within an electric power grid, comprising:

[1a] a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

[1b] the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

[1c] generating measurement and verification data corresponding to the reduction in consumed power.

## CERTIFICATE OF INTEREST

In accordance with Federal Circuit Rule 47.4(a) and (b), counsel for Appellant Causam Enterprises, Inc. certifies the following:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)): Causam Enterprises, Inc.

2. The real party in interest (Fed. Cir. R. 47.4(a)(2)): None/Not Applicable

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)): Causam Holdings, LLC

4. Legal Representatives (Fed. Cir. R. 47.4(a)(4)):

   None/Not Applicable

5. Related Cases (Fed. Cir. R. 47.4(a)(5)):

   *See* Notice of Related Case Information filed by Appellant Causam Enterprises, Inc. on June 26, 2024.

6. Organizational Victims and Bankruptcy Cases (Fed. Cir. R. 47.4(a)(6)): None/Not Applicable

November 26, 2024

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314

(571) 208-0186
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

STATEMENT OF RELATED CASES ........ viii

I. JURISDICTIONAL STATEMENT ........ 1

II. STATEMENT OF THE ISSUES ........ 1

III. STATEMENT OF THE CASE ........ 3

A. Preliminary Statement ........ 3

B. Procedural History ........ 5

1. ecobee Denied That Causam Owns the ’268 Patent ........ 5

2. Faced with this Ownership Dispute, The Board Made No Findings Regarding the ’268 Patent’s Ownership ........ 8

3. The ’268 Patent Claims Require a Correspondence Between Reduced Power and “Measurement and Verification Data” ........ 10

4. The Board Construed Claim 1 Such that No Measurement and Verification Data Needs to Be Generated During a Reduction in Consumed Power ........ 12

5. The Board Evaluated ecobee’s Challenges Only Under the Board’s Broad Interpretation of Claim 1 ........ 15

IV. SUMMARY OF THE ARGUMENT ........ 22

V. ARGUMENT ........ 24

A. Standard of Review ........ 24

B. When Ownership is Disputed in an IPR, the Board Must Resolve the Dispute to Ensure Due Process is Afforded to All Putative Owners ........ 26

C. The Board Incorrectly Interpreted Claim 1 by Failing to Recognize the Claimed "Measurement and Verification" Must Occur During a Demand Response Event to Generate Data Corresponding to the Reduction in Consumed Power for That Event ........ 34

D. The Board Failed to Evaluate Petitioner's Challenges Under the Proper Interpretation of Element [1c] ........ 39

VI. CONCLUSION AND RELIEF REQUESTED ........ 43

# TABLE OF AUTHORITIES

***Page(s)***

**Cases**

*ACCO Brands Corp. v. Fellowes, Inc.*,
813 F.3d 1361 (Fed. Cir. 2016) .......... 25

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 26

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) .......... 25

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) .......... 33

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) .......... 26

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 25

*In re NuVasive*,
842 F.3d 1376 (Fed. Cir. 2016) .......... 29

*In re Sang-Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .......... 29

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .......... 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ,
463 U.S. 29 (1983) .......... 29

*Mullane v. Central Hanover Bank Trust Co.*,
339 U.S. 306 (1950) .......... 26, 32

*Nelson v. Adams USA, Inc.*,
529 U.S. 460 (2000) .......... 27

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) .......... 25

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004) .......... 36

*Pride Mobility Prods. Corp. v. Permobil, Inc.*,
818 F.3d 1307 (Fed. Cir. 2016) .......... 24

*Regents of the University of Minnesota v. LSI Corp.*,
926 F.3d 1327 (Fed. Cir. 2019) .......... 26

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 28

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
820 F.3d 419 (Fed. Cir. 2016) .......... 36

*Thryv, Inc. v. Click-To-Call Techs., LP,*
590 U.S. 45 (2020) .......... 33

*Transcom Inc. & L & S Bearing Co. v. US & The Timken Co.*,
182 F.3d 876 (Fed. Cir. 1999) .......... 30

*United States v. James Daniel Good Real Property*,
510 U.S. 43 (1993) .......... 26

*Worlds Inc. v. Bungie, Inc.*,
903 F.3d 1237 (Fed. Cir. 2018) .......... 8, 33

**Statutes**

28 U.S.C. § 1295(a)(1) .......... 1

28 U.S.C. § 1338(a) .......... 1

28 U.S.C. § 2107 .......... 1

35 U.S.C. § 103 .......... 43

35 U.S.C. § 312 .......... passim

35 U.S.C. § 314 .......... 33

35 U.S.C. § 315 .......... 33

35 U.S.C. § 316 .......... 8

35 U.S.C. § 318 .......... 3

35 U.S.C. §§ 311-319 .......... 3

5 U.S.C. § 706 .......... 23, 24, 25

**Rules**

37 C.F.R. § 42.105 .......... 8, 28, 30, 31

37 C.F.R. § 42.8 .................................................................................. 9, 32
37 C.F.R. § 42.9 .................................................................................. 32

**Constitutional Provisions**

U.S. Const. amend. V .............................................................. 3, 23, 26, 33

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5(a) and (b), Appellant states:

*Causam Enterprises, Inc. v. U.S. International Trade Commission*, Case No. 23-1769, and *Causam Enterprises, Inc. v. Unified Patents, LLC*, Case No. 23-2410, are currently pending before this Court and have been designated companion cases to the current case by Order issued July 19, 2024.

The following pending cases in the lower court or agency will directly affect or be directly affected by this Court's decision in this appeal:

None.

## I. JURISDICTIONAL STATEMENT

(a) The statutory basis for jurisdiction of the U.S. Patent and Trademark Office to issue its Final Written Decision is 35 U.S.C. § 318(a).

(b) The statutory basis for jurisdiction of this Court to hear the appeal is 35 U.S.C. § 319 and 28 U.S.C. § 1295(a)(4)(A).

(c) This appeal was timely filed in accordance with 28 U.S.C. § 2107 and Federal Rule of Appellate Procedure 4(a), as Causam's Request for Director Review of the U.S. Patent and Trademark Office's Patent Trial and Appeal Board (the "Board") Final Written Decision was denied on April 11, 2024 and Causam timely filed its Notice of Appeal on June 12, 2024.

## II. STATEMENT OF THE ISSUES

1. Whether the Board canceled claims of U.S. Patent No. 10,394,268 (the "'268 patent") without the guarantees of procedural due process when it ignored the ownership dispute concerning the '268 patent, and therefore failed to determine whether the '268 patent's owner properly received notice and opportunity to defend the '268 patent's validity in *inter partes* review.

2. Whether the Board legally erred when it construed the claimed requirement of "generating measurement and verification data corresponding to the

reduction in consumed power" in a manner that omitted the required correspondence between the generated data and the reduction in consumed power.

3. Whether the Board's finding of invalidity was unsupported by substantial evidence where the Board evaluated petitioner ecobee's invalidity theory only under the Board's incorrect construction of claim 1, and not under the proper construction advanced by Causam.

## III. STATEMENT OF THE CASE

### A. Preliminary Statement

*Inter partes* review ("IPR") proceedings allow a party who is not the owner of a patent to petition the Patent Office to cancel "any claim of the patent finally determined to be unpatentable." 35 U.S.C. § 318(b); *see generally* 35 U.S.C. §§ 311-319. Every party against whom a claim is brought is entitled to the guarantees of procedural due process (U. S. Const. amend. V). Given the nature of the IPR proceeding against the patent, those parties to whom due process should be afforded include the persons and/or entities alleged to own the patent—as 35 U.S.C. § 312(a)(5) requires.

This case presents the rare circumstance of an IPR petitioner denying that the patent owner named in the petition owns the patent being challenged. Appellee ecobee Technologies ULC ("ecobee") acknowledged an ownership dispute regarding U.S. Patent No. 10,394,268 (the "'268 patent") in its Petition without revealing its own involvement in that ownership dispute. Appellant Causam Enterprises, Inc. ("Causam") then provided evidence to the Board that ecobee was actively contesting Causam's ownership of the '268 patent in a parallel proceeding. The Board made no findings to determine ownership of the '268 patent, and therefore did not determine whether the true owner of the '268 patent was provided with notice and an opportunity to defend the '268 patent's validity. Instead, the

Board overlooked ecobee's ownership dispute and cancelled all challenged claims of the '268 patent by final written decision. That was error.

The substance of the Board's final written decision was also erroneous. All of the challenged claims require the generation of "measurement and verification data" that "correspond[s] to" a reduction in consumed power. Causam argued throughout the proceeding below that ecobee's claim construction position and substantive challenges eliminated the "corresponding to" requirement from claim 1 of the '268 patent. ecobee's Petition relied on portions of the asserted Ehlers reference, which did not include any "measurement and verification data corresponding to the reduction in consumed power," as required by claim 1. Rather, ecobee's theory was that Ehlers' power measurements taken before a reduction in consumed power occurred could satisfy the claimed correspondence, and the Board agreed.

In its final written decision, the Board incorrectly construed the "corresponding to" claim term by finding that this term did not require measurements to occur during the period in which consumed power was reduced. It accepted ecobee's theory that a measurement taken before power was reduced met the requirement that the measurement must correspond to the reduction of power consumed. Additionally, the Board evaluated ecobee's challenges only under this overly broad construction of the "corresponding to" limitation, and not under

Causam's correct construction. Under ecobee's interpretation, the Board found the challenged claims invalid. That was also error.

### B. Procedural History

ecobee filed its Petition for *inter partes* review ("IPR") on July 28, 2022, as IPR2022-01339. The Petition challenged claims 1-11 and 13-19 of the '268 patent, and asserted two grounds of invalidity against independent claim 1. Appx0265. Claim 1 is the focus of this appeal.

#### 1. ecobee Denied That Causam Owns the '268 Patent

The statute governing IPRs contains notice provisions designed to ensure due process to a patent owner whose patent is being challenged via *inter partes* review. 35 U.S.C. § 312 states a petition "may only be considered" if a petition "identifies all real parties in interest," 35 U.S.C. § 312(a)(2), and if "petitioner provides copies" the required *inter partes* review documents, including the statement of all real parties in interest, "to the patent owner," 35 U.S.C. § 312(a)(5).

In its petition, ecobee listed Appellant Causam Enterprises, Inc. as the patent owner of the '268 patent on the cover page. Appx0256. However, ecobee did not characterize Causam as the "Patent Owner" in the body of its petition, and instead described the '268 patent as "having a recorded assignment to Causam Enterprises, Inc." Appx0260. In a footnote to the Board, ecobee stated that "Petitioner *understands* that the ownership of the '268 patent, including whether certain other

assignments are valid, *is in dispute*. Causam is the party asserting the patents." Appx0260 n.1 (emphasis added). ecobee did not inform the Board that ecobee itself was actively disputing that Causam owned the '268 patent. ecobee's certificate of service in the petition states that ecobee served the petition and exhibits on Causam's "counsel of record at the United States Patent and Trademark Office." Appx0327.

Causam's Preliminary Response informed the Board that ecobee actively disputed Causam's ownership of the '268 patent in a parallel proceeding. Appx0426-29. Causam explained that ecobee "openly disputes that Causam Enterprises, Inc. possesses any ownership interest in the '268 Patent." Appx0426 (citing Appx3410-17, Appx3510-12). Prior to filing its petition for *inter partes* review, ecobee actively disputed Causam's ownership of the '268 patent in the pending ITC case by joining in several motions "relating to ownership of the asserted patents, standing, and inventorship," including a "Motion to Summary Determination that Causam Lacks Sole Ownership of the Asserted Patents and Therefore Lacks Standing." *See* Appx3510-12. Additionally, another set of Respondents before the ITC filed a "Motion to Terminate the Investigation Based on Their Ownership Interest in the Asserted Patents." Appx3511. Following the filing of its IPR petition, ecobee continued to dispute that Causam is the owner of the '268 patent. Appx3414-15 ("Causam does not own all rights in the '268 patent

(or any of the asserted patents).") Even before this Court, in a companion proceeding, ecobee openly contends that Causam never owned the '268 patent, including when ecobee filed its petition challenging the '268 patent. *See* Appx4226-36; Appx4236 ("Causam does not own, and has never owned, the '268 patent").[1]

Prior to institution of ecobee's IPR, Causam alerted the Board that an initial determination was issued by the U.S. International Trade Commission's administrative law judge, finding that Causam did not own the '268 patent or possess standing to assert the '268 patent. Appx0452-53. Causam also alerted the Board that Causam sought Commission review of that initial determination, and that the Commission later affirmed the initial determination with certain modifications. Appx0452-53; Appx0491-93.

Like its Preliminary Response, Causam's Patent Owner Response asked the Board to dismiss ecobee's petition because ecobee denied that all real parties in interest to the proceeding were present before the Board, and because ecobee failed to provide copies of all required documents "to the patent owner," as required by 35 U.S.C. § 312(a)(2), (a)(5). Appx0426-29; Appx0743-45. Causam argued to the

[1] These briefing pages are not part of the record below but are part of the briefing involved in one of the companion cases before the Court. Causam respectfully asks the Court to take judicial notice of ecobee's unchanged position in the companion appeal, and provides this statement as part of the Joint Appendix for the convenience of the Court.

Board that "administrative efficiency weighs against any finding on the patentability of the challenged claims when the party who bears the burden of proof in this proceeding denies that the proper parties are before the Board." Appx0745 (citing *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242-43 (Fed. Cir. 2018); 35 U.S.C. § 316(e)).

### 2. Faced with this Ownership Dispute, The Board Made No Findings Regarding the '268 Patent's Ownership

Although the ownership of the '268 patent was in dispute, the Board made no findings regarding ownership of the '268 patent in either its institution decision or final written decision. *See* Appx0004-05; Appx0546-47. Instead, the Board considered ecobee's petition despite ecobee's failure to identify or serve the party who ecobee contends is the true owner of the '268 patent, holding that ecobee's challenge to Causam's ownership interest in the ITC proceeding was "unrelated to service in this proceeding." Appx0004-05; Appx0546-47.

Thus, without evaluating whether the true owner of the '268 patent was notified of ecobee's IPR petition and identified to the Board, the Board accepted ecobee's administrative argument that "proper service of a Petition under the Board's rules is made through the correspondence address of record for the subject patent." Appx0004 (citing 37 C.F.R. § 42.105(a)). The Board also acknowledged that "the Board's rules require that Patent Owner identify each real party-in-interest," citing 37 C.F.R. § 42.8(b)(1), but it concluded that Causam's statement

that it is "the sole Patent Owner and Real Party-In-Interest" was dispositive. Appx0547. It drew this conclusion despite noting ecobee's challenge to ownership. Appx0547 (finding that ecobee's challenge "in the ITC proceeding whether Causam holds proper title to the '268 patent does not negate that Causam has asserted full ownership here and that Petitioner followed the service requirements"); *see also* Appx0005.

Determining that ecobee sufficiently served Causam's representative as registered in the Patent Office's records, the Board concluded that the service requirement of 35 U.S.C. § 312(a)(5) was satisfied and did not issue any findings regarding whether Causam was the true owner of the '268 patent, did not ask ecobee to state who the putative owner was, and did not otherwise act to ensure participation by all persons or entities possessing an interest in the validity of the '268 patent. Appx0004.

Further, the Board absolved ecobee from any duty to identify all real parties in interest relating to ownership and placed that duty on Causam, instructing that "Causam is responsible for correcting its evidence of sole ownership interest, if it needs correcting, or for modifying its real parties-in-interest identification in this proceeding if necessary." Appx0547 (citing 37 C.F.R. § 42.8(a)(3), (b)(1)).

### 3. The '268 Patent Claims Require a Correspondence Between Reduced Power and "Measurement and Verification Data"

The '268 patent discloses a method of performing "load management … over large geographies" by taking "real time (active) control of residential and commercial electrical devices" and reporting back information regarding the effectiveness of the intervention. *See* Appx0092 (1:44); Appx0094 (6:49-56). During a demand response event—a period of high utility demand—the utility uses a server, which the patent calls an "active load director," to decrease system-wide power demand. Appx0102 (22:58-59); *see* Appx0095 (8:1-3). Through the server, the utility sends "power control message[s]" to "client device[s]" (*e.g.*, Internet-connected thermostats) at residential or commercial properties. Appx0102 (22:58-59). The power control messages identify either (1) a power-consuming device to turn off (*e.g.*, an AC unit), (2) an amount of power to be reduced, or (3) both. Appx0102 (22:59-64), Appx0101-102 (20:14-21:20), Appx0097 (11:28-37).

The client device (referred to in the specification as the "active load client" or "ALC") responds to the power control message by issuing a "power management command" instructing a "controllable device" to disable power to an associated "power consuming device." Appx0102 (22:63-67). Disclosed examples of a "controllable device" include the built-in "power control module" of a smart

appliance or an intermediary, such as a residential load center with "smart breaker[s]." Appx0095-96 (8:29-9:6).

To help the utility estimate "the reduction in consumed power by the power consuming device(s)," the client device generates "measurement and verification" data ("M&V" data) corresponding to the reduction. Appx0095 (7:32-37). For example, the specification discloses that the client device may generate and report time-stamped runtime data indicating when a power-consuming device was turned on or off. Appx0102 (21:42-22:15). The client device may also generate and transmit "any other information that would be useful in fine tuning future events and in improving customer experience." Appx0102 (22:1-3). This invention "provides optional participation incentives for customers based on the amount of their actual participation in the power management system." Appx0102 (22:24-27).

Claim 1 of the '268 patent, reproduced below with the paragraph designators used in the Petition, is illustrative of the subject matter of the '268 patent:

> 1. A method for managing an electric power flow within an electric power grid, comprising:
>
> [1a] a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;
>
> [1b] the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power

> consuming device to provide a reduction in consumed power; and
>
> [1c] generating measurement and verification data corresponding to the reduction in consumed power.

Appx0102-03 (22:55-23:5). Element [1c], reproduced above, requires the claimed step of "generating measurement and verification data corresponding to the reduction in consumed power." Independent claim 14, the other independent claim in the '268 patent, recites substantively similar limitations to the method steps recited in claim 1. Appx0103 (24:11-34); *see also* Appx0049 ("Independent claim 14 recites substantively similar limitations to the method steps recited in claim 1.").

#### 4. The Board Construed Claim 1 Such that No Measurement and Verification Data Needs to Be Generated During a Reduction in Consumed Power

As recounted above, element [1c] of the '268 patent recites "generating measurement and verification data corresponding to the reduction in consumed power." Appx0103 (23:4-5). The "reduction in consumed power" finds antecedent basis in element [1b]: "the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device *to provide a reduction in consumed power*." Appx0102-03 (22:65-23:3).

The Board recognized that the parties disputed the construction of element [1c]. "Patent Owner argues that 'generating measurement and verification data

corresponding to the reduction in consumed power,' as recited in claim 1, precludes the use of estimates or projected power savings, including estimates of projected savings based on actual power consumption of the power consuming device before power is disabled during a demand response event." Appx0021 (citing Appx0704, Appx0707, Appx0710-20, Appx0817-18). "Petitioner contends that estimates and projections may be used in generating the required measurement and verification data." Appx0022 (citing Appx0767-76). The Board considered Causam's argument that the claims required "measurement and verification" to occur during a demand response event, but held that the claims were not so limited. Appx0025-26.

Initially, the Board agreed with Causam "that the plain language of the claim requires generating the measurement and verification data that corresponds to the reduction in consumed power provided when the electric power flow to the device is disabled." Appx0026. But the Board disagreed that the claims contained "a timing constraint that 'generating measurement and verification data corresponding to the reduction in consumed power' must occur *during* a power reduction event and not after the power reduction event." Appx0026.

Instead, the Board held that "[n]othing in the plain language of the claims or any portion of the specification identified by Patent Owner would limit the generation of measurement and verification to be performed during the power reduction event." Appx0026. In so finding, the Board explained that Causam's

timing constraint argument was based on "an embodiment in the challenged patent that Patent Owner indicates calculates 'after a power savings event has ended' an actual or average amount of power that would have been used by an active load client during a power cut event, which Dr. Goossen testifies would be 'comparable to the baseline shown in DRM&V [AEIC Document] Figure 1.3.'" Appx0026 (citing Appx0707, Appx0102 (21:44–56), Appx3537-38 (¶ 55)); Appx3686 (Figure 1.3).

Rejecting Causam's proposed construction, the Board construed element [1c] broadly, such that "measurement and verification data corresponding to the reduction in consumed power" "encompasses both actual measurements of savings *and estimates of savings based on device power usage measured before a demand reduction event*." Appx0027 (emphasis added). While evaluating the asserted prior art, Ehlers[2] and Chen[3], the Board focused on the latter portion of this construction, and looked exclusively for estimates and projections based on measurements taken before a demand reduction event begins, i.e. before any reduction in consumed power occurs.

[2] U.S. Patent Application Publication No. 2004/0133314 to Ehlers ("Ehlers") (Appx1168-1217).

[3] U.S. Patent Application Publication No. 2004/0095237 to Chen ("Chen") (Appx2654-2725)

### 5. The Board Evaluated ecobee's Challenges Only Under the Board's Broad Interpretation of Claim 1

Because the Board broadly construed element [1c], it reached its conclusions of invalidity without requiring the asserted prior art to disclose or suggest measurement and verification data to be generated during a demand response period, i.e., without requiring the generated data to *correspond to* the reduction in consumed power. Specifically, the Board rejected "[m]any of Patent Owner's arguments" because they relied on Causam's "improperly narrow construction of 'measurement and verification data corresponding to the reduction in consumed power.'" Appx0038-39 (citing Appx0709-30, Appx0817-34); *see also* Appx0045-46 (disregarding potential events that could occur during a demand response event and render an estimate of reduced power inaccurate).

The Board began its analysis of element [1c] by reiterating its claim construction, noting that it construed "measurement and verification data" as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program," and the claimed "measurement and verification data corresponding to the reduction in consumed power" to encompass "both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event." Appx0036-37. Further, the Board indicated that it construed "data corresponding to the reduction in consumed power" to refer "to the reduction caused by disabling the electric power

flow to 'the at least one associated power consuming device' having antecedent basis in limitation 1b." Appx0036-37.

Turning to Ehler's descriptions and its Figure 1C, the Board noted that Ehlers' method of forecasting a power savings "includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and the known power requirements." Appx0037 (citing Appx1188, ¶ 16; *see also* Appx1190, ¶ 80 (describing the method steps in the context of Fig. 1C)).

Without explaining how Ehlers' additional disclosures relate to Ehlers' process for forecasting a power savings, the Board further found that Ehlers describes "that Power Supply Programs may 'credit consumers who participate with KWH [kilowatt hour] rebates based on their actual (measured & verified) contributions'" and provide "a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate." Appx0038 (citing Appx1190, ¶ 79). The Board did not explain, however, what data it was relying upon to establish Ehlers' "actual (measured & verified) contributions," and made no findings about when such data was generated. *Id*.

Finally, the Board noted that "Ehlers also indicates an advantage of the 'always on' connectivity to utility 1.06 'provide[s] much higher levels of monitoring and management of loads' and, more specifically, 'allows the utility 1.06 to know exactly how much load is available from each participating end use device 1.08 at a customer site 1.04.'" Appx0038 (citing Appx1191, ¶ 96). Per the Board, Ehlers explains that "the utility 1.06 is able to 'manage demand more closely by getting verification of control requests as curtailment commands are initiated' and 'can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions.'" Appx0038 (citing Appx1191, ¶ 96).

After analyzing the disclosure of Ehlers and without identifying any measurement and verification data generated during a demand response period, the Board again rejected Causam's arguments as relying on Causam's "improperly narrow construction of 'measurement and verification data corresponding to the reduction in consumed power.'" Appx0038-39. Causam argued that Ehlers did not satisfy the claimed correspondence because, under Ehlers' disclosed process, "'all information needed to establish the value of a power reduction event [in Ehlers] . . . can be known before the event occurs.'" Appx0818-19. The Board rejected this interpretation of Ehlers. Appx0039. The Board disagreed with Patent Owner's argument that "power usage measures of the power consuming device before the

power is cut off are estimates that are outside the scope of the claim and do not correspond to the reduction in consumed power during the event." Appx0040. In particular, the Board did not agree that "generating measurement and verification data corresponding to the reduction in consumed power," as required by the claim, "precludes doing so based on estimates or projections." Appx0039.

The Board then turned to ecobee's reliance on Ehlers' descriptions of the term "actual (measured & verified) contributions" and "actual energy savings" to disclose "generating measurement and verification data corresponding to the reduction in consumed power" by disabling electric power flow to a power consuming device. Appx0040. But in crediting this disclosure from Ehlers, the Board did not identify any measurement and verification data occurring or generated during a demand response period. *Id*. While Causam argued that Ehlers' method of determining the value of a demand response event, as disclosed in Figure 1C and ¶ 80, do not yield an "actual" power savings, the Board disagreed. Appx0040-41. The Board concluded that "[w]e do not agree that Ehlers' clear disclosures of 'actual energy savings' and rebates based on 'actual contributions' would have been understood by one of ordinary skill as anything other than 'actual.'" Appx0040-41. Again without identifying any "measurement and verification data" in Ehlers to support its finding, the Board concluded that its finding was supported by the '268 patent, which it characterized as disclosing an

embodiment that "tracks power savings based on power data collected before the outage." Appx0041 (citing Appx0095, 7:11-27).

The Board further considered Ehler's use of the term, "measured & verified," in its disclosure of crediting consumers with kilowatt hour rebates "based on their actual (measured & verified) contributions." Appx0041-42. But again, the Board made no finding that any measurement and verification data in Ehlers was generated during a demand response period. *Id.* Citing Causam's and ecobee's experts and the AEIC document, the Board found "one of ordinary skill would have understood both 'measurement and verification' in the challenged patent and Ehlers' use of 'measured & verified' … to refer to the same well-known concept of measurement and verification" and made no further findings about what "data" Ehlers generated to establish these "contributions." Appx0042.

Next, the Board addressed Causam's argument that Ehler's disclosures were insufficient because "Ehlers does not disclose or suggest any 'generating measurement and verification data corresponding to the reduction in consumed power,' as would be needed to refine a baseline that accounts for changes occurring during 'the reduction in consumed power.'" Appx0043. The Board rejected Causam's argument based on the Board's broad claim construction, finding that "the scope of claim 1 includes estimates and projections and does not require an adjustment to the baseline during or after the power reduction event." Appx0043.

The Board also relied on its claim construction to find "adjustments to the baseline are not required as claim 1 encompasses using estimated or projected savings in 'generating measurement and verification data corresponding to the reduction in consumed power.'" Appx0045.

The Board agreed with ecobee "that the challenged patent sets a baseline using historical data prior to the demand response event," and felt that this disclosure "undermines Patent Owner's position that Ehlers use of the term 'actual' does not mean 'actual at all.'" Appx0043-44. The Board also determined that Causam's position was "undermined by Ehlers' descriptions in paragraph 96 of providing utilities with 'much higher levels of monitoring and management of loads'; billing and rebates based on actual contributions; and 'getting verification of control requests as curtailment commands are initiated.'" Appx0044 (citing Appx1191, ¶ 96). The Board concluded that these descriptions "teach and suggest that Ehlers' use of 'actual contributions' refers to power savings resulting from cutting off power to the device 1.08, as required by limitation 1c—'the reduction in consumed power' provided by disabling the electric power flow to the power consuming device (limitation 1c)." Appx0044.

As such, the Board explicitly rejected Causam's claim construction position that limitation [1c] requires "a calculation to occur during or after the reduction in consumed power," and was not persuaded by Causam's observation that Ehlers

"does not measure actual consumption during the event as Patent Owner contends is required." Appx0045.

In pointing out other shortcomings of Ehlers' methodology of projecting a power savings purely in advance, Causam also expressly relied upon the testimony of ecobee's expert, Dr. Auslander, who testified that "you don't know the full amount of the reduction until the event is completed." Appx0828 (quoting Appx4107, 50:3-5). Causam contrasted Dr. Auslander's testimony against Ehlers' process, which projects an energy savings before the demand response event even begins. As Causam explained, "Ehlers' projection of a reduction in power consumption is complete before the first time period—and before any actual reduction in power consumption—commences." Appx0829-30. However, rather than crediting Dr. Auslander's testimony as evidence of Ehlers' shortcomings, the Board interpreted Dr. Auslander's testimony as being directed to a particular "type of verification … not required by all protocols." Appx0045-46 (holding that "verifying that 'somebody didn't come by and turn the switch back on' and 'that there was in fact no power drawn' by the device that was turned off is not required by limitation 1c."). Similarly, the Board rejected Causam's reliance on Dr. Auslander's testimony that "verifying a meter reading during a power reduction event does not verify power savings during the event" "for similar reasons" as

"there are many verification techniques as the AEIC Document indicates." Appx0046 (citing Appx4096, 39:11-21).

The Board concluded that Causam's reliance on Dr. Auslander's testimony was predicated on Causam's "unduly narrow view of limitation 1c." Appx0046. Again, the Board did not agree that "the claims prohibit calculation of the device's power consumption rate before the event or use of projections of power savings, as the challenge patent also discloses." Appx0046. While the Board specifically pointed to no "measurement and verification data" corresponding to Ehlers' "actual (measured & verified) contributions," or any procedures for generating such data in Ehlers, the Board stated its view that Ehlers's "actual (measured & verified) contributions" and "actual energy savings" "further undermine Patent Owner's position that Ehlers' use of baselines does not teach or suggest limitation 1c." Appx0046.

Thus, without evaluating whether Ehlers rendered the challenged claims invalid under Causam's interpretation of element [1c], the Board concluded that Ehlers rendered claim 1 obvious under its broad interpretation, and reached the same outcome for claim 14. Appx0047-48; Appx0049-55.

## IV. SUMMARY OF THE ARGUMENT

As a matter of proper procedure, given ecobee's steadfast position that Causam is not the owner of the '268 patent, the Board should not have considered

ecobee's IPR petition without addressing the ownership dispute. ecobee's unidentified putative owner of the '268 patent was never identified as a real party in interest to the Board, and the Board did not demand that the putative owner be served with ecobee's petition. Under these facts, the Board wrongly disregarded ecobee's ownership dispute and elevated a rule of procedure over the statutory requirements of 35 U.S.C. § 312, thereby violating the statute and the Due Process Clause of the Fifth Amendment. *See* U.S. Const. amend. V. Under 5 U.S.C. § 706, the Board's final written decision should be vacated as not in accordance with the law, with instructions to dismiss the petition.

If this Court reaches the merits of ecobee's challenges, the Board should be reversed. The Board broadly construed "measurement and verification data corresponding to the reduction in consumed power" to encompass "both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event." In so doing, the Board expanded the scope of claim 1 to encompass power reduction forecasts projected before a demand response event has occurred, and therefore before any reduction in consumed power has occurred. This was error because claim 1's requirement to generate "measurement and verification data corresponding to" power reduced during a demand response event, when properly construed, requires the measurement and

verification data to be generated at least during the demand response event in order to correspond to the reduction in power.

The power usage baseline in Ehlers is forecasted based on a measurement taken before an event begins, and Ehlers uses that baseline to compute estimates of power savings. But this does not mean that Ehlers discloses the generation of measurement and verification data corresponding to the demand response event. The Board relied on its overly broad claim construction and did not make any findings that measurement and verification occurred in Ehlers during a demand response event, or that data corresponding to the reduction in consumed power was generated.

# V. ARGUMENT

## A. Standard of Review

This Court reviews decisions by the Board under the standards set forth in the Administrative Procedure Act (APA). 5 U.S.C. § 706; *Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1313 (Fed. Cir. 2016). This Court will set aside the Board's actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). The Board's "[d]eterminations about governing legal standards and about intrinsic evidence are reviewed *de novo*, and any factual findings about extrinsic evidence relevant to the question, such as

evidence about knowledge of those skilled in the art, are reviewed for" substantial evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017); *ACCO Brands Corp. v. Fellowes, Inc.*, 813 F.3d 1361, 1365 (Fed. Cir. 2016).

In addition, under the APA, this Court will "hold unlawful and set aside agency action ... not in accordance with law [or] ... without observance of procedure required by law." 5 U.S.C. § 706.

This Court reviews a Board's construction of a claim term, and any supporting determinations made based on the intrinsic record, *de novo*. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020). Any factual findings the Board made regarding extrinsic evidence are reviewed for substantial evidence. *Id*.

Obviousness is a question of law based on underlying findings of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). This Court reviews "the Board's ultimate determination of obviousness *de novo* and its underlying factual determinations for substantial evidence." *Id*. Underlying factual questions can include the scope and content of the prior art, the differences between the prior art and the claimed invention, whether the prior art reference teaches away, and the presence or absence of a motivation to combine. *Ariosa Diagnostics v. Verinata*

*Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015); *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1345 (Fed. Cir. 2020).

### B. When Ownership is Disputed in an IPR, the Board Must Resolve the Dispute to Ensure Due Process is Afforded to All Putative Owners

As "[t]he Board's jurisdiction is premised on the *res* (i.e., the patent)," *Regents of the University of Minnesota v. LSI Corp.*, 926 F.3d 1327, 1345 (Fed. Cir. 2019), proper identification of the owner of the patent and notice to the owner of the patent is required by notions of procedural due process found in the guarantees of the Due Process Clause of the Fifth Amendment. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48-49 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property") (collecting cases).

The identification and notice provisions in 35 U.S.C. § 312 of the IPR statute establish requirements directed to providing the Constitutionally-mandated notice and opportunity to be heard. Under 35 U.S.C. § 312(a)(2), a petition must identify "all real parties in interest." Under 35 U.S.C. § 312(a)(5), a petition must be served "on the patent owner." Thus, both under the procedural aspects of the Due Process Clause of the Fifth Amendment and the IPR statute, notice to the patent owner is required to allow the patent owner to defend the validity of the challenged patent. *See Mullane v. Cent. Hanover & Bank Trust Co.*, 339 U.S. 306, 314 (1950) ("The

fundamental requisite of due process of law is the opportunity to be heard. This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.") (quotation and citation omitted). And where there is more than one patent owner, due process requires notice to all patent owners. *Cf. Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000) ("judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords *every party against whom a claim is stated*") (emphasis added).

In this case, however, the petitioner has taken the position before the ITC and this Court that Causam does not own the patent. When this dispute in ownership was raised before the Board, the Board improperly instituted without making any findings on the proper owner of the '268 patent. Appx0004-05. To this Court, ecobee openly proclaims "Causam does not own, and has never owned, the '268 patent." *See* Appx4236 ("Causam does not own, and has never owned, the '268 patent"). Prior to filing its Petition against the '268 patent, ecobee also sought a finding by the ITC that Causam does not have standing to assert the '268 patent. *See* Section III.B.1 *supra*. However, ecobee's Petition filed with the Board coyly avoided any such pronouncements. Instead, ecobee's Petition hinted at an "understanding" of an ownership dispute regarding the '268 patent, without

disclosing ecobee's involvement in that dispute. *See* Section III.B.1 *supra*; Appx0260 n.1.

Despite believing that Causam is not the owner of the '268 patent, ecobee served the petition on Causam, the entity identified in the Patent Office's records as the owner of the '268 patent. At no time did ecobee identify or disclose the requisite statutory service to the entity ecobee believed was the true owner of the '268 patent, nor did ecobee identify to the Board who ecobee believes is the owner of the '268 patent. *See* Section III.B.1 *supra*.

Once this ownership dispute was raised to the Board, the Board looked only to its regulations for compliance. As the Board stated in its Decision: "proper service of a Petition under the Board's rules is made through the correspondence address of record for the subject patent." Appx0004 (citing 37 C.F.R. § 42.105(a)). "Petitioner asserts that it followed this procedure, and Patent Owner does not argue otherwise." Appx0004. This administrative check fails to address ownership disputes, however, and fails in this case to reconcile the fact that ecobee purposefully brought Causam into the proceeding without believing that Causam has a right to defend the '268 patent's validity.

Given this dispute in ownership, the Board was required to make findings to address this dispute and therefore provide this Court with the basis for the Board's actions. *See SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ("courts cannot exercise

their duty of review unless they are advised of the considerations underlying the action under review."); *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) ("the PTAB 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* , 463 U.S. 29, 43 (1983) (cleaned up)); *In re Sang-Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002) ("the Board must not only assure that the requisite findings are made, based on evidence of record, but must also explain the reasoning by which the findings are deemed to support the agency's conclusion.").

Without making evidentiary findings and explaining its legal conclusions, the Board could not ensure that all statutory requirements were met. 35 U.S.C. § 312(a)(2) requires a petition to identify "all real parties in interest," and 35 U.S.C. § 312(a)(5) requires a petition to be served "on the patent owner." But after ecobee's petition failed to identify the entity ecobee actually believed owned the '268 patent, and ecobee did not serve its petition on the entity ecobee believed was the true owner of the '268 patent, the Board made no evidentiary findings or legal conclusions concerning whether these statutory requirements were met. These Board's failures demonstrated the flaws in the procedure undertaken in this proceeding.

The Board relied on Causam's claim of sole ownership of the '268 patent, Appx0004-05, but that did not resolve the ownership dispute. Rather, Causam's claim of sole ownership and ecobee's contention in opposition show only that there remained an ownership dispute. Causam's assertion of ownership does not excuse the Board from its failure to resolve this ownership dispute, which is necessary to ensure that due process notice was provided to the owner to *all* requisite parties. *See Transcom, Inc. v. United States*, 182 F.3d 876, 880-81 (Fed. Cir. 1999) (allowing a party to challenge "procedural flaws in the administrative proceeding," including a lack of notice to "unnamed exporters"). The Board embarked on a flawed process when considering the challenge to the '268 patent without resolving the ownership dispute before it, and consistent with *Transcom*, any party may challenge the process used. *Id*.

Thus, the Board erred in considering the petition without first resolving the ownership dispute before it. The Board's primary justification for allowing the proceeding to continue without first resolving the ownership dispute was not on any statute or constitutional principles, but on its rule, specifically 37 C.F.R. § 42.105(a). Appx0004.

And while 37 C.F.R. § 42.105(a) requires service "through the correspondence address of record for the subject patent," it does not state that service in that matter complies with 35 U.S.C. § 312(a)(5). Indeed, 37 C.F.R. §

42.105(a) permits service in other ways. *See* 37 C.F.R. § 42.105(a) ("The petitioner may additionally serve the petition and supporting evidence on the patent owner at any other address known to the petitioner as likely to effect service."). Absent making any finding on ownership, the Board could not ensure that ecobee complied with 35 U.S.C. § 312 or that all parties alleging ownership of the '268 patent were notified of this proceeding.

In ordinary cases, the Board may be correct to presume that service "through the correspondence address of record for the subject patent" would provide sufficient notice to the patent owner. But ecobee presented an extraordinary petition—its petition did not identify the entity ecobee believed to be the patent owner.

At this point, it should be noted that none of the Patent Office rules for conducting IPRs deals with a situation where a petitioner serves a petition only on an entity that it contends is *not* the patent owner. The Patent Office's rules for IPRs do not identify procedures for resolving ownership disputes or for making declarations of ownership. But that does not give the Board *carte blanche* to ignore ownership disputes. This lack of procedures highlights the lack of procedural due process, rather than demonstrating that due process was satisfied.

To comply with due process notice requirements and 35 U.S.C. § 312(a)(5), the Board should have required ecobee to provide notice "reasonably calculated,

*under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" before considering ecobee's petition. *See Mullane*, 339 U.S. at 314 (emphasis added); *see also id*., at 314-315 (calling for "due regard for the practicalities and peculiarities of the case"). It was wrong for the Board to disregard the specific facts of this case, particularly ecobee's lack of openness about the entity it contends owns the '268 patent.

Moreover, citing 37 C.F.R. §§ 42.8(a)(3) and (b)(1), the Board improperly shifted the burden of compliance with 35 U.S.C. § 312(a) onto Causam. *See* Appx0547 ("Causam is responsible for correcting its evidence of sole ownership interest, if it needs correcting, or for modifying its real parties-in-interest identification in this proceeding if necessary"). To be sure, this requirement turns the case on its head because it is ecobee, not Causam, is the entity who contends that there is some other true owner of the '268 patent out in the world. Similarly, the Board's citation to 37 C.F.R. § 42.9 concerning a "partial owner," *see* Appx0547, also lacks any relevance to the ownership dispute because neither Causam nor ecobee contend there is any issue of "partial" ownership. Nevertheless, 35 U.S.C. § 312(a)(2) and (a)(5) and notice requirements under due process place the burden of compliance squarely on the party seeking relief, namely the petitioner. It was wrong for the Board to suggest that Causam bore the burden to provide

notice to the unidentified entity that ecobee contends owns the ’268 patent. *Cf. Worlds Inc.*, 903 F.3d at 1242-43 (holding “the IPR petitioner bears the burden of persuasion” concerning 35 U.S.C. § 315(b)).

The Patent Office rules cited by the Board do not excuse the Board’s failure to resolve the ownership dispute that was before it. And without resolving the ownership dispute, the Board could not determine whether ecobee met its burden to comply with 35 U.S.C. § 312(a)(2) and (a)(5) or the notice requirements of the Due Process Clause of the Fifth Amendment.

Finally, this challenge raises an appealable issue since it implicates a constitutional question. *See* 35 U.S.C. § 314(d); *Thryv, Inc. v. Click-To-Call Techs., LP,* 590 U.S. 45, 53 (2020) (noting that in *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016), the Court “declined to ‘decide the precise effect of §314(d) on,’ for example, ‘appeals that implicate constitutional questions.’”). While the requirements of 35 U.S.C. § 312(a)(2) and (a)(5) are provided in the *inter partes* review statute, these provisions relate to constitutional questions of procedural due process and, thus, remain reviewable despite 35 U.S.C. § 314(d). In other words, the question presented is not “whether the agency should have instituted review at all,” *Thryv*, 590 U.S. at 58, but rather whether concepts of procedural due process permit the agency to conduct a review without constitutional notice to all interested

parties, particularly where the party initiating the action asserts that not all interested parties are present.

For the foregoing reasons, the Board's failure to resolve the ownership dispute before it was error. Not only did it provide no findings on proper ownership for this Court to review, but the Board's inaction resulted in a failure to ensure that the handling of ecobee's Petition complied with statutory and procedural due process requirements.

### C. The Board Incorrectly Interpreted Claim 1 by Failing to Recognize the Claimed "Measurement and Verification" Must Occur During a Demand Response Event to Generate Data Corresponding to the Reduction in Consumed Power for That Event

The Board erred in broadly interpreting claim 1, and more specifically element [1c], such that claim 1 "encompasses using estimated or projected savings in 'generating measurement and verification data corresponding to the reduction in consumed power.'" *See* Section III.B.4 *supra*. As discussed in Section V.D below, the Board relied upon this broad interpretation while evaluating whether Ehlers discloses or suggests generating measurement and verification data prior to any reduction of consumed power, i.e. before a demand response event. This was error because any data generated prior to a demand response event does not *correspond to* a reduction in consumed power during that demand response event under the proper interpretation of element [1c].

Properly construed, independent claim 1[4] requires the system to take measurements during a demand response event in order to generate measurement and verification data corresponding to a reduction in consumed power for that demand response event. Element [1b] of claim 1 requires a client device to issue a power management command to a controllable device, which causes the controllable device to disable the electric power flow to a power consuming device "to provide a reduction in consumed power." Element [1c] then requires "generating measurement and verification data corresponding to the reduction in consumed power."

The antecedence found in element [1b] for "the reduction in consumed power" in element [1c] mandates that any "measurement and verification data" cannot exist before the demand response period, i.e. prior to issuance of the power management command. The Board indicated that it construed "data corresponding to the reduction in consumed power" to refer "to the reduction caused by disabling the electric power flow to 'the at least one associated power consuming device' having antecedent basis in limitation 1b." Appx0036-37. Yet, the Board's interpretation of element [1c] effectively removes the antecedence to "a" reduction in consumed power, thereby permitting the generated measurement and verification

[4] Independent claim 14 contains similar recitations as claim 1. Causam's arguments in this Blue Brief focus on claim 1 but apply equally to claim 14, just as the Board similarly focused on claim 1.

data to lack any correspondence to the "reduction in consumed power." This yields a claim interpretation that eliminates the "corresponding to the reduction in consumed power" from element [1c]. As this Court has explained, "interpretations that render some portion of the claim language superfluous are disfavored." *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004); *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." (citations omitted)); *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 429 (Fed. Cir. 2016).

By the express language of element [1c], the generation of measurement and verification data must "correspond to" the reduction in consumed power. This requirement for a correspondence between the reduction in consumed power and the generation of measurement and verification data cannot be ignored. *See Merck & Co.*, 395 F.3d at 1372; *SimpleAir, Inc.*, 820 F.3d at 419.

As a matter of logic, element [1c] requires measurement and verification *during* a demand response period to give meaning to the antecedence for "the reduction in consumed power," and to satisfy the requirement for correspondence of the generated measurement and verification data to the reduction in consumed power.

The intrinsic and extrinsic evidence are in accord. As noted above, the claimed system may generate and report time-stamped runtime data during the demand response period indicating when a power-consuming device was turned on or off. Appx0102 (21:42-22:15). Further, that the system may perform calculations after the demand response event to determine the value of the demand response event does not negate that measurement and verification must occur during the demand response event to generate measurement and verification data corresponding to the reduction in consumed power.

Both Causam's and ecobee's experts gave testimony that was in accord with Causam's interpretation that a measurement occurs during the demand response event. Causam's Dr. Goossen opined that measurement and verification data described and claimed in the '268 patent would be generated during the power reduction event. Appx3542-46 at ¶¶ 65-70; *see also* Appx0721-22; *see also* Appx3535 at ¶ 51 ("[m]easurement and verification data" as used in the claims of the '268 patent is "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program."); Appx3551 at ¶ 79 (discussing changes occurring during "the reduction in consumed power").

ecobee's Dr. Auslander also noted that measurement occurred during an event, but sought to delay calculation of the total reduction in consumed power until after the event. At deposition, while discussing "measurement and verification data

in the context of the '268 patent," Dr. Auslander testified that this included "data taken before, *during*, and after a demand response event." Appx3603 at 17:3-7 (emphasis added). Dr. Auslander also noted that this method "involves having some knowledge or information of what was – what was going on prior to the event, and *then what goes on during the event* … . [Y]ou then attempt to figure out how much energy would have been used had the event not occurred." Appx3604-05 at 18:21-19:9 (emphasis added). Dr. Auslander was even specific about when "the measurement and verification data [would] need to be generated" in order to practice the "generating" step of claim 1. His response was that "at minimum, it would have to be generated at the end of the event." Appx4067 at 10:1-8. He noted that "you would have partial data *during the event*. But the full data would not be available until the end of the event, [and] could be available later." *Id*., 10:12-14 (emphasis added). He then explained that "if you look at verification as measuring how much power was actually used, one part of verification, *as measuring what power was actually used during the event*, that's not known until the event ends." *Id*., 10:18-22 (emphasis added).

The proper construction of element [1c] requires measurement and verification *during* a demand response period to give meaning to the antecedence for "the reduction in consumed power," and to satisfy the requirement for

correspondence of the generation of measurement and verification data to the reduction in consumed power

### D. The Board Failed to Evaluate Petitioner's Challenges Under the Proper Interpretation of Element [1c]

The Board evaluated Petitioner's challenges only under its incorrect interpretation of element [1c], which encompasses both projections and estimations before a demand response event as satisfying the claimed requirements. The Board specifically relied upon Ehlers' Figure 1C and corresponding description to explain how Ehlers determines the effect of a demand response event. *See* Section III.B.5 *supra*. As found by the Board, Ehlers' method "includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements." Appx0037-38 (emphasis in original) (citing Appx1188 at ¶ 16 and Appx1190 at ¶ 80 (describing the method steps in the context of Fig. 1C)); *see also* Section III.B.5 *supra*.

However, in Ehlers' Figure 1C, the only measurement occurs before a demand response event, not during a demand response event. Notably, the Board never evaluated how the Petition's challenges render claim 1 obvious under the proper interpretation of element [1c], namely an interpretation that requires measurement and verification data to be generated *during* the demand response

event. Instead, the Board rejected "[m]any of Patent Owner's arguments" because they relied "on its improperly narrow construction of 'measurement and verification data corresponding to the reduction in consumed power.'" Appx0038-39.

Without identifying the requisite "measurement and verification data" associated with these disclosures, the Board additionally relied on Ehlers' description "that Power Supply Programs may 'credit consumers who participate with KWH [kilowatt hour] rebates based on their *actual (measured & verified) contributions*'" and provide "a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate." Appx0038 (emphasis in original) (citing Appx1190 at ¶ 79), *see also* Section III.B.5 *supra*. But these additional disclosures did not alter the Board's view that the measurement in Ehlers' forecasting method of Figure 1C occurs before the demand response event. Rather, the Board's findings regarding Ehlers' KWH rebates and actual contribution disclosures are relevant to what Ehlers' measurement achieve rather than when the measurements are performed. Indeed, the Board relied on Ehler's description of "measured & verified" in its passage discussing crediting consumers with kilowatt hour rebates "based on their actual (measured & verified) contributions," but does not describe when the "measurement and verification" in Ehlers occurs. Similarly, the Board's discussion of Ehlers' "always on" connectivity does not address when measurement occurred relative to a demand response period. Section III.B.5 *supra*.

The Board's error is most evident in how it addresses Causam's arguments concerning a "baseline." In the Board's view, claim 1 does not require a refinement of a "baseline" based on measurements taken during a demand response event. The Board found instead that "the scope of claim 1 includes estimates and projections and does not require an adjustment to the baseline during or after the power reduction event." Appx0043. The Board also concluded that claim 1 "encompasses using estimated or projected savings in 'generating measurement and verification data corresponding to the reduction in consumed power.'" Appx0045.

This focus on estimates and projected savings does not show measurement occurring during a demand response event, or the generation of measurement and verification data corresponding to a reduction in power consumed. Ehlers' failure to disclose any refinement of a baseline reinforces that Ehlers does not generate measurement and verification data corresponding to the reduced power consumption during the demand response period. The Board's suggestion that the '268 patent also "sets a baseline using historical data prior to the demand response event," Appx0043-44, does not undermine Causam's position or convert Ehlers' use of the term "actual" into the requisite demand response period measurements required by element [1c]. As noted above, Ehler's Figure 1C, as described in Ehlers' ¶ 80, Appx1190, forecasts the value of a demand response period prior to the start of any power savings, but does not take measurements during a demand

response period or otherwise generate measurement and verification data corresponding to a reduction in power consumed.

Similarly, the Board's reliance on broad pronouncements in Ehlers "of providing utilities with 'much higher levels of monitoring and management of loads'; billing and rebates based on actual contributions; and 'getting verification of control requests as curtailment commands are initiated'" (*see* Appx0044) do not disclose the generation of measurement and verification data corresponding to a reduction in power consumed during demand response periods. Rather, these disclosures in Ehlers simply reflect that fact that Ehlers uses an unrefined baseline estimate, produced using forecasted energy savings prior to a demand response period, to report its "actual contributions."

ecobee's own expert testified regarding the desirability of measurement and verification occurring during a demand response period. Appx4107, 50:3-5 (testifying that "you don't know the full amount of the reduction until the event is completed"). The Board did not credit this testimony, however. Appx0045-46. The Board also rejected Causam's positions that element [1c] requires "a calculation to occur during or after the reduction in consumed power" and that Ehlers "does not measure actual consumption during the event." Appx0045-46. Instead, the Board interpretated element [1c] such that Ehler's projections, produced by measurements before a demand response period or power savings begins, to

satisfy the claimed requirement to generate measurement and verification data *corresponding to* reduced power consumption during a demand response period. This interpretation and application of Ehlers to element [1c] are in error.

Accordingly, the Board's invalidation of claims 1-11 and 13-19 based on 35 U.S.C. § 103 in view of Ehlers and in view of Ehlers and Chen should be vacated and reversed.

## VI. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Causam respectfully asks that the Court reverse, or alternatively vacate and remand, the Board's final written decision.

Dated: November 26, 2024

Respectfully submitted,

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(571) 208-0186
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 46
Date: March 19, 2024

PUBLIC VERSION

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ECOBEE TECHNOLOGIES ULC,
Petitioner,

v.

CAUSAM ENTERPRISES, INC.,
Patent Owner.

---

IPR2022-01339
Patent 10,394,268 B2

---

Before BRIAN J. McNAMARA, BARBARA A. BENOIT, and JOHN A. HUDALLA, *Administrative Patent Judges*.

BENOIT, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

In this *inter partes* review instituted pursuant to 35 U.S.C. § 314, ecobee Technologies ULC ("Petitioner") challenges the patentability of claims 1–11 and 13–19 ("the challenged claims") of U.S. Patent No. 10,394,268 B2 (Ex. 1001, "the '268 patent"), owned by Causam Enterprises, Inc. ("Patent Owner" or "Causam").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. We base our decision on the preponderance of the evidence standard. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

Having reviewed the arguments of the parties and the supporting evidence, we conclude that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

## *A. Procedural History*

Petitioner filed a Petition requesting *inter partes* review of the challenged claims (Paper 2, "Pet." or "Petition"), to which Patent Owner filed a Preliminary Response (Papers 8, 9 (public version), "Preliminary Response"). With the Board's authorization, Petitioner filed a Reply to the Preliminary Response (Paper 12), and Patent Owner filed a Sur-reply to the Reply (Papers 13, 15 (public version)). On March 9, 2023, we instituted an *inter partes* review of the challenged claims on all grounds asserted by Petitioner (Papers 17, 20 (public version), "Dec." or "Institution Decision").

Subsequent to the Institution Decision, Patent Owner filed a Response (Papers 27, 28 (public version), "PO Resp."), to which Petitioner filed a Reply (Paper 31, "Pet. Reply"). In response, Patent Owner filed a Sur-reply (Paper 37, "PO Sur-reply"). A hearing was held on December 7, 2023. *See* Paper 41.

### *B. Related Matters*

The parties identify the following judicial matters that may affect or be affected by a decision in this proceeding: *Smart Thermostats, Load Control Switches and Components Thereof*, ITC Investigation No. 337-TA-1277; *Causam Enterprises, Inc. v. ecobee, Inc.*, Case No. 6-21-cv-00748 (W.D. Tex.); *Causam Enterprises, Inc. v. Resideo Technologies, Inc.*, Case No. 6-21-cv-00749 (W.D. Tex.); *Causam Enterprises, Inc. v. Itron, Inc.*, Case No. 6-21-cv-00750 (W.D. Tex.); *Causam Enterprises, Inc. v. Alarm.com Incorporated*, Case No. 6-21-cv-00751 (W.D. Tex.); and *Causam Enterprises, Inc. v. Xylem, Inc.*, Case No. 6-21-cv-00752 (W.D. Tex.). Pet. 64–65; Paper 4, 3.

### *C. Real Parties-in-Interest*

Patent Owner "states that it is the sole Patent Owner and Real Party-In-Interest." Paper 4, 3. Petitioner states that "[t]he real-parties-in-interest for this petition are ecobee Technologies ULC, ecobee Ltd., and Generac Holdings Inc." Pet. 64.

In its Preliminary Response to the Petition, Patent Owner argued that the Petition was time-barred because Alarm.com is a privy of Petitioner and a real party-in-interest to the Petition. Prelim. Resp. 6–21 (citing Exs. 2002, 2005, 2006, 2007). We addressed and subsequently rejected Patent Owner's arguments in the Institution Decision. Dec. 5–14. In its Patent Owner Response to the Petition, Patent Owner again argues that the Petition is time-barred for the same reasons and that the "Petition should have been denied." PO Resp. 50–54. Patent Owner has neither presented any new evidence into the record, beyond the evidence we considered previously in rendering our Institution Decision, nor cited any additional legal authority to support its

position. Based on the complete record now before us, we see no reason to change our previous determination. We are not persuaded that Alarm.com is a privy of Petitioner or should have been identified real party-in-interest in this proceeding. Accordingly, for the reasons stated in our Institution Decision, the Petition is not time-barred.

*D. Patent Owner's Ownership Argument*

Patent Owner additionally contends that the Petition cannot be considered because Petitioner did not provide copies of required documents "to the patent owner," as required by 35 U.S.C. § 312(a)(5). PO Resp. 54. Patent Owner essentially repeats its contentions presented in its Preliminary Response that, in disputing Causam's ownership interest in the challenged patent in another forum, Petitioner is taking an improper inconsistent position here and "denies that the proper parties are before the Board." *Id.* at 56. We considered and addressed Patent Owner's substantially similar arguments in our Institution Decision. Dec. 3–4.

We determine that consideration of the Petition is proper under 35 U.S.C. § 312(a)(5), which requires document copies to be provided "to the patent owner or, if applicable, the designated representative of the patent owner." As we noted in our Institution Decision, proper service of a Petition under the Board's rules is made through the correspondence address of record for the subject patent. 37 C.F.R. § 42.105(a). Petitioner asserts that it followed this procedure, and Patent Owner does not argue otherwise. Pet. Reply 26 (citing Pet. 68); PO Resp. 54–56; *see generally* PO Sur-reply.

Also as noted in our Institution Decision, Patent Owner unequivocally identifies itself, Causam, as owner of the challenged patent. Paper 4, 3

("Causam Enterprises, Inc. states that it is the sole Patent Owner and Real Party-In-Interest.").

Accordingly, as we stated in our Institution Decision, Petitioner's challenge in another forum as to whether Causam holds proper title to the '268 patent "does not negate that Causam has asserted full ownership here and that Petitioner followed the service requirements." Dec. 4.

*E. The '268 Patent*

The '268 patent, titled "Method and Apparatus for Actively Managing Consumption of Electric Power over an Electric Power Grid," relates to selectively enabling and disabling power consuming devices based on power control messages received at a client device from a load management server. Ex. 1001, codes (54), (57).

*1. The Written Description*

The '268 patent describes an embodiment that "controls power distribution for a variety of electric utility companies or any other electric power grid operator(s) by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating customers." *Id.* at 6:66–7:4. Customers permit the disabling of certain power-consuming devices during peak loading times so that, "[w]hen the serving utility needs more power than it is currently able to supply, the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis." *Id.* at 7:4–6, 7:20–23.

Figure 1 of the '268 patent, reproduced below, illustrates "an exemplary IP-based active power load management system." *Id.* at 7:66–67; 3:49–50.




*FIG. 1*

Figure 1 shows system 10 as including an active load client (ALC) 300, which is accessible through a specified address, such as an IP address. *Id.* at 8:29–30. In an embodiment, client 300 communicates with residential load center 400 containing smart breaker modules that "are able to switch from an 'ON' (active) state to an 'OFF' (inactive) [state], and vice versa." *Id.* at 8:35–40. "Typically, each smart breaker controls a single appliance (e.g., a washer/dryer 30, a hot water heater 40, an HVAC unit 50, or a pool pump 70)." *Id.* at 8:47–49. In addition, client 300 may control an individual smart appliance 60 directly, for example, "without communicating with the residential load center [4]00." *Id.* at 8:50–52.

System 10 also includes active load director server 100 that "may serve as the primary interface to customers, as well as to service personnel."

*Id.* at 9:7–9. Server 100 can receive commands from utility control center (UCC) 200, for example, a "Cut" command that "instructs the ALD server 100 to reduce a specified amount of power for a specified amount of time," and a "How Much" command that "requests information for the amount of power (e.g., in megawatts) that can be reduced by the requesting utility control center 100." *Id.* at 9:53–66.

Figure 2 of the '268 patent, reproduced below, illustrates "an exemplary active load director (ALD) server." *Id.* at 3:52–53.




FIG. 2

Figure 2 depicts server 100 having master event manager 106 that "receives instructions in the form of transaction requests from the UCC command processor 104 and routes instructions to components necessary to complete the requested transaction, such as the ALC manager 108." Ex. 1001, 10:17–22. In turn, ALC manager 108 "routes instructions between the ALD server 100 and each active load client 300 within the system 10 through an ALC interface 112." *Id.* at 10:23–25. For example, "upon receiving instructions (e.g., a 'Cut' instruction) from the master event

manager 106 to reduce power consumption for a specified utility, the ALC manager 108 determines which active load clients 300 and/or individually controlled devices to switch to the 'OFF' state based upon present power consumption data stored in the ALD database 124." *Id.* at 11:28–34. Then, ALC manager 108 "sends a message to each selected active load client 300 containing instructions to turn off all or some of the devices under the active load client's control." *Id.* at 11:34–37.

Figure 3 of the '268 patent, reproduced below, illustrates "an exemplary active load client and smart breaker module." *Id.* at 3:55–56.




FIG. 3

As shown in Figure 3, active load client 300 includes device control manager 314, which "processes power management commands for various controllable devices logically connected to the active load client 300," including "smart breakers 402–412 or other IP based devices 420, such as smart appliances with individual control modules." *Id.* at 14:45–50. In

operation, "ALD database 124 contains information on the present power consumption (and/or the average power consumption) for each controllable device 402–412, 420 connected to each active load client 300." *Id.* at 20:33–37. ALC manager 108 uses this stored information for determining which devices to turn off upon receiving, for example, a "Cut" message, and sends a "'Turn Off' or equivalent transaction message or command to each active load client 300, along with a list of the devices to be turned off and a 'change state to off' indication for each device 402–412, 420 in the list." *Id.* at 20:37–45. ALC manager then logs "the amount of power (either actual or average), as determined from the ALD database 124, saved for each active load client 300." *Id.* at 20:45–49.

*2. Illustrative Claim*

Petitioner challenges claims 1–11 and 13–19 of the '268 patent. Pet. 6. Independent claim 1 is reproduced below (with bracketed information added).

> 1. A method for managing an electric power flow within an electric power grid, comprising:
>
> [1a] a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;
>
> [1b] the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and
>
> [1c] generating measurement and verification data corresponding to the reduction in consumed power.

Ex. 1001, 22:56–23:5.

### *F. Grounds of Institution and Testimonial Evidence*

#### *1. Ground of Institution*

We instituted trial on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference/Basis |
|---|---|---|
| 1–11, 13–19 | 103(a) | Ehlers[1] |
| 1–11, 13–19 | 103(a) | Ehlers, Chen[2] |

Dec. 33–34.

#### *2. Testimonial Evidence*

In support of its challenges, Petitioner cites the direct testimony of its expert, David M. Auslander, Sc.D. Ex. 1002, Declaration of David M. Auslander; Ex. 1014, Reply Declaration of David M. Auslander. Petitioner also cites the cross-examination testimony of Patent Owner's expert, Keith Goossen, Ph.D. Ex. 1014, Deposition Transcript of Keith Goossen, Ph.D.

In opposition to Petitioner's challenges, Patent Owner cites the direct testimony of its expert, Dr. Goossen. Ex. 2009, Declaration of Keith W. Goossen, Ph.D. in Support of Patent Owner's Response. Patent Owner also cites the cross-examination testimony of Petitioner's expert, Dr. Auslander. Ex. 2014, Deposition Transcript of Dr. Auslander.

## II. ANALYSIS

### *A. Legal Standards Concerning Demonstrating Unpatentability*

To prevail in challenging the patent claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e) (2012); 37 C.F.R. § 42.1(d) (2017). "In an [*inter partes* review], the petitioner has the burden from the onset to show

---

[1] US 2004/0117330 A1, published June 17, 2004 (Ex. 1004, "Ehlers").
[2] US 2004/0095237 A1, published May 20, 2004 (Ex. 1012, "Chen").

with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *see also* 37 C.F.R. § 42.104(b) (requiring a petition for *inter partes* review to identify how the challenged claim is to be construed and where each element of the claim is found in the prior art patents or printed publications relied on). This burden never shifts to Patent Owner except in limited circumstances not present here. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

Petitioner asserts that certain claims of the challenged patent are unpatentable under 35 U.S.C. § 103(a) as obvious over a reference alone and in combination with another reference. A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of

nonobviousness.[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Consideration of the Graham factors "helps inform the ultimate obviousness determination." *Apple v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

### *B. Level of Ordinary Skill in the Art*

Petitioner contends that a person of ordinary skill in the art "would have had a bachelor's degree in engineering, computer science, or a comparable field of study, and at least three years of experience in energy management systems," but that "[a]dditional relevant industry experience may compensate for lack of formal education or vice versa." Pet. 12 (citing Ex. 1002 ¶¶ 16–18). In the Institution Decision, we adopted Petitioner's proposed level of ordinary skill, which appeared reasonable given the specification of the '268 patent and asserted prior art of record. Dec. 21–22.

Following institution, neither Petitioner nor Patent Owner objected to this determination. Additionally, Patent Owner's expert agreed with Petitioner's proposal (Ex. 2009 ¶ 28). The proposed level of ordinary skill is consistent with the problems and solutions in the prior art of record. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). Accordingly, we maintain this determination of the level of ordinary skill in the art for purposes of this Decision.

### *C. Claim Construction*

In *inter partes* review proceedings we construe claims using the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), as articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303

[3] Patent Owner has not offered objective evidence of non-obviousness. *See generally* PO Resp.; PO Sur-reply.

(Fed. Cir. 2005) (en banc), and its progeny. *See* 37 C.F.R. § 42.100(b). Only claim terms that are in controversy need to be construed and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

We determined that no claim limitations needed to be expressly construed to determine whether to institute an *inter partes* review. Dec. 23. Notwithstanding, based on the record after Institution, we now determine that it is necessary to construe "measurement and verification data" and "measurement and verification data corresponding to the reduction in consumed power" in this Decision.

*1. "measurement and verification data"*

Independent claims 1 and 14 each recite "generating measurement and verification data corresponding to the reduction in consumed power." Ex. 1001, 23:4–5, 14:27–29. In its Response to the Petition, Patent Owner acknowledges that "measurement and verification data" is not defined in the '268 patent but contends, relying on Dr. Goossen's testimony, that "measurement and verification" was "well-understood by a [person of ordinary skill in the art] and in the industry of demand response." PO Resp. 9 (citing Ex. 2009 ¶ 43). Patent Owner also notes that Petitioner's expert, Dr. Auslander, testifies that "his understanding of 'measurement and verification' comes from his 'general knowledge.'" PO Resp. 9 (citing Ex. 2010, 20:10–19). To support his testimony as to how one of ordinary skill would have understood the term "measurement and verification,"

Dr. Goossen relies on a publication by the AEIC[4] Load Research Committee titled "Demand Response Measurement & Verification" (Ex. 2011 ("AEIC Document")[5, 6]) and a Federal Energy Regulatory Commission (FERC) order (Ex. 2013).[7] PO Resp. 9–17.

Relying on Dr. Goossen's testimony, Patent Owner contends that "measurement and verification data" as used in the challenged claims would have been understood by one of ordinary skill at the time of the invention as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." PO Resp. 14 (citing Ex. 2009 ¶ 51; Ex. 2010, 45:16–18); *see* Ex. 2011, 10[8] (AEIC indicating "[m]easurement and verification (M&V) refers to the application of

[4] The Association of Edison Illuminating Companies (AEIC) is an organization of electric utilities, founded in 1885 by Thomas Edison, that provides an opportunity for "major electric utilities . . . to share knowledge, collaborate, and provide guidance to the industry." *See* Our Story on the AEIC Website (accessed January 9, 2024), https://aeic.org/about/. "AEIC's Load Research & Analytics Committee helps utilities carry out research to understand and leverage how their customers use energy." *See* Load Research and Analytics Committee page on AEIC Website (accessed January 9, 2024), https://aeic.org/focus-areas/load-research-and-analytics/.

[5] Petitioner refers to the document as "AEIC," whereas Patent Owner refers to the document as "DRM&V." We use the abbreviation of the authoring organization to avoid confusion with the abbreviation M&V used by the parties and references for measurement and verification.

[6] Dr. Goossen acknowledges that the AEIC Document was published after the earliest priority date claimed by the challenged patent but testifies that the "discussion of measurement and verification concepts are consistent with the understanding of" one of ordinary skill in 2007. Ex. 2009 ¶ 43.

[7] Patent Owner cites the FERC Order as "supporting evidence that the 'measurement and verification' term continued to be used as Dr. Goossen" testified. PO Resp. 16; *see* Ex. 2009 ¶ 52.

[8] We cite to the original page numbers of the AEIC Document.

appropriate statistical and load research techniques *to measure and verify the load reduction impact resulting from the utilization of a Demand Response program*" (emphasis added)). In its Reply, Petitioner accepts Patent Owner's proposed construction for this proceeding. Pet. Reply 6 (noting that Patent Owner's construction does not require any baseline adjustment and requires only the use of data to monitor and verify a load reduction in a demand response program).

We begin our analysis with the intrinsic evidence, which includes the claims, written description, and prosecution history. The plain language of claim 1 recites "generating measurement and verification data that corresponds to the reduction in consumed power" that is provided when the electric power flow to the power consuming device (or devices) is disabled. Ex. 1001, 23:1–5, 24:25–29 (claim 14 reciting "based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power"); PO Sur-reply 4–5. The claims, however, do not otherwise recite how "measurement and verification data" is generated. Nor do the dependent claims provide much clarity on the meaning of "measurement and verification data." *See, e.g.,* Ex. 1001, 23:9–14 (claim 3 reciting "a report message . . . including an indication of an amount of power consumed by the . . . power consuming device corresponding measurement and verification data"), 23:25–27 (claim 6 reciting that "the measurement and verification data is associated with individual power consuming devices"), 23:28–30 (claim 7 reciting "aggregating the measurement and verification data for a multiplicity of power consuming devices"), 23:35–39 (claim 9 reciting "a status message . . . indicating a total amount of power consumed by the . . .

power consuming device and the corresponding measurement and verification data”). As Patent Owner notes, dependent claim 9 draws a distinction between “measurement and verification data” and the “total amount of power consumed by the . . . power consuming device.” PO Resp. 15; *see also* PO Resp. 8 (presenting similar argument).

Although the written description does not use the term “measurement and verification data,” the written description references “measurement and verification of the reduction in consumed power.” Ex. 1001, 7:32–34. The written description further indicates that “measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s).” *Id.* at 7:34–37; *see id.* at 7:50 (identifying FERC and NERC as examples of governing bodies of the electric power grid); *see* PO Resp. 43–51; PO Resp. 15 (citing Ex. 1001, 7:32–37), 43 (citing Ex. 1001, 7:43–51); Pet. Reply 2 (indicating the challenged patent “makes clear that such requirements [for the measurement and verification process] are not addressed in the specification and are instead left to the responsible party” (citing Ex. 1001, 7:28–43)). That the written description refers to measurement and verification processes (rather than measurement and verification data) is of little moment. As Dr. Auslander explains, “data is what results from the process.” Ex. 2014, 42:5–8; *see* PO Sur-reply 11 (quoting Ex. 2014, 42:5–8).

As such, neither the claim language nor the written description provides sufficient clarity as to the meaning understood by one of ordinary skill at the time of the invention of “measurement and verification data” recited in the claims. Nor does the prosecution history of the challenged patent (Ex. 1005). As Petitioner summarizes, the application claims were

rejected for obviousness-type double patenting, a terminal disclaimer was filed, and a notice of allowance issued (Ex. 1005, 13–19). Pet. 5–6; Ex. 1005, 127–135 (rejection), 116–122 (terminal disclaimer), 13–19 (notice of allowance).

Accordingly, we next consider Patent Owner's extrinsic evidence concerning how one of ordinary skill at the time of the invention would have understood the term "measurement and verification data" as used in the claims and in the context of the specification. *See, e.g.,* PO Resp. 9–17.

Relying on Dr. Goossen's testimony, Patent Owner contends that "measurement and verification data" as used in the challenged claims would have been understood by one of ordinary skill at the time of the invention as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." PO Resp. 14 (citing Ex. 2009 ¶ 51; Ex. 2010, 45:16–18). This understanding of "measurement and verification" relies on a definition of measurement and verification from "Demand Response Measurement & Verification" by the AEIC Load Research Committee (Ex. 2011, "AEIC Document"). *See* Ex. 2011, 10 (AEIC indicating "[m]easurement and verification (M&V) refers to the application of appropriate statistical and load research techniques *to measure and verify the load reduction impact resulting from the utilization of a Demand Response program*" (emphasis added)).

As noted by the publication's title, the term "measurement and verification" is used in context of demand response, which the AEIC Document defines as follows:

> Changes in electric usage by end-use customers from their normal consumption patterns in response to changes in the price of electricity over time, or to incentive payments designed to

> induce lower electricity use at time of high wholesale market prices or when system reliability is jeopardized.

Ex. 2011, 6 (adopting the definition used by the U.S. Department of Energy (DOE)); *see* PO Resp. 10 n.3 (quoting DOE definition of Demand Response).

Patent Owner further relies on Figure 1.3 of Section 1.4 of the AEIC Document that is labeled "Measurement and Verification Quantifies Load Reduction Value" and is reproduced below.

**Figure 1.3 – M&V Quantifies Load Reduction Value**




Ex. 2011, 10; *see* PO Resp. 11 (reproducing Fig. 1.3).

Figure 1.3 shows a dark gray rectangle representing the actual load or "metered value" that was actually used during the 1-hour event example illustrated in the figure. Ex. 2011, 9–10. The figure also shows the baseline of what the customer would have used had the program not been enacted. *Id.* The difference between the baseline and the actual load is shown as a light gray rectangle representing the reduced load during the 1-hour event. *Id.* As noted in the figure, measurement and verification quantifies, with statistical confidence, the unknown value of the reduced load. *Id.* at 10.

The AEIC Document reiterates these concepts in describing measuring load reduction by "collecting or calculating the following two key components [baseline and actual use]:"

> Baseline (CBL)—The amount of energy the customer *would have consumed* absent a signal to reduce [demand]. . . .
>
> Actual Use—The amount of energy the customer *actually consumed* during the DR event period.
>
> Load Reduction—The mathematical difference between the Baseline and the Actual Use.
>
> Baseline – Actual Use = Load Reduction

Ex. 2011, 12; PO Resp. 11 (quoting Ex. 2011, 12).

Patent Owner indicates that AEIC Document confirms Dr. Goossen's testimony that one of ordinary skill at the time of the invention would have understood "measurement and verification data" as used in the challenged claims as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." PO Resp. 14 (citing Ex. 2009 ¶ 51; Ex. 2010, 45:16–18). Specifically, Dr. Goossen testifies that his proposed construction of "measurement and verification data" is supported by the Federal Energy Regulatory Commission (FERC) Final Rule regarding demand response compensation in organized wholesale energy markets (Ex. 2013). Ex. 2009 ¶ 52 (testimony concerning Ex. 2013 ¶¶ 86–93 "directed to measurement and verification for demand response events"); *see* PO Resp. 14 (discussing Dr. Goossen's testimony concerning same). The FERC Final Rule indicates that each wholesale energy market that has a demand response program "has procedures for the measurement and verification of the demand response," which "include techniques to establish a customer baseline for each demand response participant."

Ex. 2013 ¶ 87; PO Resp. 14 (discussing Ex. 2013 ¶ 87). "This customer baseline then becomes the basis for measuring the quantity of demand response delivered to the wholesale market." Ex. 2013 ¶ 87. "Customer baselines are often based on historic load information . . . ." *Id.*

The parties' agreed-upon construction—data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program—is substantially based on a definition of measurement and verification from the AEIC Document, and Dr. Goossen testifies that the definition reflects the understanding of one of ordinary skill at the time of the invention. *See* Ex. 2011, 10 (AEIC indicating "[m]easurement and verification (M&V) refers to the application of appropriate statistical and load research techniques *to measure and verify the load reduction impact resulting from the utilization of a Demand Response program*" (emphasis added)); Ex. 2009 ¶ 43. The parties' agreed-upon construction also is consistent with the FERC Final Rule discussion of measurement and verification for demand response events, which Dr. Goossen confirms. Ex. 2009 ¶ 43. Like Patent Owner and Dr. Goossen, we recognize that the two extrinsic references are dated after the earliest filing date identified by the challenged patent. Notwithstanding, we credit Dr. Goossen's testimony that these documents are consistent with how one of ordinary skill would have understood the term "measurement and verification data" at the time of the invention. We also find these references to be consistent with the challenged patent's discussion of measurement and verification methods "determined by the appropriate governing body or authority for the electric power grid(s)." Ex. 1001, 7:32–37.

For these reasons, we determine the parties' agreed-upon construction does not elucidate the meaning of this term, but the extrinsic record is consistent with the parties' agreed-upon construction. Accordingly, we adopt the proposal that "measurement and verification data" as used in the challenged claims would have been understood by one of ordinary skill as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program."

### *2. "measurement and verification data corresponding to the reduction in consumed power"*

Accepting the parties' agreement to adopt this claim construction for "measurement and verification data," however, does not settle the parties' dispute as to the scope of the claim term "measurement and verification data corresponding to the reduction in consumed power," recited in claims 1 and 14. Neither party proposes an express construction of this term. Patent Owner contests the scope of the claim in arguing whether the subject matter of the claims would have been obvious over Ehlers. PO Resp. 21–31. In its Reply, Petitioner disagrees with Patent Owner's proposed scope of the claims. Pet. Reply 6–15.

More specifically, Patent Owner argues that "generating measurement and verification data corresponding to the reduction in consumed power," as recited in claim 1, precludes the use of estimates or projected power savings, including estimates of projected savings based on actual power consumption of the power consuming device before power is disabled during a demand response event. *See, e.g.,* PO Resp. 23–31; PO Resp. 15, 18 (arguing written description precludes using estimates or projections); PO Sur-reply 1–2 (indicating that prior art disclosure of "establishment of a baseline prior to a power measurement reduction event, or before power is reduced, does not

'correspond to a reduction in consumed power'"). Petitioner contends that estimates and projections may be used in generating the required measurement and verification data. Pet. Reply 6–15. We agree with Petitioner for the following reasons.

Patent Owner argues that the written description "contemplates 'monitor[ing] and calculat[ing] precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate' without measurement and verification data." PO Resp. 15 (quoting Ex. 1001, 6:24–27); PO Resp. 18 (same). We note initially that Patent Owner seems to argue that this passage draws a distinction between monitoring and calculating savings based on an estimate and doing so using measurement and verification data. The written description in this passage (or elsewhere) does not draw such a distinction. The written description expressly indicates (and as Patent Owner quotes) that "[e]mbodiments of the present invention monitor and calculate . . . instead of merely providing an estimate" but does not contrast this "merely providing an estimate" with "measurement and verification data" as Patent Owner seems to argue. Ex. 1001, 6:24–27.

Furthermore, we do not view this passage as precluding estimates to be used in "generating measurement and verification data corresponding to the reduction in consumed power." As noted earlier, "the reduction in consumed power" finds antecedent basis in "disable the electric power flow to the . . . associated power consuming device to provide a reduction in consumed power," recited in claim 1. Thus, the reduction in consumed power results from the disabling of electric power to the power consuming device. As Patent Owner recognizes, "generating measurement and

verification data corresponding to the reduction in consumed power" "defines the difference between the expected use/baseline and the actual amount of power consumed (*i.e.*, the power consumption that actually occurred) during the demand response period, in order to accurately determine the reduced power consumed as a result of the demand response event," as shown in AEIC Document, Figure 1.3 discussed earlier. PO Resp. 17 (discussing how Ex. 2011, Fig. 1.3 illustrates "generating measurement and verification data corresponding to the reduction in consumed power" recited in claims 1 and 14).

As Patent Owner and its expert Dr. Goossen also recognize, direct measurement of "the hypothetical load that would have been used in absence of the demand response event" is not possible. PO Resp. 10. Instead, as Patent Owner indicates, measurement and verification processes quantify the reduction "with statistical confidence" (PO Resp. 11–12) and involve "the application of appropriate statistical and load research techniques." PO Resp. 10 (citing Ex. 2011, 10), 11–12 (citing same). Thus, we do not agree that the claim language precludes the use of estimates or projections.

The AEIC Document shows that demand response programs were known to employ estimated measurement and verification data:

> Regardless of the type of Demand Response program employed . . . *all require analysis to estimate the demand reduction*. The estimate is the difference between what the customer actually used and what that customer would have used had the program not been enacted. What the customer would have used is referred to as the baseline and is the key to effective Measurement and Verification.

Ex. 2011, 9 (emphasis added); *see* PO Resp. 11 (discussing actual use and customer baseline as defined in the AEIC Document). Thus, the document

on which Patent Owner relies states unequivocally that all types of Demand Response programs "require analysis to estimate the demand reduction." Ex. 2011, 9.

Moreover, the written description discloses an embodiment that uses estimates of power consumed by devices. Ex. 1001, 7:6–27. Patent Owner's understanding of measurement and verification data as precluding the use of estimated or projected savings would exclude this embodiment. As a general rule, "there is a strong presumption against a claim construction that excludes a disclosed embodiment." *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011); *c.f. Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that a claim construction excluding a preferred embodiment "is rarely, if ever, correct"). We discern no intention in the written description to limit "measurement and verification data corresponding to the reduction in consumed power" to preclude this embodiment. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intension to limit the claim scope using words or expressions of manifest exclusion or restriction.").

Accordingly, we conclude Petitioner's position that allows for the use of estimates and projected power savings to be consistent with the intrinsic and extrinsic evidence and do not adopt Patent Owner's more narrow construction requiring measurement and verification data to be based on the actual reduction in consumed power. We agree with Petitioner that measurement and verification data—meaning data used to measure and

verify the impact of the load reduction resulting from the utilization of a Demand Response program—encompasses both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event, which are both described as embodiments in the written description.

To the extent that Patent Owner argues a level of precision or accuracy needed in "generating measurement and verification data corresponding to the reduction in consumed power," we do not agree that the claims are so limited. *See* PO Resp. 12 (Dr. Goossen testifying methods for "a more accurate baseline to be established for the demand response event"; citing Ex. 2009 ¶ 46); PO Sur-reply 16–18 (discussing increased accuracy of measurement and verification methods). Patent Owner has not identified any claim language that requires a particular level of accuracy. Moreover, the written description indicates the body governing electric power grids may determine the methods to be used for measurement and verification data, which undercuts Patent Owner's position that a particular level of accuracy is needed to meet the claims. Ex. 1001, 7:34–37. To be sure, the written description indicates more precise reporting is beneficial. For example, the challenged patent identifies "[o]ne of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis." Ex. 1001, 6:20–24. Such statements in the written description, however, do not limit the claims as Patent Owner advocates.

Patent Owner also argues that the challenged claims "require the generation of measurement and verification data ('M&V data')

*corresponding to the reduction in consumed power*, or during a power reduction event." PO Sur-reply 1; PO Sur-reply 4–5. As noted previously, we agree with Patent Owner that the plain language of the claim requires generating the measurement and verification data that corresponds to the reduction in consumed power provided when the electric power flow to the device is disabled. To the extent, however, that Patent Owner is arguing a timing constraint that "generating measurement and verification data corresponding to the reduction in consumed power" must occur *during* a power reduction event and not after the power reduction event, we disagree. Nothing in the plain language of the claims or any portion of the specification identified by Patent Owner would limit the generation of measurement and verification to be performed during the power reduction event. Indeed, Patent Owner describes an embodiment in the challenged patent that Patent Owner indicates calculates "after a power savings event has ended" an actual or average amount of power that would have been used by an active load client during a power cut event, which Dr. Goossen testifies would be "comparable to the baseline shown in DRM&V [AEIC Document] Figure 1.3." PO Resp. 18 (citing Ex. 1001, 21:44–56; Ex. 2009 ¶ 55).

We also note that Patent Owner clarified in its Sur-reply that the claims do not require a baseline estimated before a power savings or demand response event to be adjusted later, i.e., during the event. PO Sur-reply 1 (indicating the claims do not "require an adjustment to the baseline during a power reduction event"). To the extent that Patent Owner is arguing here that the claim precludes using estimates or projections of savings based on information collected prior to the power saving event, we disagree for the

reasons discussed above, which include Patent Owner's acknowledgement that such savings are not able to be directly measured and, as the AEIC Document indicates, analysis is required to estimate the demand reduction. Ex. 2011, 9.

For these reasons, we determine that "measurement and verification data corresponding to the reduction in consumed power" encompasses both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event, which are both described as embodiments in the written description.

*3. Summary of Claim Construction*

In sum, for the reasons set forth above, and having considered the arguments and evidence of record, we conclude "measurement and verification data" as used in the challenged claims would have been understood by one of ordinary skill as "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program," as agreed-to by the parties. Additionally, we conclude "measurement and verification data corresponding to the reduction in consumed power" encompasses both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event.

*D. Obviousness over Ehlers*

Petitioner contends claims 1–11 and 13–19 ("the challenged claims") would have been obvious over Ehlers, citing particular passages and declaration testimony of Dr. Auslander for support. Pet. 8–52.

*1. Disclosure of Ehlers (Ex. 1004)*

Ehlers is titled "System and Method for Controlling Usage of a Commodity," and relates to "managing the delivery and usage of a

commodity such as electricity." Ex. 1004, code (54), ¶ 2. Ehlers discloses a method in which energy usage by a controlled device is measured and cut off during a first time period. *Id.* ¶ 16. A customer rebate is provided based on actual energy savings as a function of the first time period, the measured energy usage, and a known power requirement. *Id.*

Figure 1A of Ehlers, reproduced below, illustrates an energy management system. *Id.* ¶ 19.




Figure 1A "is a block diagram of an energy management system, according to an embodiment." *Id.*

Utility 1.06 may monitor and control electricity usage by controlling nodes 1.10 and/or devices 1.08 using a Power Supply Program (or PROGRAM or PSP). *Id.* ¶¶ 59, 78. Customer site 1.04 includes several

types of devices 1.08 including metered device 1.08A, controlled device 1.08B, and metered and controlled device 1.08C. *Id.* ¶ 60.

Customer site 1.04 also includes several types of nodes 1.10. Ex. 1004 ¶¶ 62–65. Gateway node 1.10D provides two-way communication between gateway node 1.10D and the other nodes and utility control system 1.12. *Id.* Load metering node 1.10A measures "the instantaneous power being delivered (typically, in kWh [kilowatt-hours]) to the associated metered device 1.08A" or "total power delivered to the metered device 1.08A over a predetermined period of time." *Id.* ¶ 63. Control node 1.10B controls device 1.08B by turning it on or off or controlling features, such as start time, end time, and duration. *Id.* ¶ 64. Load control node 1.10C measures "instantaneous power being delivered to the controlled and metered device 1.08C" and controls device 1.08C accordingly. *Id.* ¶ 65. As such, Ehlers discloses that load control node 1.10B and load control node 1.10C receive communications from gateway node 1.10D and control operation of controlled devices 1.08B and 1.08C, respectively, such as by shutting down or curtailing operation of the nodes. *Id.* ¶¶ 78–81, 96, 138.

A customer may access system 1.02 and "monitor and control the nodes 1.10 and/or the devices 1.08 through the user interface 1.14." *Id.* ¶ 77. "[U]tility 1.06 may also monitor and control the usage of electricity by controlling the nodes 1.10 and/or the devices 1.08." *Id.* ¶ 78. In particular, the utility "may define, modify, implement and engage one or more Power Supply Program[s] . . . which are designed to alleviate or reduce energy demand during peak periods." *Id.* A program can "shift discretionary residential loads out of peak demand periods and credit customers who participate with KWH [kilowatt hour] rebates based on their actual

(measured & verified) contributions." *Id.* ¶ 79. The "always on" connectivity between utility control system 1.02 and nodes 1.10 "provide[s] much higher levels of monitoring and management of loads." *Id.* ¶ 96. The utility 1.06 is able to "get[] verification of control requests as curtailment commands are initiated" and "can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions." *Id.* When the utility requires an increase in electrical supply, the utility activates a Power Supply Program and broadcasts a "supply request" that includes "a Curtailment ID," identifies devices that are to contribute, start time, duration, and other information. *Id.* ¶ 135. Gateway node 1.10D receives the "supply request" and "when the start time occurs, begin[s] a Supply Request transaction." *Id.* ¶¶ 135–136. Gateway node 1.10D and other nodes 1.10 power off the specified devices 1.08 and "report the status of each device 1.08 back to the system." *Id.* ¶¶ 137–138. The Curtailment ID included in the supply request message enables the system to collect responses to the supply request and "provide accurate analysis and billing/crediting information for the activated" Power Supply Program. *Id.* ¶ 136.

Ehlers depicts a method for managing energy delivery in Figure 1C, reproduced below.




Figure 1C

Ex. 1004 ¶ 21; *see, e.g.,* Pet. 22–23 (citing Ex. 1004 ¶¶ 16, 79, 96–97); Pet. Reply 23 (citing Ex. 1004 ¶¶ 16, 80).[9]

Ehlers' method illustrated in Figure 1C includes three steps for shifting energy requirements from a first period of time to a later period. Ex. 1004 ¶ 80. The first step 1.32A "measure[s] energy usage of a device 1.08 operated by a customer" and for which the power rating of the device 1.08 is known. *Id.* "In a second step 1.32B, energy to the device 1.08 is cut off during the first time period." *Id.* "In a third step 1.32C, a rebate is provided to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and the known power requirements." *Id.*

*2. Independent Claim 1*

Petitioner relies on specific passages in Ehlers as teaching or suggesting the limitations recited by independent claim 1 and declaration testimony of Dr. Auslander for support. Pet. 13–24. Petitioner also relies on declaration testimony of Dr. Auslander that one of ordinary skill would have

[9] Ehlers also describes the three steps shown in Figure 1C and described in paragraph 80 in paragraph 16 that is part of Ehlers' Summary of the Invention section. *Compare* Ex. 1004 ¶ 16 (Summary of Invention), *with* Ex. 1004 ¶ 80 (description of Fig. 1C).

had a reasonable expectation of success "in modifying Ehlers (to the extent needed)" based on Petitioner's mapping of the claims. Pet. 12 (citing Ex. 1002 ¶ 57).

*a. Claim 1 Preamble*

The preamble of claim 1 recites "[a] method for managing an electric power flow within an electric power grid." Ehlers discloses a "method [to] manage delivery of energy from a distribution network to one or more sites" and uses electricity throughout its description as the example of energy for which delivery and usage is managed. Ex. 1004 ¶¶ 15, 58, 59; *see* Pet. 13 (citing Ex. 1004 ¶¶ 15, 58, 59). Patent Owner does not address the preamble of claim 1. To the extent that the preamble is limiting, we find that Petitioner, relying on unambiguous descriptions in Ehlers, has demonstrated that Ehlers discloses this feature.

*b. Claim 1 Limitation 1a*[10]

Claim 1 recites "a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device" (limitation 1a). The plain language of the claim only requires that the power control message indicates either "an amount of electric power to be reduced" or "an identification of at least one controllable device to be instructed to

[10] Petitioner refers to this limitation as limitations 1b–1c. Pet. 14–19.

disable the electric power flow to at least one associated power consuming device." We analyze the latter option.[11]

Petitioner maps the recited client device to Ehlers' gateway node 1.10D, the recited load management server to Ehlers' utility control system, and the recited power control message to Ehlers' supply request. Pet. 13–15 (citing, e.g., Ex. 1004 ¶¶ 62, 72, 135, 63–64, 65, 70, 78, 135–139). Patent Owner does not address Petitioner's showing as to this limitation. *See generally* PO Resp.

Ehlers describes two-way communication between the gateway node 1.10D and the utility control system, which are connected in an exemplary implementation "via an 'always on'" network. Ex. 1004 ¶¶ 62, 72 (referencing the exemplary implementation shown in Fig. 1B); *see, e.g.,* Pet. 14 (citing Ex. 1004 ¶¶ 62, 72). Ehlers describes power supply programs designed by the utility "to alleviate or reduce energy demand during peak periods." Ex. 1004 ¶ 78; *see, e.g.,* Pet. 14 (citing Ex. 1004 ¶ 78). In some power supply programs, electricity requirements are shifted from a peak period to a later time period by disabling some power-consuming devices during the peak period. Ex. 1004 ¶¶ 79–81; *see, e.g.,* Pet. 14 (citing Ex. 1004 ¶¶ 79, 81). In one example, Ehlers describes the broadcast of "a supply request" for a power supply program when to gateway node 1.10D and other nodes 1.10, which enables "a Supply Request transaction" to begin at the designated start time. Ex. 1004 ¶ 135; *see, e.g.,* Pet. 14 (citing Ex. 1004 ¶ 135). We agree with Petitioner that Ehlers teaches or suggests a

---

[11] Petitioner also relies on Ehlers as teaching "an amount of power to be reduced" in a power control message, which we need not reach. *See* Pet. 15–16.

client device (Ehlers' gateway node 1.10D) receiving a power control message (Ehlers' supply request) from a load management server (Ehlers' utility control system).

Petitioner additionally maps the recited "at least one controllable device" to Ehlers' "control node 1.10B and/or load control node 1.10C" and maps the recited "at least one associated power consuming device" to Ehlers' "devices 1.08, such as an HVAC unit or pool pump." Pet. 17. Ehlers indicates that "control node 1.10B, in general, is used to control the controlled device 1.08B," such as by "controllably cut[ting] off and supply[ing] power to the controlled device 1.08B." Ex. 1004 ¶ 64; *see, e.g.,* Pet. 19 (citing Ex. 1004 ¶¶ 64–66). In the example of a pool pump, Ehlers indicates that "control node 1.10B may simply turn power to the pool pump on and off." Ex. 1004 ¶ 64; *see, e.g.,* Pet. 19 (citing Ex. 1004 ¶¶ 64–66). In contrast to control node 1.10B, Ehlers indicates that "load control node 1.10C, in general, is used to both measure the instantaneous power being delivered to the controlled and metered device 1.08C and controls the device 1.08C." Ex. 1004 ¶ 65; *see, e.g.,* Pet. 19 (citing Ex. 1004 ¶¶ 64–66).

We agree with Petitioner that Ehlers also indicates that the supply request message sent to Ehlers' gateway node 1.10D includes information identifying "the devices that are to contribute" by having power cut off to the devices. Ex. 1004 ¶¶ 135, 137–138; *see, e.g.,* Pet. 17 (citing Ex. 1004 ¶¶ 135–139). Because Ehlers indicates that the power consuming devices may be integrated with the nodes 1.10, we agree with Petitioner that Ehlers teaches or suggests the supply request message includes an identification of control node 1.10B or load control node 1.10C that controls delivering power to the power consuming device. Ex. 1004 ¶ 68 (indicating nodes 1.10

may be integrated with the corresponding device 1.08); *see* Pet. 18 (citing Ex. 1004 ¶¶ 67–68).

As such, we also agree with Petitioner that Ehlers teaches or suggests "the power control message indicating . . . an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device."

For these reasons, we find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*c. Claim 1 Limitation 1b*[12]

Claim 1 recites "the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power" (limitation 1b).

Petitioner relies on Ehlers' descriptions of communications between gateway node 1.10D and two control nodes 1.10B and 1.10C to manage power of power-consuming devices. Pet. 19–22 (citing Ex. 1004 ¶¶ 59–66, 81, 162, 76–79, 161–162, 214, 81, 16, 96, Fig. 1B). Patent Owner does not address Petitioner's showing as to this limitation. *See generally* PO Resp.

In addition to communication between the utility control system and the gateway node 1.10D, Ehlers also describes two-way communication between the gateway node 1.10D (the recited client device) and the control node 1.10B and the load control node 1.10C (the recited at least one controllable device). Ex. 1004 ¶ 62; *see, e.g.,* Pet. 19–20. As described

[12] Petitioner refers to this limitation as limitations 1d–1e. Pet. 19-22.

above, Ehlers indicates the gateway node 1.10D receives a supply request from the utility control system; the gateway node 1.10D has two-way communication with the control node 1.10B and the load control node 1.10C; and the control node 1.10B or the load control node 1.10C controls cutting off power to the controlled device. We also note Ehlers' description of "curtailment commands" being initiated in the context of managing energy demands further supports this finding. Ex. 1004 ¶ 96; *see, e.g.,* Pet. 23 (quoting "curtailment commands" in Ex. 1004 ¶ 96).

Accordingly, we determine that one of ordinary skill would have understood Ehlers to teach or suggest the gateway node 1.10D (which Petitioner maps to the recited "client device") issuing a power management command to the control node 1.10B or the load control node 1.10C (which Petitioner maps to the recited "at least one controllable device") to disable electric power to the pool pump or other controlled device (which Petitioner maps to the recited "associated power consuming device"). Ehlers' disabling provides a reduction in consumed power to meet the supply request sent from the utility control system.

For these reasons, we find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*d. Claim 1 Limitation 1c*[13]

Claim 1 also recites "generating measurement and verification data corresponding to the reduction in consumed power." As discussed above, "measurement and verification data" as used in the challenged claims would have been understood by one of ordinary skill as "data used to measure and verify the impact of the load reduction resulting from the utilization of a

[13] Petitioner refers to this limitation as limitation 1f. Pet. 22.

Demand Response program." Also, as discussed above, "measurement and verification data corresponding to the reduction in consumed power" encompasses both actual measurements of savings and estimates of savings based on device power usage measured before a demand reduction event. Additionally, limitation 1c recites "data corresponding to the reduction in consumed power" that refers to the reduction caused by disabling the electric power flow to "the at least one associated power consuming device" having antecedent basis in limitation 1b.

*(i) Petitioner's Reliance on Ehlers' Descriptions*

Petitioner relies on Ehlers' method for managing energy delivery by shifting energy requirements from a first period of time to a later period. *See, e.g.,* Pet. 22–23 (citing Ex. 1004 ¶¶ 16, 79, 96–97); Pet. Reply 23 (citing Ex. 1004 ¶¶ 16, 80).[14] Specifically, Petitioner contends that one of ordinary skill "would have understood that Ehlers suggests utilizing measurement and verification methods to generate data corresponding to the reduction in consumed power (the disclosed load curtailment data and/or actual (measured & verified) contributions." Pet. 23 (citing Ex. 1004 ¶¶ 16, 79, 96–97; Ex. 1002 ¶¶ 85–88).

Ehlers' method "includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements."

[14] Ehlers also describes the three steps shown in Figure 1C and described in paragraph 80 in paragraph 16 that is part of Ehlers' Summary of the Invention section. *Compare* Ex. 1004 ¶ 16 (Summary of Invention) *with* Ex. 1004 ¶ 80 (description of Fig. 1C).

Ex. 1004 ¶ 16 (emphasis added); *see also* Ex. 1004 ¶ 80 (describing the method steps in the context of Fig. 1C). Ehlers explains the method in the context of Figure 1C and states that the controlled device to which energy is cut off is device 1.08 operated by the customer. Ex. 1004 ¶ 80.

Ehlers also describes that Power Supply Programs may "credit consumers who participate with KWH [kilowatt hour] rebates based on *their actual (measured & verified) contributions*." Ex. 1004 ¶ 79; *see, e.g.,* Pet. 23 (citing Ex. 1004 ¶ 79). Ehlers further notes that the Power Supply Program "provides a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate." Ex. 1004 ¶ 79.

Ehlers also indicates an advantage of the "always on" connectivity to utility 1.06 "provide[s] much higher levels of monitoring and management of loads" and, more specifically, "allows the utility 1.06 to know exactly how much load is available from each participating end use device 1.08 at a customer site 1.04." Ex. 1004 ¶ 96; *see, e.g.,* Pet. 22–23 (citing Ex. 1004 ¶ 96). Ehlers continues by explaining that the utility 1.06 is able to "manage demand more closely by getting verification of control requests as curtailment commands are initiated" and "can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions." Ex. 1004 ¶ 96; *see, e.g.,* Pet. 23 (citing Ex. 1004 ¶ 96).

*(ii) Ehlers' Use of Estimates and Projections*

Patent Owner argues that the Petition fails to show sufficiently that Ehlers teaches or suggests "generating measurement and verification data corresponding to the reduction in consumed power." PO Resp. 20–41; PO Sur-reply 1–18. Many of Patent Owner's arguments rely on its improperly

narrow construction of "measurement and verification data corresponding to the reduction in consumed power." *See* PO Sur-reply 2–3 ("[I]n Ehlers, all information needed to establish the value of a power reduction event . . . can be known before the event occurs."); PO Sur-reply 5 ("Ehlers' process for calculating a projected power savings before the reduction of power even begins . . . does not correspond to a reduction in consumed power."); PO Sur-reply 6 ("Ehlers' process of issuing rebates to customers for shutting a device off for an agreed-upon period of time does not disclose or suggest all features" of claim 1); PO Sur-reply 7–8 (making similar arguments regarding Ex. 1004 ¶ 141); PO Sur-reply 7 ("[A] measurement of power before a power reduction event begins is not 'measurement and verification data corresponding to a reduction in consumed power," as claimed.); PO Sur-reply 8 ("It is not enough that Ehlers uses a process to compute a projected reduction in power consumption."); PO Sur-reply 13 ("Ehlers discloses no modification to the pre-computed value of the load reduction."); PO Sur-reply 14 ("The data used to compute the estimated reduction is a projection of what would have occurred during the first time period, but does not correspond to any actual reduction in consumed power."); PO Sur-reply 14 ("Ehlers does not consider the actual consumption of a device in determining a reduction in consumption.").

As explained in Section II.C, we do not agree that "generating measurement and verification data corresponding to the reduction in consumed power" when the electric power flow to the device is disabled precludes doing so based on estimates or projections.

*(iii) Ehlers' Description of "Actual Contributions" and "Actual Energy Savings"*

Petitioner also relies on Ehlers' descriptions of the term "actual (measured & verified) contributions" and "actual energy savings" to disclose "generating measurement and verification data corresponding to the reduction in consumed power" by disabling electric power flow to a power consuming device, as discussed above. Pet. 23 (citing Ex. 1004 ¶¶ 16, 79, 96–97; Ex. 1002 ¶¶ 85–88). Patent Owner contends that Ehlers' use of the term "actual (measured & verified) contributions," "actual energy savings," and the like, however, does not teach or suggest "generating measurement and verification data corresponding to the reduction in consumed power" by disabling electric power flow to a power consuming device, as required by limitation 1c. *See* PO Resp. 20–41; PO Sur-reply 1–18; *see, e.g.,* PO Resp. 24 ("[W]hile Ehlers uses the term, 'actual energy savings,' in [0016] and [0080], Ehlers' 'actual energy savings' is not 'actual' at all, or an energy savings that is actually experienced by the system . . . but is a projected energy savings.").

Rather, Patent Owner argues that power usage measures of the power consuming device before the power is cut off are estimates that are outside the scope of the claim and do not correspond to the reduction in consumed power during the event. *See, e.g.,* PO Resp. 20–21 ("Once Ehlers cuts power off to a device, such as shown in Ehlers' FIG. 1C, Ehlers assumes a power savings based on a duration of the energy cut-off (the 'first time period') and a projected energy usage established before the demand response event."); PO Resp. 28 ("In each instance here [in Ehlers' ¶¶ 138–139], the projected contribution is established prior to a device's actual power reduction occurs and does not correspond to an actual reduction in

consumed power.”); PO Resp. 29–31 (presenting similar arguments regarding Ex. 1004 ¶¶ 140, 346, 344, Fig. 5C); PO Sur-reply 2 (“Ehlers’ establishment of a baseline prior to a power measurement reduction event, or before the power is reduced, does not ‘correspond[] to a reduction in consumed power.’”).

We do not agree that Ehlers’ clear disclosures of “actual energy savings” and rebates based on “actual contributions” would have been understood by one of ordinary skill as anything other than “actual.” This finding is supported by the challenged patent, which indicates: “[b]ecause the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage.” Ex. 1001, 7:23–27; *see* Pet. Reply 14 (citing Ex. 1001, 7:11–27). The written description of the challenged patent here expressly ties knowing the amount of power consumed by each power consuming device *before the outage* to two things—(i) determining which devices to turn off and (ii) tracking the power savings. *See* Pet. 14 (arguing the challenged patent cuts loads “based upon present power consumption”) (citing, e.g., Ex. 1001, 7:11–27). Thus, the challenged patent tracks power savings based on power data collected before the outage.

*(iv) Ehlers’ Description of “measured & verified”*

We turn to Patent Owner’s similar argument that Ehlers does not disclose “generating measurement and verification data corresponding to the reduction in consumed power” when the electric power flow to the device is disabled because Ehlers use of “measured & verified” would not have suggested to one of ordinary skill “generating measurement and verification data” as required by claim 1. As Petitioner notes, Ehlers explicitly describes

crediting consumers with kilowatt hour rebates "based on their actual (measured & verified) contributions." *See, e.g.,* Pet. 23 (citing Ex. 1004 ¶ 79); Pet. Reply 18.

As previously discussed, Patent Owner contends, relying on Dr. Goossen's testimony for support, that the concept of measurement and verification would have been well-understood to one of ordinary skill and in the demand response industry at the time of the invention. *See* PO Resp. 9 (citing Ex. 2009 ¶ 43). Patent Owner, however, argues that Ehlers' use of "actual (measured & verified) contributions" is an "unexplained disclosure" by Ehlers and would not have been understood by one of ordinary skill as the well-understood concept of measurement and verification. *See, e.g.,* PO Sur-reply 15 (Petitioner "leans heavily on Ehlers' unexplained disclosure of 'actual (measured & verified) contributions'"); PO Sur-reply 15 (arguing Ehlers' disclosure of "measured & verified" "does not mean that Ehlers discloses the method" recited in limitation 1c).

In view of the AEIC document and Dr. Goossen's testimony that measurement and verification was well-known in the industry at the time of the invention, we find one of ordinary skill would have understood both "measurement and verification" in the challenged patent and Ehlers' use of "measured & verified" (which is used parenthetically to modify the description of actual contributions of consumers participating in a Power Supply Program) to refer to the same well-known concept of measurement and verification. *See, e.g.,* Ex. 2011, 10; Ex. 2009 ¶ 43. Our finding is bolstered by the context of Ehlers' descriptions noted above of "higher levels of monitoring and management of loads," "manag[ing] demand more closely by getting verification," and providing rebates. Ex. 1004 ¶ 96. Our

finding also is bolstered by Dr. Auslander's testimony that "Ehlers suggests that measurement and verification methods are used." Ex. 1002 ¶ 54 (discussing Ex. 1004 ¶ 141). We credit Dr. Auslander's testimony because it is consistent with Ehlers' description of "measured & verified" contributions and Dr. Goossen's testimony discussed above.

Moreover, Patent Owner argues that Dr. Auslander's testimony is insufficient because the testimony is not that Ehlers expressly *discloses* measurement and verification data but that the testimony is that Ehlers only *suggests* measurement and verification methods are used. PO Resp. 37 (quoting Ex. 1002 ¶ 54). This argument does not undermine Dr. Auslander's testimony because an express disclosure is not required to demonstrate obviousness under 35 U.S.C. § 103.

*(v) Ehlers' Use of Baselines*

Patent Owner also contends that "Ehlers does not disclose or suggest any 'generating measurement and verification data corresponding to the reduction in consumed power,' as would be needed to refine a baseline that accounts for changes occurring during 'the reduction in consumed power.'" PO Resp. 31. For the reasons discussed above in Section II.C (Claim Construction), the scope of claim 1 includes estimates and projections and does not require an adjustment to the baseline during or after the power reduction event.[15] Additionally, we agree with Petitioner that the challenged patent sets a baseline using historical data prior to the demand response event, which also undermines Patent Owner's position that Ehlers use of the

[15] In its Sur-reply, Patent Owner acknowledges that the challenged claims do not "require an adjustment to the baseline during a power reduction event." PO Sur-reply 1.

term "actual" does not mean "actual at all." PO Resp. 24; *see* Pet. Reply 14 (citing Ex. 1001, 7:11–27, 11:28–37, 15:39–43).

Patent Owner's position is still further undermined by Ehlers' descriptions in paragraph 96 of providing utilities with "much higher levels of monitoring and management of loads"; billing and rebates based on actual contributions; and "getting verification of control requests as curtailment commands are initiated." Ex. 1004 ¶ 96. These descriptions teach and suggest that Ehlers' use of "actual contributions" refers to power savings resulting from cutting off power to the device 1.08, as required by limitation 1c—"the reduction in consumed power" provided by disabling the electric power flow to the power consuming device (limitation 1c). Notably, as discussed previously, Patent Owner acknowledges that knowing the amount of power that was saved is hypothetical and only able to be estimated because of the impossibility of measuring something that does not occur. *See, e.g.,* PO Resp. 10–12; Ex. 2011, 9–10.

Patent Owner's expert, Dr. Goossen, opines that Ehlers does not disclose or suggest "generating measurement and verification data corresponding to the reduction in consumed power" because Ehlers does not "refine a baseline that accounts for changes occurring during 'the reduction in consumed power.'" PO Resp. 31 (citing Ex. 2009 ¶ 79); *see, e.g.,* PO Resp. 33 (citing Ex. 2009 ¶¶ 65–70 (characterizing testimony as "discussing how 'generating measurement and verification data corresponding to the reduction in consumed power allows the '268 Patent to establish a predicted baseline that differs meaningfully from Ehlers' straight-line projection")); PO Resp. 34 (citing Ex. 2009 ¶¶ 70, 82, 84); PO Resp. 36 (citing Ex. 2009 ¶ 85). Dr. Goossen's testimony, however, is predicated on Patent Owner's

overly narrow claim construction. As noted previously, adjustments to the baseline are not required as claim 1 encompasses using estimated or projected savings in "generating measurement and verification data corresponding to the reduction in consumed power."

Along these lines, Patent Owner also seems to contend that limitation 1c requires a calculation to occur during or after the reduction in consumed power. PO Resp. 40 ("Ehlers expressly discloses that a device's 'contribution is equal to the power consumption rate prior to activation of the program for the time period of the PROGRAM, i.e. the amount of energy being saved.'" (quoting Ex. 1004 ¶ 140)); PO Sur-reply 2–3; PO Sur-reply 13 ("Ehlers discloses no modification to the pre-computed value of the load reduction as a result of the verification of pool pump status disclosed in Ehlers' [0081].").

Patent Owner also points to Dr. Auslander's testimony for support that Ehlers does not "verify power savings during the event" and so does not measure actual consumption during the event as Patent Owner contends is required. PO Sur-reply 12–13. More specifically, Patent Owner contends that Dr. Auslander's testimony that "you don't know the full amount of the reduction until the event is completed" (quoting Ex. 2014, 50:3–5) supports its position. PO Sur-reply 12. As the full reprinted testimony in the Patent Owner Response indicates, Dr. Auslander's answer is given with the qualification "*if* your protocol includes verification that there was in fact no power drawn, that is, somebody didn't come by and turn the switch back on, then you don't know the full amount of the reduction until the event is completed." Ex. 2014, 49:22–50:5 (emphasis added); PO Sur-reply 12 (reproducing Ex. 2014, 49:3–50:5). As such, Dr. Auslander indicates that

this type of verification is not required by all protocols. Although "generating measurement and verification data corresponding to the reduction in consumed power" requires some type of verification, the particular technique of verifying that "somebody didn't come by and turn the switch back on" and "that there was in fact no power drawn" by the device that was turned off is not required by limitation 1c.

Patent Owner also relies on Dr. Auslander's testimony that "verifying a meter reading during a power reduction event does not verify power savings during the event" (citing Ex. 2014, 39:11–21). PO Sur-reply 12–13. Dr. Auslander's statement does not support Patent Owner's position for similar reasons. As discussed previously, and as Patent Owner acknowledges (PO Sur-reply 15), there are many verification techniques as the AEIC Document indicates.

Moreover, Patent Owner's citation of Dr. Auslander's testimony is predicated on Patent Owner's unduly narrow view of limitation 1c. As discussed previously, we do not agree that the claims prohibit calculation of the device's power consumption rate before the event or use of projections of power savings, as the challenge patent also discloses. Furthermore, as noted above, Ehlers describes "actual (measured & verified) contributions" and "actual energy savings," which further undermine Patent Owner's position that Ehlers' use of baselines does not teach or suggest limitation 1c.

*(vi) Level of Accuracy Required*

Closely related to its arguments that adjustments to baseline calculations are required to show "generating measurement and verification data corresponding to the reduction in consumed power" when the electric power flow to the device is disabled, Patent Owner contends that Ehlers' methods are not sufficiently accurate. Patent Owner argues that, because the

challenged patents described procedures for performing measurement and verification are purportedly superior to those disclosed by Ehlers, Ehlers does not teach or suggest limitation 1c. *See, e.g.,* PO Sur-reply 3–6 (section titled "The '268 Patent Claims a Novel and Improved Power Management Method"); PO Sur-reply 17–18 (arguing that accurate performance calculations are essential).

Claim 1 does not recite a level of precision, accuracy, or even a particular manner of "generating measurement and verification data corresponding to the reduction in consumed power." Moreover, Patent Owner acknowledges that "measurement and verification techniques can vary, and different techniques can yield different levels of accuracy." PO Sur-reply 15. We do not agree that a particular level of precision is required by the claim language, which encompasses use of both estimates and actual measurement of savings for the reasons stated in Section II.C.

*(vii) Ehlers' Lack of Description Regarding Rebate Acceptability*

Nor do we agree with Patent Owner's argument that the Petitioner is required to demonstrate "that Ehlers' procedure for issuing a customer rebate would also be accepted by a governing entity for awarding supply equivalence." PO Sur-reply 7 (citing Ex. 1001, 7:32–51). Our construction of "measurement and verification data"—data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program—does not require such a showing. Patent Owner's argument amounts to impermissibly reading an embodiment into the claims.

*(viii) Summary of Limitation 1c Findings*

In sum, there is no dispute that Ehlers expressly discloses a three-step method for reducing energy demands during a time period (Ex. 1004 ¶¶ 16, 80, Fig. 1C) and expressly discloses providing customers who participate in

Power Supply Programs with kilowatt hour "rebates based on their actual (measured & verified) contributions" (Ex. 1004 ¶¶ 79, 80). Further, our construction of "measurement and verification data" means "data used to measure and verify the impact of the load reduction resulting from the utilization of a demand response program."

Accordingly, for the reasons discussed above, we agree with Petitioner that Ehlers teaches or suggests "generating measurement and verification data corresponding to the reduction in consumed power," recited in limitation 1c. In particular, Ehlers' "actual (measured & verified) contributions" teaches or suggests the reduction in consumed power provided by disabling the electric power flow to the power consuming device, as required by limitation 1c.

We, therefore, find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*e. Summary of Claim 1 Findings*

Claim 1 requires three steps: receiving a power control message that indicates an indication of a controllable device to be instructed to disable the electric power flow to an associated power consuming device (limitation 1a), issuing a power management command to the controllable device to cause the controllable device to disable the electric power flow to the associated power consuming device (limitation 1b), and "generating measurement and verification data corresponding to the reduction in consumed power" provided by disabling the electric power flow to the power consuming device (limitation 1c). For the reasons given, we agree with Petitioner that Ehlers teaches or suggests the recited limitations.

Additionally, Petitioner contends that one of ordinary skill would have had a reasonable expectation of success of making any modifications to

Ehlers to the extent that any modifications were necessary. Pet. 12 (citing Ex. 1002 ¶ 57). Dr. Auslander indicates that the technology in the relevant timeframe of 2007 was a relatively predictable art. Pet. 12 (citing Ex. 1002 ¶ 57). We are persuaded that one of ordinary skill would have had a reasonable expectation of success as Petitioner contends.

For the reasons discussed above, and having considered the arguments and evidence of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that Ehlers would have rendered obvious the subject matter recited in claim 1.

*3. Independent Claim 14*

Independent claim 14 is directed to "[a] system for managing electric power on an electric power grid" comprising a client device and a device control manager. Independent claim 14 recites substantively similar limitations to the method steps recited in claim 1. For substantially similar limitations, Petitioner relies on its arguments made with respect to claim 1. *See* Pet. 41–46. Patent Owner's arguments discussed above with regard to the "measurement and verification" limitation 1c applies equally to these limitations. *See* PO Resp. 20–41 (arguing claims 1 and 14 together with regard to measurement and verification). For the reasons discussed previously with respect to claim 1, however, we do not agree with Patent Owner's position regarding measurement and verification required by claim 14.

*a. Claim 14 Preamble and Client Device*

For "[a] system for managing electric power on an electric power grid," Petitioner relies on Ehlers' system and method, as discussed above. Pet. 42 (incorporating claim 1 arguments); Pet. 13 (citing Ex. 1004 ¶¶ 61–62, Figs. 1A–1C). Patent Owner does not address Petitioner's showing as to

the preamble. *See generally* PO Resp. To the extent that the preamble is limiting, we find that Petitioner, relying on unambiguous descriptions in Ehlers, has demonstrated that Ehlers discloses the preamble.

Claim 14 recites "a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device" and "wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request." For the client device and similarly to claim 1's arguments, Petitioner relies on Ehlers' gateway node "that issues power control instructions to controllable devices (e.g., a control node), which causes the controllable devices to selectively enable and disable a flow of power to consuming devices (e.g., a pool pump)." Pet. 42. Petitioner relies on Ehlers' description of two-way communication between the gateway node and other system components as suggesting a "controllable device interface facilitating communication of power control instructions" as required in claim 14. Pet. 42–43 (citing Ex. 1004 ¶¶ 60–66, 162, 171, 169; Ex. 1002 ¶¶ 154–157). Patent Owner does not address Petitioner's showing as to this limitation. *See generally* PO Resp. We agree that Ehlers' description of two-way communication would have suggested to one of ordinary skill that the gateway node would have included an interface communicating instructions as required by claim 14.

Regarding the client device receiving a power control message, Petitioner relies on its arguments discussed above with respect to substantially similar limitation recited in claim 1. Pet. 45. Petitioner additionally indicates that Ehlers' utility control system is remote because it is "located away from the customer site" and may be provided "by a third party." Pet. 45–46 (citing Ex. 1004 ¶ 73, Fig. 1A). Regarding power control message being responsive to a power reduction request, Petitioner relies on Ehlers' description of the system broadcasting a supply request in conjunction with activating a Power Supply Program, which "are designed to alleviate or reduce energy demand during peak periods." Pet. 46 (citing Ex. 1004 ¶¶ 78, 135; Ex. 1002 ¶¶ 167–169). We agree with Petitioner's position, which relies on unambiguous descriptions in Ehlers that sufficiently support its contentions.

Additionally, for the reasons discussed above with respect to claim 1, we agree with Petitioner that Ehlers teaches or suggests the client device recited in claim 14. We, therefore, find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*b. Claim 14 Device Manager*

Claim 14 also recites "a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power" (the device management limitation).

Petitioner contends that "Ehlers discloses and/or suggests a device control manager in the form of a processor and control logic included in the gateway node." Pet. 43; *see* Pet. 43–46 (addressing the device manager limitation). Petitioner relies on Ehlers' description of the gateway node 1.10D controlling devices 1.08A–C through load metering nodes 1.10A–C. Pet. 44–45 (citing Ex. 1004 ¶¶ 60–66, 84, 179, Fig. 1A). Petitioner further relies on Ehlers' description in paragraph 179 that the node 1.10 is provided "with the necessary control intelligence to manage its associated load . . . as well as manage communications over . . . the two-way communications channel 2.06." Pet. 44 (quoting Ex. 1004 ¶ 179).

We agree with Petitioner that Ehlers teaches or suggests the power command instructions and the controllable device interface based on Ehlers' description of two-way communication and controlling devices. Pet. 43–45 (citing Ex. 1004 ¶¶ 60–66, 84, 179, Fig. 1A). Patent Owner does not address Petitioner's showing as to the power control instructions or interface required by this limitation. *See generally* PO Resp. 41–42.

In addition to arguing measurement and verification deficiencies as discussed above with respect to claim 1, Patent Owner contends that Petitioner fails to explain why "'measurement and verification data' in Ehlers is generated by gateway node 1.10D." PO Resp. 42. Patent Owner contends that the Petitioner "just refers back to its analysis of feature 1[f] from claim 1," which does not recite a device control manager. PO Resp. 42; PO Sur-reply 18–19 (repeating its PO Resp. argument).

We disagree with Patent Owner's characterization of Petitioner's argument. Patent Owner unduly focuses on Petitioner's incorporation of its claim 1 analysis with regard to "based upon a reduction in consumed power

for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power" (Pet. 45). Petitioner argues that "Ehlers discloses and/or suggests a device control manager in the form of a processor and control logic included in the gateway node" and the node is provided with "the necessary control intelligence to manage its associated load." Pet. 43–45 (citing Ex. 1004 ¶¶ 60–66, 84, 179, Figs. 1A). Petitioner also relies on Ehlers' paragraph 84 that describes the gateway node as "collect[ing] information regarding the health and maintenance of energy devices" in addition to collecting "actual energy interval data" for devices. Ex. 1004 ¶ 84; *see* Pet. 44 (citing Ex. 1004 ¶ 84). Petitioner further relies on Dr. Auslander's declaration testimony that it would have been obvious to modify Ehlers' gateway node 1.10D to include a device control manager operably coupled to a controllable device interface because one of ordinary skill "would have known that including the same would be beneficial for each of the nodes 1.10A–C, such that communications from gateway node 1.10D are able to be routed to the respective nodes." Pet. 45 (citing Ex. 1002 ¶ 164). Petitioner's arguments are persuasive.

Patent Owner argues that Ehlers' gateway node 1.10D does not generate its own data and instead only requests measurement data. PO Resp. 42. In support of this argument, Patent Owner cites Dr. Auslander's answer at his deposition that Ehlers' gateway node 1.10D generates measurement and verification data "because the gateway node 'requested the

measurement to be taken.'" *Id.* (citing Ex. 2010, 79:10–80:7[16]); PO Sur-reply 19 (repeating its PO Resp. argument). Yet Dr. Auslander's incomplete statement is not dispositive of this issue in view of other evidence from Ehlers on which Petitioner relies. Among various descriptions relied on by Petitioner, Ehlers indicates the gateway node has "the necessary control intelligence to manage its associated load"; "collect[ing] information regarding the health and maintenance of energy devices"; and collecting "actual energy interval data" for devices. Ex. 1004 ¶¶ 179, 84; *see* Pet. 44 (citing Ex. 1004 ¶¶ 179, 84). These descriptions of the gateway node managing an energy load and collecting energy data from devices occur in the context of Ehlers disclosure of the three-step method performed by the energy management system that includes crediting consumers "based on their actual (measured & verified) contributions." Ex. 1004 ¶¶ 16, 79, 80, 179.

Read in this context, we determine that these descriptions in Ehlers would have at least suggested to one of ordinary skill that the gateway node would have been "operable to . . . based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power" to a power consuming device, as required by claim 14. Dr. Auslander's testimony that the gateway node's request for a device to take measurements supports our understanding that the gateway node would have been operable to generate measurement and verification data corresponding to the

[16] Ex. 2010, 79:20–22 (testifying that "generating" encompasses "that the measurement was taken was because the [gateway node] requested the measurement to be taken").

reduction in consumed power. Ex. 1002 ¶ 164. Generating measurement and verification data is a reasonable inference made from collecting energy data, particularly in the context of the gateway node having necessary control intelligence to manage its associated load and Ehlers' context of providing rebates based on "actual (measured & verified) contributions." Claim 14 does not recite how "generating measurement and verification data corresponding to the reduction in consumed power" is performed.

For these reasons, we find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*c. Summary of Claim 14 Findings*

We also are persuaded that one of ordinary skill would have had a reasonable expectation of success to the extent modifications of Ehlers would have been necessary for the reasons identified by Petitioner and discussed above with respect to claim 1.

Having considered the arguments and evidence of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that Ehlers would have rendered obvious the subject matter recited in claim 14.

*4. Dependent Claims 2 and 15–17: Power Supply Value (PSV)*

Claims 2 and 15–17, each of which depends directly or indirectly from either of independent claims 1 and 14, additionally recite "a power supply value (PSV)." These claims additionally recite that the power supply value (i) corresponds to the reduction in consumed power provided by disabling the electric power flow to a power consuming device (claims 2 and 15), (ii) indicates a compensation provided for power supply associated with the reduction in consumed power for the disabled flow of electric power

(claim 15), where the compensation is one of enumerated types of compensation (claim 16), and (iii) is "generated based upon a governing entity for the power grid operating region and/or operational regulations" (claim 17). The written description of the '268 patent indicates:

> Importantly, the power supply value (PSV) is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid.

Ex. 1001, 7:32–41.

Petitioner contends that this portion expressly defines "power supply value." Pet. 6–7 (quoting Ex. 1001, 7:32–41). Patent Owner does not address whether the written description defines "power supply value" but relies on the same or substantially similar disclosures. PO Resp. 43–44 (quoting Ex. 1001, 7:32–37, 7:43–51). We need not decide whether "power supply value" is expressly defined in the patent to resolve the parties' dispute concerning Ehlers' disclosure. *See* Dec. 22–23.

Additionally, we note that the many locations at which the power supply value is calculated in the written description— "at the meter or submeter or at building control system or at any device or controller that measures power"—encompasses Ehlers' various nodes at the customer side, which Patent Owner does not dispute.[17] *See, e.g.,* PO Resp. 43–46. Because

---

[17] Additionally, Patent Owner's expert, Dr. Goossen, acknowledges that information about a customer's contribution to power reductions during a Power Supply Program is determined on "the customer side" by the gateway

there is no dispute that Ehlers teaches or suggests this, we need not decide whether the power supply value needs to be "calculated at the meter or submeter, at building control system, or at a device or controller that measures power," as Petitioner proposes (Pet. 7) but is not required by the plain language of the claims.

*a. power supply value corresponding to the reduction in consumed power*

For the power supply value corresponding to the reduction in consumed power provided by disabling the electric power flow to a power consuming device (required by claims 2 and 15), Petitioner again relies on Ehlers' system and three-step method for time-shifting energy requirements, crediting consumers with kilowatt hour rebates based on their actual (measured & verified) contributions, and passing "detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions" (Ex. 1004 ¶ 96). Pet. 24–25 (citing Ex. 1004 ¶¶ 16, 96, 97, 79); Pet. 62. Petitioner contends, with support of Dr. Auslander, that Ehlers' determining load control reductions and kilowatt hour rebates suggests an actual value that includes measurement and verification of the reduction in consumed power. *See, e.g.,* Pet. 25 (citing Ex. 1002 ¶¶ 91–94). Patent Owner contends that Ehlers does not disclose actual energy savings and therefore also fails to disclose a power supply value. PO Resp. 44; PO Sur-reply 19–20. For the reasons discussed above with respect to claim 1, we do not agree with Patent Owner that Ehlers does not disclose actual energy savings.

---

node and then reported to the utility. Ex. 1014, 235:4–236:8; *see* Pet. Reply 24 (citing Ex. 1014, 235:4–236:8).

Although Ehlers does not use the term "power supply value," we credit Dr. Auslander's testimony that Ehlers' three-step method for time-shifting energy requirements would have suggested to one of ordinary skill generating an actual value corresponding to the reduction in consumed power. Ex. 1002 ¶¶ 91–94 (citing Ex. 1004 ¶¶ 16, 96, 79); *see* Pet. 25. As discussed above, Ehlers discloses expressly "crediting consumers with KWH rebates based on their actual (measured & verified) contributions" and billing programs at the utility that receive "detailed load curtailment data" and "where credits can be applied to customer bills commensurate with their contributions. Ex. 1004 ¶¶ 79, 96; Ex. 1002 ¶ 92–94 (citing Ex. 1004 ¶¶ 16, 96, 79).

Patent Owner points to the lack of Ehlers' inclusion of a power supply value in extensive list of stored data elements as evidence that Ehlers does not disclose the recited PSV. PO Resp. 44 (citing Ex. 1004 ¶¶ 269–309; Ex. 2009 ¶ 98) (relying on Dr. Goossen testimony that "none of these values disclose a 'power supply value' as claimed"). Ehlers indicates that these data elements are stored within the system and may be stored in gateway node. Ex. 1004 ¶ 268. Even if Ehlers' list of data stored does not include a PSV, we are persuaded that Ehlers teaches a PSV, as discussed above. Though the list is extensive, Ehlers does not present this list of data as exclusive, definitive, or required for every embodiment of the invention. Rather, Ehlers describes this list as "one aspect of the invention." Ex. 1004 ¶ 268. Moreover, neither claims 2 and 15 require storing a PSV but rather require generating a PSV.

For these reasons, we determine that Ehlers teaches or suggests a power supply value that corresponds to the reduction in consumed power as

required by claims 2 and 15. We, therefore, find that Petitioner has demonstrated that Ehlers teaches or suggests these PSV limitations recited in claims 2 and 15.

*b. power supply value indicates a compensation*

Claim 15 also recites that the power supply value "indicates a compensation provided for power supply associated with the reduction in consumed power." Petitioner relies on Ehlers' rebates discussed above for this additional requirement. Pet. 46–47. Patent Owner does not provide particular arguments regarding this aspect of claim 15. PO Resp. 43–46. We agree with Petitioner that Ehlers' description of providing rebates and credit applied to consumer bills commensurate with their contributions teaches or suggests compensation provided for power supply associated with the reduction in consumed power, as required by claim 15. *See* Ex. 1004 ¶¶ 79, 96.

Claim 16, which depends from claim 15, further requires that the compensation includes at least one of various enumerated types of compensation. Petitioner contends that the compensation is a "rebate based, in part, on actual energy savings" and so is energy compensation, which is one of the enumerated types of compensation. Pet. 29–30 (contending one of ordinary skill "would have understood that Ehlers discloses and/or suggests this limitation, e.g., that the compensation includes at least energy compensation, as Ehlers teaches that the rebate is based, in part, on actual energy savings").[18] Patent Owner contends that this is insufficient because

[18] Regarding compensation recited in claim 16, Petitioner refers to arguments made regarding substantially similar types of compensation recited in claim 5. Pet. 47 (incorrectly identifying claim 5 as claim 4).

Petitioner equates kilowatt hours to compensation, whereas Dr. Goossen explains that energy compensation involves assigning a dollar value per kilowatt hour. PO Sur-reply 21–22; Ex. 1014, 237:20–22 (Patent Owner's expert, Dr. Goossen, explained that "energy compensation" in claim 5 refers to "assigning a dollar per kilowatt hour value.").

We do not agree with Patent Owner's argument that energy compensation based on kilowatt hours is not a form of compensation commensurate with the scope of claim 16. Rather, Petitioner argues with particularity that Ehlers discloses energy compensation. *See* Pet. 29–30 (contending one of ordinary skill "would have understood that Ehlers discloses and/or suggests this limitation, e.g., that the compensation includes at least energy compensation, as Ehlers teaches that the rebate is based, in part, on actual energy savings").

Moreover, we agree with Petitioner that Ehlers teaches or suggests energy compensation in the form of rebates based on actual energy savings. For example, as discussed above, Ehlers describes "credits [being] applied to consumer bills commensurate with their contributions" based on actual energy savings. Ex. 1004 ¶¶ 16, 80, 79, 96.

For these reasons, we find that Ehlers teaches or suggests a power supply value that indicates a compensation as required by claims 15 and 16. We, therefore, find that Petitioner has demonstrated that Ehlers teaches or suggests the limitations recited in claims 15 and 16.

---

*Compare* Ex. 1001, 23:18–24 (claim 5), *with id.* at 24:40–45 (claim 16 listing same types of compensation as claim 5).

*c. power supply value is generated based upon a governing entity*

Claim 17 depends directly from claim 15 and further recites "wherein the PSV is generated based upon a governing entity for the power grid operating region and/or operational regulations." Petitioner contends that one of ordinary skill would have understood that Ehlers' power supply value would be generated based on a governing entity. Pet. 48 (citing Ex. 1002 ¶¶ 178–180). Patent Owner does not address claim 17. *See generally* PO Resp.

We agree with Petitioner and Dr. Auslander that one of ordinary skill would have understood that "utilities are governed by state and federal regulatory agencies" in light of Ehlers' description that "State and Federal regulatory agencies, utilities, DOE, and others [are] concerned with maintaining a high level of reliability and integrity in the electric delivery systems" (Ex. 1004 ¶ 209). Pet. 47–48 (citing Ex. 1002 ¶¶ 174–176; Ex. 1004 ¶ 209). We also agree that descriptions in Ehlers of the utility monitoring and controlling electricity usage by controlling nodes and devices, two-way communication between the gateway node and the utility control system, and authorized users at the utility interacting with Ehlers' energy management system support a determination that one of ordinary skill would have understood that Ehlers' power supply value generated corresponding to the reduction in consumed power to be "based upon a governing entity for the power grid operating region," as required by claim 17. Ex. 1004 ¶¶ 62, 70, 338; Ex. 1002 ¶¶ 174–180 (citing Ex. 1004 ¶¶ 62, 70, 338); *see* Pet. 47–48.

For these reasons, we find that Petitioner has demonstrated that Ehlers teaches or suggests this limitation.

*d. Summary of Findings Regarding Dependent Claims 2 and 15–17*

We also are persuaded that one of ordinary skill would have had a reasonable expectation of success to the extent modifications of Ehlers would have been necessary for the reasons identified by Petitioner and discussed above with respect to claim 1. *See* Pet. 12.

Having considered the arguments and evidence of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that Ehlers would have rendered obvious the subject matter recited in claims 2 and 15–17.

*5. Dependent Claims 3–11 and 13*

Claims 3–11 and 13 each depends directly or indirectly from independent claim 1. Some of these claims additionally recite communicating various types of messages to, or receiving a message from, the load management server, which, as discussed previously, Petitioner maps to Ehlers utility control system. *See, e.g.,* Pet. 26. In the context of the two-way communication between Ehlers' gateway node and utility control system and the "always on" connectivity (Ex. 1004 ¶¶ 62, 96) discussed above, Petitioner identifies specific passages in Ehlers that teach or suggest the additional limitations recited in dependent claims 3–11 and 13. *See* Pet. 25–41. Patent Owner provides particular arguments regarding claims 4, 5, and 9, which are addressed below. *See* PO Resp. 46–50.

*a. Dependent Claims 3–5: a report message*

Claim 3 depends from claim 1 and further recites "communicating a report message to the load management server, the report message including an indication of an amount of power consumed by the at least one associated power consuming device corresponding to the measurement and verification data."

For these limitations Petitioner relies on various communications between the gateway node and the utility control system (corresponding to the load management server) described in Ehlers. Pet. 25–30 (citing Ex. 1004 ¶¶ 96, 142, 146, 114, 135–139, 141). Patent Owner does not address Petitioner's showing as to the limitations recited in claim 3. *See generally* PO Resp.

We agree with Petitioner that Ehlers teaches or suggests communicating the required report message to the utility control system, which Petitioner maps to the recited load management server (Pet. 26). For example, Ehlers indicates that after the supply request period of the Power Supply Program ends, the gateway node 1.10D "report[s] a completion message to the [utility control] system 1.02 that includes the whole house demand data and total consumption data." Ex. 1004 ¶ 142; Pet. 26 (quoting Ex. 1004 ¶ 142). Ehlers also indicates that, during the Power Supply Program, "the gateway node 1.10D may report the electrical demand generated by each device 1.08 in the" Power Supply Program and that "every message includes [information] so that the system 1.02 can collect all of the responses to the supply request and provide accurate analysis and billing/crediting information for the" Power Supply Program. Ex. 1004 ¶¶ 146, 136; Pet. 26–27 (quoting Ex. 1004 ¶¶ 146, 136).

As such, Ehlers expressly discloses that the gateway node communicates to the utility control system a message reporting power consumption data that occurred during the reduced power consumption time period of the Power Supply Program, reports electrical demand generated by the device in the Power Supply Program, and collects messages for the purpose of providing "accurate analysis and billing/crediting information"

for the Power Supply Program. Ex. 1004 ¶¶ 142, 146, 136. As Petitioner notes (Pet. 28), the billing/crediting information reflects a customer's "actual (measured & verified) contributions," as discussed previously. Ex. 1004 ¶¶ 79, 96. Thus, we agree with Petitioner that Ehlers teaches or suggests communicating to the load management server a report message that includes an indication of an amount of power consumed by an associated power consuming device corresponding to the measurement and verification data.

Accordingly, we determine that Petitioner has demonstrated that Ehlers teaches or suggests the limitations recited in claim 3.

Claim 4 depends from claim 3 and further recites "wherein the report message indicates a compensation associated with the reduction in consumed power." Claim 5 depends from claim 4 and further requires that the compensation includes at least one of various enumerated types of compensation, similar to claim 16 discussed above.

Regarding claims 4 and 5, Ehlers expressly provides compensation associated with the reduction in consumed power at least in the form of kilowatt hour (KHW) rebates described in paragraph 79 and "where credits can be applied to consumer bills commensurate with their contributes" based on "detailed load curtailment data" passed on to the back-office billing programs of the utility (described in paragraph 96). Petitioner contends that the compensation is a "rebate based, in part, on actual energy savings" and so is energy compensation, which is a type of compensation enumerated in claim 5. Pet. 29–30. As discussed above with regard to claim 16, we agree with Petitioner that Ehlers teaches or suggests energy compensation.

Patent Owner also contends Petitioner's showing for claims 4 and 5 are insufficient because "reporting device as off does not report a kilowatt hour rebate" in Ehlers' message does not amount to reporting compensation. PO Resp. 47 (citing Ex. 2010, 58:1–12). Patent Owner indicates that Ehlers' paragraphs 16 and 80, which describe the three-step method, do not describe a message. PO Resp. 48–49. These statements, however, do not undermine the descriptions from Ehlers on which Petitioner relies. That the gateway node reports customer contributions during the power reduction to the utility control system, which passes on "detailed load curtailment data on to the back-office billing programs . . . where *credits can be applied to consumer bills commensurate with their contributions*" at least suggests including "compensation associated with the reduction in consumed power" in the message where compensation includes "energy compensation," as required by claims 4 and 5. Ex. 1004 ¶ 96.

Accordingly, we find that Petitioner has demonstrated that Ehlers teaches or suggests the limitations recited in claims 4 and 5.

*b. Dependent Claims 6 and 7: measurement and verification data*

Claims 6 and 7 each depend directly from claim 1. Claim 6 additionally recites "wherein the measurement and verification data is associated with individual power consuming devices." Petitioner indicates that Ehlers describes operations related to measuring energy usage of individual devices and points out the singular references to a device, such as "a controlled device," "each participating end use device," and the like. Pet. 30–31 (citing Ex. 1004 ¶¶ 16, 96, 114, 135–139, 331). As such, we agree that Ehlers teaches or suggests that the measurement and verification data generated is associated with individual power consuming devices.

Claim 7 further recites "aggregating the measurement and verification data for a multiplicity of power consuming devices." Petitioner relies on Ehlers' express disclosure that "[i]n addition to reporting individual demand contributed by each device 1.08 during the [Power Supply Program], the gateway node 1.10D may also send the total demand generated for all devices 1.08 for the [Power Supply Program] to the system 1.02" in addition to other passages. Ex. 1004, ¶ 144; Pet. 31–32 (citing Ex. 1004 ¶¶ 96, 79, 144, 331, 358). Based on these unambiguous descriptions, we agree that Ehlers teaches or suggests "aggregating the measurement and verification data for a multiplicity of power consuming devices," as required by claim 7.

Patent Owner reiterates its position that Ehlers does not teach or suggest measurement and verification data but does not otherwise address Petitioner's showing as to the additional limitations recited in claims 6 and 7. *See* PO Resp. 49. For the reasons discussed above, we determine that Petitioner has demonstrated that Ehlers teaches or suggests the limitations recited in claims 6 and 7.

*c. Dependent Claims 8–11 and 13*

Claims 8–11 and 13 each depend directly from claim 1. Patent Owner does not present particular arguments regarding the limitations additionally recited in claims 8, 10, 11, and 13. Patent Owner reiterates its position that Ehlers does not teach or suggest measurement and verification data but does not otherwise address Petitioner's showing as to the additional limitations recited in claims 8–11. *See* PO Resp. 49–50.

Claims 8 and 9 each recite "communicating a status message to the load management server." Claim 8 further recites "the status message indicating a status of the at least one controllable device," and claim 9

further recites "the status message indicating a total amount of power consumed by the at least one associated power consuming device."

For claim 8, Petitioner relies on express disclosures in Ehlers that the gateway node 1.10 reports "the status of each device 1.08 back to the system 1.02." Ex. 1004 ¶ 137; Pet. 32–33 (citing Ex. 1004 ¶¶ 84, 96, 137, 60, 67–68, 119–121, 162, 122–123). Accordingly, we agree with Petitioner that Ehlers teaches or suggests the limitations recited in claim 8.

Regarding claim 9, Petitioner relies on many of the same passages of Ehlers discussed previously to show communicating messages about energy consumption data and contributions to energy savings, as well as measurement and verification of actual contributions of a customer and providing customers with rebates. Pet. 34 (citing Ex. 1004 ¶¶ 96–97, 114, 135–139, 141–142, 146, 79). For these reasons, we agree with Petitioner that Ehlers teaches or suggests the limitations recited in claim 9.

Claim 10 further recites "receiving a subsequent power control message from the load management server instructing the client device to enable the electric power flow to the at least one associated power consuming device with the electric power previously disabled." Petitioner additionally relies on Ehlers' express disclosure of a "supply request cancel message to abort the" Power Supply Program that causes gateway node 1.10D to "re-enable" power to devices 1.08. Pet. 35 (citing Ex. 1004 ¶¶ 142–143). This unambiguously discloses sending a message to the gateway node to enable electric power flow that was disabled during the Power Supply Program. Accordingly, we agree with Petitioner that Ehlers teaches or suggests the limitations recited in claim 10.

Claim 11 recites "the client device receiving a status message, from the load management server, that requests status information for a controllable device and receiving a status response message from the controllable device." Claim 11 also requires storing each status message[19] for reference in connection with power reduction events.

For the status message being received by the client device, Petitioner contends, based on Dr. Auslander's declaration testimony, that "[i]t would have been obvious that such a request would be received by the gateway node 1.10D." Pet. 35–36 (citing Ex. 1004 ¶¶ 135–137, 68, 216, 131–134, 118, 151, 59; Ex. 1002 ¶¶ 135–137). For support, Petitioner cites Ehlers' teaching that the gateway node polls devices and sends status information to the utility system in the context of Ehlers' disclosures concerning the communication between the gateway node and the utility control system, reporting of status of each device by the gateway node to the utility, polling of devices by the gateway node, and ability for customers to view status information for power-consuming devices. Pet. 35–36 (citing Ex. 1004 ¶¶ 135–137, 68, 216, 131–134, 118, 151, 59; Ex. 1002 ¶¶ 135–137).

For the client device receiving a status response message from the controllable device, Petitioner additionally relies on Ehlers' teaching that "[t]he load control node 1.10C may . . . provide status information, e.g., state of load control means, when a status command is received from the gateway" and "[e]ach node 1.10 may also report back the status of the

---

[19] Claim 11 recites "storing each status *response* message" although claim 11 recites only one step directed to "receiving a status *response* message." Ex. 1001, 23:50, 23:52 (emphases added). The initial step recites "receiving a *status message* from the load management server." Ex. 1001, 23:47–48 (emphasis added).

associated device 1.08, their energy usage or other utility consumption rate . . . to the central control node 1.10." Pet. 37–38 (citing Ex. 1004 ¶¶ 162, 181–182; Ex. 1002 ¶¶ 138–140).

For "storing each status response message" as required by claim 11, Petitioner contends, with support from Dr. Auslander's declaration testimony, that one of ordinary skill would have understood the information would have been stored because (i) Ehlers discloses the utility control system "may be implemented in software which is stored and executed on a back-end server," which would include a memory; and (ii) the information must have been stored while determining billing and crediting information for the Power Supply Program and reporting to energy providers. Pet. 38–39 (citing Ex. 1004 ¶¶ 72, 144, 202; Ex. 1002 ¶¶ 141–144); *see also* Pet. 38–39 (citing Ex. 1004 ¶¶ 135–137, 268, 85).

The inferences of Petitioner as to what Ehlers would have suggested to one of ordinary skill naturally follow from Ehlers' description of the types of information being communicated in the system that "allows a utility to manage delivery or usage of electricity to the customer's site" and are supported by Dr. Auslander's declaration testimony. Ex. 1004 ¶ 59; Pet. 38–39 (citing Ex. 1002 ¶¶ 141–144); Ex. 1002 ¶ 142 (citing Ex. 1004 ¶¶ 135–137), ¶ 143 (citing Ex. 1004 ¶ 72); *see, e.g.,* Pet. 37 (quoting Ex. 1004 ¶ 59).

Additionally, Petitioner's contention that information would have been stored in memory as required by claim 11 is likewise supported by disclosures of Ehlers cited by Dr. Auslander. Pet. 39 (citing Ex. 1002 ¶¶ 145–146); Ex. 1002 ¶ 145 (citing Ex. 1004 ¶¶ 268, 85, 202).

For these reasons, we agree with Petitioner that Ehlers teaches or suggests the limitations recited in claim 11.

Claim 13 additionally recites that the power control message received by the client device from the load management server includes "a list of controllable devices to be instructed to disable the electric power flow to associated power consuming devices" (rather than identifying at least one controllable device as recited in independent claim 1). Claim 13 also recites that "the power management command causes the controllable devices identified in the list to disable the electric power flow to the associated consuming devices to achieve the reduction in consumed power."

Petitioner contends that one of ordinary skill would have understood Ehlers to disclose or suggest the limitations additionally recited in claim 13 because Ehlers describes the supply request as including identifiers "of the devices that are to contribute" and describes that Power Supply Programs "may be defined which when activated may curtail one or more devices 1.08." Pet. 40 (quoting Ex. 1004 ¶¶ 110, 342; citing Ex. 1002 ¶¶ 147–148); *see also* Pet. 40–41 (citing Ex. 1004 ¶¶ 135, 60, 67, 68, 135–138; Ex. 1002 ¶¶ 147–151). We agree with Petitioner that Ehlers' use of plural forms of "devices" in the context of Ehlers' description of its energy management system discussed above discloses or at least suggests the message and commands for multiple controllable devices as required by claim 13.

We also are persuaded that one of ordinary skill would have had a reasonable expectation of success to the extent modifications of Ehlers would have been necessary for the reasons identified by Petitioner and discussed above with respect to claim 1. *See* Pet. 12. Having considered the arguments and evidence of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that Ehlers would have rendered obvious the subject matter recited in claims 3–11 and 13.

*6. Dependent Claims 18 and 19*

Claim 18, which depends directly from independent claim 14, recites a power control message substantially similar to limitation 1a of claim 1. Petitioner relies on its arguments regarding Ehlers' supply control message. Pet. 48–49. For the reasons discussed above, we find that Petitioner has demonstrated that Ehlers teaches or would have suggested this limitation.

Claim 19, which also depends directly from independent claim 14, additionally recites a communications interface facilitating communications between the remote management server and the client device. Claim 19 further recites "the device control manager communicates at least one power consumption indicator and at least one power management status to the remote load management server via the communications interface."

Petitioner relies on Ehlers two-way communication discussed previously as well as an express disclosure that nodes have interfaces. Pet. 49–50 (quoting Ex. 1004 ¶¶ 62, 72, 84, 171, 169). Regarding the device control manager limitations, Petitioner relies on Ehlers' teaching about the gateway node reporting information and status information discussed above. Pet. 50–51 (citing Ex. 1004 ¶¶ 179, 136–137, 96–97, 79). Based on these teachings, Dr. Auslander opines that one of ordinary skill would have understood Ehlers to suggest "the processor and control logic of the gateway node (the device control manager) communicate" as required by claim 19. Ex. 1002 ¶¶ 187–190; Pet. 51 (quoting same). Petitioner also contends, relying on Dr. Auslander's declaration testimony, that one of ordinary skill would have found it obvious in light of these teachings to include a power consumption indicator and a power management status in the status message sent by the control logic and processor of the gateway node. Pet. 52 (citing Ex. 1002 ¶¶ 191–193). Petitioner contends this modification would have

been a simple substitution that could be accomplished with a reasonable expectation of success. *Id.* (citing Ex. 1002 ¶ 192). Furthermore, Petitioner contends its modification supports Ehlers' goal to determine the amount of power reduced through measurement and verification. *Id.* (citing Ex. 1002 ¶¶ 191–193).

Patent Owner does not address claim 19. We agree with Petitioner that Ehlers would have disclosed to one of ordinary skill the communications interface, power consumption indicator, and power management status as required by the limitations in claim 19.

We also agree with Petitioner that one of ordinary skill would have had reason to modify Ehlers with a reasonable expectation of success, as discussed above. Having reviewed the evidence and arguments of record, we determine that Petitioner has demonstrated that Ehlers would have the rendered obvious the subject matter recited in claims 18 and 19.

*E. Obviousness over Ehlers and Chen*

Petitioner also contends that the challenged claims would have been obvious over Ehlers and Chen. Pet. 52–62.

*1. Disclosure of Chen (Ex. 1012)*

Chen is titled "Electronic Message Delivery System Utilizable in the Monitoring and Control of Remote Equipment and Method of Same," and relates to "controlling, monitoring and managing remote devices and, more particularly to, methods and systems for remotely adjusting states and/or characteristics of the remote devices for reducing demand/consumption." Ex. 1012, code (54), ¶ 2. Figure 17 of Chen, reproduced below, illustrates a system for monitoring and controlling remote devices. *Id.* ¶ 50.




FIG. 17

Figure 17 "is a diagram illustrating an exemplary system for monitoring and controlling remote devices." *Id.* In the system shown in Figure 17, central server 1710 may "receiv[e] a command message and generat[e] a control signal or information message in response." *Id.* ¶ 55. A command message received at the central server "may include instructions for adjusting characteristics (e.g., state, operation control parameters, etc.) of the devices," and, in particular, "may include information related to an amount of adjustment, devices to be adjusted, . . . and/or other instructions." *Id.* ¶ 67. A control signal or informational message generated by the central server "may include instructions for monitoring, adjusting, controlling and/or otherwise manipulating the devices," including "lighting systems 1742; refrigeration systems 1744; HVAC systems 1746; generator 1748 . . . and other controllable devices 1750." *Id.* ¶¶ 57–58. "Meter device 1740, such as an energy meter or other component, may be used to measure an amount of consumption or other condition or action, which may then be fed

back to the interface unit 1738, or to the Central Server 1710 via a separate communicate link 1735, or both." *Id.* ¶ 60.

*2. Petitioner's Combination of Ehlers and Chen*

In addition to relying on the Ehlers' teachings as discussed above, Petitioner makes additional arguments relying on Chen in combination with Ehlers' system only regarding limitation 1b. *See, e.g.,* Pet. 56–59 (claim 1), 59–62 (claims 2–11, 13–19). Specifically, Petitioner relies on Chen's express disclosure of a command message that "include[s] instructions for adjusting characteristics . . . of devices," including "an amount of adjustment." Pet. 56–57 (quoting Ex. 1012 ¶¶ 67, 74). As noted above, the plain language of limitation 1b requires a power control message indicating an amount of electric power to be reduced or an identification of a controllable device to be instructed to disable the electric power flow.

Petitioner contends that one of ordinary skill would have reason to include Chen's power control message in Ehlers' system. Pet. 56–57. Petitioner contends that one of ordinary skill would look to Chen to ensure Ehlers' gateway node would receive "sufficient information to achieve reduction of a particular amount of power consumption, based on present supply of power." Pet. 58. Incorporating Chen's message indicating an amount of electric power to be reduced would enable Ehlers' gateway node 1.10D "to have more precise information pertaining to the appropriate devices to shut off, and for how long," as Dr. Auslander testifies. Pet. 58 (citing Ex. 1002 ¶¶ 213–214).

Petitioner also contends that one of ordinary skill would have had a reasonable expectation of success in implementing Chen's power control message into Ehlers' system, which would have "involved combining prior art elements according to known methods to yield predictable results" of

"providing more precise information in a control message." Pet. 58–59 (citing Ex. 1002 ¶ 215). According to Dr. Auslander, the implementation of Chen's command message in Ehlers' system "would not require substantial modification and would have been within the" level of ordinary skill. Pet. 59 (paraphrasing Ex. 1002 ¶ 215).

Additionally, Petitioner contends that Ehlers and Chen are in the same field as the challenged patent—monitoring and controlling power consuming equipment by providing control messages from servers to client devices concerning reduction in power consumption—and thus are analogous art. Pet. 55 (citing Ex. 1001, 1:26–32; Ex. 1004, Abstract, ¶¶ 59–66; Ex. 1012 ¶¶ 50, 18–21, 54–60; Ex. 1002 ¶ 204).

Patent Owner does not address these contentions regarding limitation 1b, Petitioner's reasons one of ordinary skill would have had combined Chen's teachings with Ehlers' system, or Petitioner's contentions regarding reasonable expectation of success.

Having reviewed the evidence and arguments of record, we determine that Petitioner has demonstrated that Ehlers in combination with Chen would have disclosed or suggested to one of ordinary skill "the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device," as recited in claim 1. Additionally, for reasons discussed above, we also determine that Petitioner has demonstrated that Ehlers in combination with Chen would have disclosed or suggested to one of ordinary skill the other limitations recited in claim 1 and the limitations recited in claims 2–11 and 13–19.

Having considered the arguments and evidence of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill would have had reason to combine the teachings of Ehlers and Chen in the manner proposed by Petitioner, would have had a reasonable expectation of success in doing so, and that Ehlers and Chen's combined teachings would have disclosed or suggested the subject matter recited in claims 1–11 and 13–19.

## III. CONCLUSION[20]

Having considered all the arguments and evidence of record, we conclude that Petitioner has shown by a preponderance of the evidence that all challenged claims are unpatentable.

In summary:

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–11, 13–19 | 103 | Ehlers | 1–11, 13–19 | |
| 1–11, 13–19 | 103 | Ehlers, Chen | 1–11, 13–19 | |
| **Overall Outcome** | | | 1–11, 13–19 | |

[20] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–11 and 13–19 of the '268 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Justin Oliver
Catherine Taylor
VENABLE LLP
joliver@venable.com
cntaylor@venable.com

For PATENT OWNER:

Wayne Helge
NOSSAMAN LLP
whelge@nossaman.com

James Wilson
DAVIDSON BERQUIST JACKSON & GOWDEY LLP
jwilson@dbjg.com

US010394268B2

(12) **United States Patent**
**Forbes, Jr.**

(10) **Patent No.: US 10,394,268 B2**
(45) **Date of Patent: *Aug. 27, 2019**

(54) **METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID**

(71) Applicant: **Causam Energy, Inc.**, Raleigh, NC (US)

(72) Inventor: **Joseph W. Forbes, Jr.**, Raleigh, NC (US)

(73) Assignee: **CAUSAM ENERGY, INC.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 132 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/618,981**

(22) Filed: **Jun. 9, 2017**

(65) **Prior Publication Data**

US 2017/0277214 A1 Sep. 28, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/456,306, filed on Aug. 11, 2014, now Pat. No. 9,678,522, which is a

(Continued)

(51) **Int. Cl.**

***G05F 1/66*** (2006.01)
***G06Q 10/06*** (2012.01)

(Continued)

(52) **U.S. Cl.**

CPC ............... ***G05F 1/66*** (2013.01); ***G01D 4/004*** (2013.01); ***G06Q 10/06*** (2013.01); ***G06Q 50/06*** (2013.01);

(Continued)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,906,242 | A | 9/1975 | Stevenson |
| 4,023,043 | A | 5/1977 | Stevenson |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1729223 | A | 12/2006 |
| JP | 2000078748 | A | 3/2000 |

(Continued)

OTHER PUBLICATIONS

B.J. Kirby, Spinning Reserve from Responsive Loads, Oak Ridge National Laboratory, United States Dept. of Energy, Mar. 2003 (54 pages).

(Continued)

*Primary Examiner* — Ramesh B Patel
(74) *Attorney, Agent, or Firm* — Neo IP

(57) **ABSTRACT**

A client device manages consumption of power supplied by an electric utility to power consuming devices. Power flow to the power consuming devices is selectively enabled and disabled by one or more controllable devices controlled by the client device. The client device receives a power control message from a load management server. The power control message indicates at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices. Responsive to the power control message, the client device issues a power management command to one or more controllable devices under the client device's control. The power management command causes the one or more controllable devices to disable a flow of electric power to the one or more associated power consuming device.

**19 Claims, 8 Drawing Sheets**





PETITIONER ECOBEE
EX. 1001

**Related U.S. Application Data**

continuation of application No. 13/463,761, filed on May 3, 2012, now Pat. No. 8,805,552, which is a continuation-in-part of application No. 13/172,389, filed on Jun. 29, 2011, now Pat. No. 8,315,717, which is a continuation of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951.

(51) **Int. Cl.**

| | |
|---|---|
| ***H02J 3/14*** | (2006.01) |
| ***H04L 29/08*** | (2006.01) |
| ***G01D 4/00*** | (2006.01) |
| ***G06Q 50/06*** | (2012.01) |

(52) **U.S. Cl.**

CPC ................ ***H02J 3/14*** (2013.01); ***H04L 67/02*** (2013.01); *Y02B 70/3225* (2013.01); *Y02B 90/242* (2013.01); *Y02B 90/245* (2013.01); *Y04S 10/54* (2013.01); *Y04S 20/222* (2013.01); *Y04S 20/322* (2013.01); *Y04S 20/40* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,589,075 | A | 5/1986 | Buennagel |
| 4,799,059 | A | 1/1989 | Grindahl et al. |
| 4,819,180 | A | 4/1989 | Hedman et al. |
| 4,819,229 | A | 4/1989 | Pritty et al. |
| 5,237,507 | A | 8/1993 | Chasek |
| 5,361,982 | A | 11/1994 | Liebl et al. |
| 5,388,101 | A | 2/1995 | Dinkins |
| 5,462,225 | A | 10/1995 | Massara et al. |
| 5,481,546 | A | 1/1996 | Dinkins |
| 5,502,339 | A | 3/1996 | Hartig |
| 5,544,036 | A | 8/1996 | Brown et al. |
| 5,570,002 | A | 10/1996 | Castleman |
| 5,592,491 | A | 1/1997 | Dinkins |
| 5,640,153 | A | 6/1997 | Hildebrand et al. |
| 5,644,173 | A | 7/1997 | Elliason et al. |
| 5,675,503 | A | 10/1997 | Moe et al. |
| 5,696,695 | A | 12/1997 | Ehlers et al. |
| 5,721,936 | A | 2/1998 | Kikinis et al. |
| 5,926,776 | A | 7/1999 | Glorioso et al. |
| 5,973,481 | A | 10/1999 | Thompson et al. |
| 6,018,690 | A | 1/2000 | Saito et al. |
| 6,037,758 | A | 3/2000 | Perez |
| 6,078,785 | A | 6/2000 | Bush |
| 6,102,487 | A | 8/2000 | Oevreboe |
| 6,107,693 | A | 8/2000 | Mongia et al. |
| 6,115,676 | A | 9/2000 | Rector et al. |
| 6,154,859 | A | 11/2000 | Norizuki et al. |
| 6,216,956 | B1 | 4/2001 | Ehlers et al. |
| 6,233,327 | B1 | 5/2001 | Petite |
| 6,254,009 | B1 | 7/2001 | Proffitt et al. |
| 6,304,552 | B1 | 10/2001 | Chapman et al. |
| 6,366,217 | B1 | 4/2002 | Cunningham et al. |
| 6,374,101 | B1 | 4/2002 | Gelbien |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,519,509 | B1 | 2/2003 | Nierlich et al. |
| 6,529,839 | B1 | 3/2003 | Uggerud et al. |
| 6,535,797 | B1 | 3/2003 | Bowles et al. |
| 6,577,962 | B1 | 6/2003 | Afshari |
| 6,583,521 | B1 | 6/2003 | Lagod et al. |
| 6,601,033 | B1 | 7/2003 | Sowinski |
| 6,602,627 | B2 | 8/2003 | Liu et al. |
| 6,621,179 | B1 | 9/2003 | Howard |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,681,154 | B2 | 1/2004 | Nierlich et al. |
| 6,687,574 | B2 | 2/2004 | Pietrowicz et al. |
| 6,718,761 | B2 | 4/2004 | Merswolke et al. |
| 6,732,055 | B2 | 5/2004 | Bagepalli et al. |
| 6,747,368 | B2 | 6/2004 | Jarrett |
| 6,778,882 | B2 | 8/2004 | Spool et al. |
| 6,784,807 | B2 | 8/2004 | Petite et al. |
| 6,832,135 | B2 | 12/2004 | Ying |
| 6,834,811 | B1 | 12/2004 | Huberman et al. |
| 6,836,737 | B2 | 12/2004 | Petite et al. |
| 6,862,498 | B2 | 3/2005 | Davis et al. |
| 6,865,450 | B2 | 3/2005 | Masticola et al. |
| 6,868,293 | B1 | 3/2005 | Schurr et al. |
| 6,879,059 | B2 | 4/2005 | Sleva |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,904,336 | B2 | 6/2005 | Raines et al. |
| 6,906,617 | B1 | 6/2005 | der |
| 6,909,942 | B2 | 6/2005 | Andarawis et al. |
| 6,914,533 | B2 | 7/2005 | Petite |
| 6,914,893 | B2 | 7/2005 | Petite |
| 6,934,316 | B2 | 8/2005 | Cornwall et al. |
| 6,944,555 | B2 | 9/2005 | Blackett et al. |
| 6,961,641 | B1 | 11/2005 | Forth et al. |
| 6,990,593 | B2 | 1/2006 | Nakagawa |
| 7,003,640 | B2 | 2/2006 | Mayo et al. |
| 7,019,667 | B2 | 3/2006 | Petite et al. |
| 7,035,719 | B2 | 4/2006 | Howard et al. |
| 7,039,532 | B2 | 5/2006 | Hunter |
| 7,053,767 | B2 | 5/2006 | Petite et al. |
| 7,088,014 | B2 | 8/2006 | Nierlich et al. |
| 7,103,511 | B2 | 9/2006 | Petite |
| 7,123,994 | B2 | 10/2006 | Welk et al. |
| 7,133,750 | B2 | 11/2006 | Raines et al. |
| 7,136,725 | B1 | 11/2006 | Paciorek et al. |
| 7,141,321 | B2 | 11/2006 | McArthur et al. |
| 7,142,949 | B2 | 11/2006 | Brewster et al. |
| 7,177,728 | B2 | 2/2007 | Gardner |
| 7,181,320 | B2 | 2/2007 | Whiffen et al. |
| 7,184,861 | B2 | 2/2007 | Petite |
| 7,200,134 | B2 | 4/2007 | Proctor et al. |
| 7,206,670 | B2 | 4/2007 | Pimputkar et al. |
| 7,209,804 | B2 | 4/2007 | Curt et al. |
| 7,209,840 | B2 | 4/2007 | Petite et al. |
| 7,233,843 | B2 | 6/2007 | Budhraja et al. |
| 7,263,073 | B2 | 8/2007 | Petite et al. |
| 7,263,450 | B2 | 8/2007 | Hunter |
| 7,274,975 | B2 | 9/2007 | Miller |
| 7,289,887 | B2 | 10/2007 | Rodgers |
| 7,295,128 | B2 | 11/2007 | Petite |
| 7,305,282 | B2 | 12/2007 | Chen |
| 7,313,465 | B1 | 12/2007 | O'Donnell |
| 7,343,341 | B2 | 3/2008 | Sandor et al. |
| 7,345,998 | B2 | 3/2008 | Cregg et al. |
| 7,346,463 | B2 | 3/2008 | Petite et al. |
| 7,366,164 | B1 | 4/2008 | Habib et al. |
| 7,397,907 | B2 | 7/2008 | Petite |
| 7,406,364 | B2 | 7/2008 | Rissanen et al. |
| 7,412,304 | B2 | 8/2008 | Uenou |
| 7,424,527 | B2 | 9/2008 | Petite |
| 7,440,871 | B2 | 10/2008 | McConnell et al. |
| 7,451,019 | B2 | 11/2008 | Rodgers |
| 7,468,661 | B2 | 12/2008 | Petite et al. |
| 7,480,501 | B2 | 1/2009 | Petite |
| 7,486,681 | B2 | 2/2009 | Weber |
| 7,492,617 | B2 | 2/2009 | Petter et al. |
| 7,528,503 | B2 | 5/2009 | Rognli et al. |
| 7,536,240 | B2 | 5/2009 | McIntyre et al. |
| 7,541,941 | B2 | 6/2009 | Bogolea et al. |
| 7,565,227 | B2 | 7/2009 | Richard et al. |
| 7,650,425 | B2 | 1/2010 | Davis et al. |
| 7,697,492 | B2 | 4/2010 | Petite |
| 7,711,796 | B2 | 5/2010 | Gutt et al. |
| 7,715,951 | B2 | 5/2010 | Forbes et al. |
| 7,738,999 | B2 | 6/2010 | Petite |
| 7,739,378 | B2 | 6/2010 | Petite |
| 7,747,165 | B2 | 6/2010 | Emery et al. |
| 7,940,901 | B2 | 5/2011 | Paraskevakos et al. |
| 8,010,812 | B2 | 8/2011 | Forbes et al. |
| 8,032,233 | B2 | 10/2011 | Forbes et al. |
| 8,032,461 | B2 | 10/2011 | Winter et al. |
| 8,046,110 | B2 | 10/2011 | Mayor et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS


8,068,938 B2 11/2011 Fujita
8,131,403 B2 3/2012 Forbes et al.
8,145,361 B2 3/2012 Forbes et al.
8,260,468 B2 9/2012 Ippolito et al.
8,260,470 B2 9/2012 Forbes et al.
8,295,989 B2 10/2012 Rettger et al.
8,307,225 B2 11/2012 Forbes et al.
8,315,717 B2 11/2012 Forbes et al.
8,315,743 B2 11/2012 Sackman et al.
8,359,124 B2 1/2013 Zhou et al.
8,359,215 B1 1/2013 Robbins et al.
8,364,609 B2 1/2013 Ozog
8,396,606 B2 3/2013 Forbes et al.
8,407,252 B2 3/2013 Bennett et al.
8,417,569 B2 4/2013 Gross
8,428,752 B2 4/2013 Bennett et al.
8,442,917 B1 5/2013 Burke
8,457,802 B1 6/2013 Steven et al.
8,463,449 B2 6/2013 Sanders
8,473,111 B1 6/2013 Shankar et al.
8,527,107 B2 9/2013 Forbes et al.
8,570,999 B1 * 10/2013 Nguyen ................ H04B 3/542 370/343
8,571,930 B1 10/2013 Galperin
8,583,520 B1 11/2013 Forbes
8,588,991 B1 * 11/2013 Forbes, Jr. ............ G05B 19/02 700/295
8,600,556 B2 12/2013 Nesler et al.
8,684,266 B2 4/2014 Bennett et al.
8,761,952 B2 6/2014 Forbes
8,805,552 B2 8/2014 Forbes
8,806,239 B2 8/2014 Forbes
8,890,505 B2 11/2014 Forbes
8,983,669 B2 * 3/2015 Forbes, Jr. ............... G05F 1/66 700/286
8,996,183 B2 3/2015 Forbes
9,177,323 B2 11/2015 Forbes
9,461,471 B2 * 10/2016 Forbes, Jr. ............ G05B 15/02
9,651,973 B2 * 5/2017 Forbes, Jr. ............ G06Q 10/00
9,952,611 B2 * 4/2018 Forbes, Jr. ............ G05B 15/02
9,989,982 B2 * 6/2018 Forbes, Jr. ............ G05B 15/02
2001/0030468 A1 10/2001 Anderson et al.
2001/0038343 A1 11/2001 Meyer et al.
2002/0019758 A1 2/2002 Scarpelli
2002/0019802 A1 2/2002 Malme et al.
2002/0035496 A1 3/2002 Fukushima et al.
2002/0036430 A1 3/2002 Welches et al.
2002/0109607 A1 8/2002 Cumeralto et al.
2002/0138176 A1 9/2002 Davis et al.
2002/0143693 A1 10/2002 Soestbergen et al.
2002/0161648 A1 10/2002 Mason et al.
2002/0198629 A1 12/2002 Ellis
2003/0009401 A1 1/2003 Ellis
2003/0009705 A1 1/2003 Thelander et al.
2003/0036820 A1 2/2003 Yellepeddy et al.
2003/0083980 A1 5/2003 Satake
2003/0144864 A1 7/2003 Mazzarella
2003/0149937 A1 8/2003 McElfresh et al.
2003/0158632 A1 8/2003 Nierlich et al.
2003/0167178 A1 9/2003 Jarman et al.
2003/0176952 A1 9/2003 Collins
2003/0225483 A1 12/2003 Santinato et al.
2003/0229572 A1 12/2003 Raines et al.
2003/0233201 A1 12/2003 Horst et al.
2004/0006439 A1 1/2004 Hunter
2004/0024483 A1 2/2004 Holcombe
2004/0044571 A1 3/2004 Bronnimann et al.
2004/0088083 A1 5/2004 Davis et al.
2004/0095237 A1 5/2004 Chen et al.
2004/0107025 A1 * 6/2004 Ransom ............ G05B 19/4185 700/286
2004/0117330 A1 6/2004 Ehlers et al.
2004/0128266 A1 7/2004 Yellepeddy et al.
2004/0138834 A1 7/2004 Blackett et al.
2004/0153170 A1 8/2004 Santacatterina et al.
2004/0158478 A1 8/2004 Zimmerman
2004/0158541 A1 8/2004 Notarianni et al.
2004/0162793 A1 8/2004 Scott et al.
2004/0193329 A1 9/2004 Ransom et al.
2004/0225514 A1 11/2004 Greenshields et al.
2004/0230533 A1 11/2004 Benco
2005/0021397 A1 1/2005 Cui et al.
2005/0033481 A1 2/2005 Budhraja et al.
2005/0055432 A1 3/2005 Rodgers
2005/0065742 A1 3/2005 Rodgers
2005/0080772 A1 4/2005 Bem
2005/0096856 A1 5/2005 Lubkeman et al.
2005/0096857 A1 5/2005 Hunter
2005/0096979 A1 5/2005 Koningstein
2005/0097204 A1 5/2005 Horowitz et al.
2005/0125243 A1 6/2005 Villalobos
2005/0127680 A1 6/2005 Lof et al.
2005/0138432 A1 * 6/2005 Ransom ................ G01D 4/004 726/4
2005/0192711 A1 9/2005 Raines et al.
2005/0192713 A1 9/2005 Weik et al.
2005/0197742 A1 9/2005 Scott et al.
2005/0216302 A1 9/2005 Raji et al.
2005/0216580 A1 9/2005 Raji et al.
2005/0234600 A1 10/2005 Boucher et al.
2005/0240314 A1 10/2005 Martinez
2005/0240315 A1 10/2005 Booth et al.
2005/0246190 A1 11/2005 Sandor et al.
2005/0267642 A1 12/2005 Whiffen et al.
2005/0276222 A1 12/2005 Kumar et al.
2005/0288954 A1 12/2005 McCarthy et al.
2006/0020544 A1 1/2006 Kaveski
2006/0020596 A1 1/2006 Liu et al.
2006/0022841 A1 2/2006 Hoiness et al.
2006/0025891 A1 2/2006 Budike
2006/0031934 A1 2/2006 Kriegel
2006/0064205 A1 3/2006 Ying
2006/0069616 A1 3/2006 Bau
2006/0106635 A1 5/2006 Ulrich et al.
2006/0142900 A1 6/2006 Rothman et al.
2006/0142961 A1 6/2006 Johnson et al.
2006/0161310 A1 7/2006 Lal
2006/0161450 A1 7/2006 Carey et al.
2006/0168191 A1 7/2006 Ives
2006/0190354 A1 8/2006 Meisel et al.
2006/0195334 A1 8/2006 Reeb et al.
2006/0212350 A1 9/2006 Ellis et al.
2006/0224615 A1 10/2006 Korn et al.
2006/0241244 A1 10/2006 Soeda et al.
2006/0241314 A1 10/2006 Sullivan et al.
2006/0271244 A1 11/2006 Cumming et al.
2006/0271314 A1 11/2006 Hayes
2006/0276938 A1 12/2006 Miller
2006/0282328 A1 12/2006 Gerace et al.
2007/0021874 A1 1/2007 Rognli et al.
2007/0038563 A1 2/2007 Ryzerski
2007/0058453 A1 3/2007 Shaffer et al.
2007/0058629 A1 3/2007 Luft
2007/0070895 A1 3/2007 Narvaez
2007/0085702 A1 4/2007 Walters et al.
2007/0091900 A1 4/2007 Asthana et al.
2007/0094043 A1 4/2007 Bannai et al.
2007/0100503 A1 5/2007 Balan et al.
2007/0100961 A1 5/2007 Moore
2007/0150353 A1 6/2007 Krassner et al.
2007/0156621 A1 7/2007 Wright et al.
2007/0156887 A1 7/2007 Wright et al.
2007/0174114 A1 7/2007 Bigby et al.
2007/0192333 A1 8/2007 Ali
2007/0203722 A1 8/2007 Richards et al.
2007/0204176 A1 8/2007 Shaffer et al.
2007/0213878 A1 9/2007 Chen
2007/0214118 A1 9/2007 Schoen et al.
2007/0214132 A1 9/2007 Grubb et al.
2007/0255457 A1 11/2007 Whitcomb et al.
2007/0260540 A1 11/2007 Chau et al.
2007/0282495 A1 12/2007 Kempton et al.
2007/0286210 A1 12/2007 Gutt et al.
2007/0291644 A1 12/2007 Roberts et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2007/0299562 A1 12/2007 Kates
2008/0010212 A1 1/2008 Moore et al.
2008/0015976 A1 1/2008 Sandor et al.
2008/0040223 A1 2/2008 Bridges et al.
2008/0091625 A1 4/2008 Kremen
2008/0104026 A1 5/2008 Koran
2008/0109387 A1 5/2008 Deaver et al.
2008/0130673 A1 6/2008 Cregg et al.
2008/0147465 A1 6/2008 Raines et al.
2008/0154801 A1 6/2008 Fein et al.
2008/0165714 A1 7/2008 Dettinger et al.
2008/0172312 A1 7/2008 Synesiou et al.
2008/0177423 A1 7/2008 Brickfield et al.
2008/0177678 A1 7/2008 Martini et al.
2008/0186202 A1 8/2008 Vaswani et al.
2008/0195462 A1 8/2008 Magdon-Ismail et al.
2008/0224892 A1 9/2008 Bogolea et al.
2008/0231114 A1 9/2008 Tolnar et al.
2008/0238710 A1 10/2008 Tolnar et al.
2008/0249832 A1 10/2008 Richardson et al.
2008/0255899 A1 10/2008 McConnell et al.
2008/0263025 A1 10/2008 Koran
2008/0270223 A1 10/2008 Collins et al.
2008/0272934 A1 11/2008 Wang et al.
2008/0281473 A1 11/2008 Pitt
2008/0306824 A1 12/2008 Parkinson
2008/0306830 A1 12/2008 Lasa et al.
2008/0313632 A1 12/2008 Kumar et al.
2008/0319893 A1 12/2008 Mashinsky et al.
2009/0012996 A1 1/2009 Gupta et al.
2009/0018884 A1 1/2009 McConnell et al.
2009/0024718 A1 1/2009 Anagnostopoulos et al.
2009/0038343 A1 2/2009 Gibson
2009/0043519 A1 2/2009 Bridges et al.
2009/0043520 A1 2/2009 Pollack et al.
2009/0045804 A1 2/2009 Durling et al.
2009/0055031 A1 2/2009 Slota et al.
2009/0055032 A1 2/2009 Rodgers
2009/0062970 A1 3/2009 Forbes et al.
2009/0063228 A1 3/2009 Forbes
2009/0088907 A1 4/2009 Lewis et al.
2009/0112701 A1 4/2009 Turpin
2009/0112758 A1 4/2009 Herzig
2009/0124241 A1 5/2009 Krishnaswamy et al.
2009/0125462 A1 5/2009 Krishnaswamy et al.
2009/0135836 A1 5/2009 Veillette
2009/0138362 A1 5/2009 Schroedl et al.
2009/0157529 A1 6/2009 Ehlers et al.
2009/0187344 A1 7/2009 Brancaccio et al.
2009/0187499 A1 7/2009 Mulder et al.
2009/0198384 A1 8/2009 Ahn
2009/0228335 A1 9/2009 Niyogi et al.
2009/0240381 A1 9/2009 Lane
2009/0240677 A1 9/2009 Parekh et al.
2009/0281673 A1 11/2009 Taft
2009/0281674 A1 11/2009 Taft
2009/0313034 A1 12/2009 Ferro et al.
2009/0313103 A1 12/2009 Ambrosio et al.
2009/0319415 A1 12/2009 Stoilov et al.
2010/0076835 A1 3/2010 Silverman
2010/0082464 A1 4/2010 Keefe
2010/0094981 A1 4/2010 Cordray et al.
2010/0106575 A1 4/2010 Bixby
2010/0106641 A1 4/2010 Chassin et al.
2010/0138452 A1 6/2010 Henkin et al.
2010/0163634 A1 7/2010 Klein et al.
2010/0169175 A1 7/2010 Koran
2010/0179862 A1 7/2010 Chassin et al.
2010/0191862 A1 7/2010 Forbes et al.
2010/0217452 A1 8/2010 McCord et al.
2010/0217549 A1 8/2010 Galvin et al.
2010/0217550 A1 8/2010 Crabtree et al.
2010/0217642 A1 8/2010 Crubtree et al.
2010/0218108 A1 8/2010 Crabtree et al.
2010/0222935 A1* 9/2010 Forbes, Jr. ............. G06Q 10/00 700/291
2010/0235008 A1* 9/2010 Forbes, Jr. ............. G06Q 10/00 700/291
2010/0274407 A1 10/2010 Creed
2010/0293045 A1 11/2010 Burns et al.
2010/0306033 A1 12/2010 Oved et al.
2010/0324748 A1 12/2010 Voysey
2010/0328849 A1 12/2010 Ewing et al.
2010/0332373 A1 12/2010 Crabtree et al.
2011/0007824 A1 1/2011 Bridges et al.
2011/0025556 A1 2/2011 Bridges et al.
2011/0029655 A1 2/2011 Forbes et al.
2011/0055036 A1 3/2011 Helfan
2011/0060474 A1 3/2011 Schmiegel et al.
2011/0080044 A1 4/2011 Schmiegel
2011/0106729 A1 5/2011 Billingsley et al.
2011/0115302 A1 5/2011 Slota et al.
2011/0130982 A1 6/2011 Haag et al.
2011/0133655 A1 6/2011 Recker et al.
2011/0145061 A1 6/2011 Spurr et al.
2011/0147360 A1 6/2011 Hammerstrom
2011/0161250 A1 6/2011 Koeppel et al.
2011/0172841 A1 7/2011 Forbes
2011/0178610 A1 7/2011 Gamble et al.
2011/0185303 A1 7/2011 Katagi et al.
2011/0196546 A1 8/2011 Muller et al.
2011/0196547 A1 8/2011 Park et al.
2011/0204717 A1 8/2011 Shaffer
2011/0204719 A1 8/2011 Sackman et al.
2011/0208366 A1 8/2011 Taft
2011/0208367 A1 8/2011 Sackman et al.
2011/0231028 A1 9/2011 Ozog
2011/0235656 A1 9/2011 Pigeon
2011/0251730 A1 10/2011 Pitt
2011/0257809 A1 10/2011 Forbes et al.
2011/0258022 A1 10/2011 Forbes et al.
2011/0267202 A1 11/2011 Efthymiou et al.
2011/0270452 A1 11/2011 Lu et al.
2011/0270682 A1 11/2011 Valin
2012/0004872 A1 1/2012 Oh et al.
2012/0029897 A1 2/2012 Cherian et al.
2012/0059532 A1 3/2012 Reifenhaeuser et al.
2012/0078427 A1 3/2012 Jang et al.
2012/0089263 A1 4/2012 Park et al.
2012/0095841 A1 4/2012 Luckerman et al.
2012/0101652 A1 4/2012 Shin et al.
2012/0131100 A1 5/2012 Van Olst et al.
2012/0146799 A1 6/2012 Bell et al.
2012/0153888 A1 6/2012 Jung
2012/0154171 A1 6/2012 Hurri et al.
2012/0196482 A1 8/2012 Stokoe
2012/0205977 A1 8/2012 Shin et al.
2012/0221162 A1 8/2012 Forbes
2012/0223840 A1 9/2012 Guymon et al.
2012/0226384 A1 9/2012 Forbes
2012/0232816 A1 9/2012 Oh et al.
2012/0239218 A1 9/2012 Forbes
2012/0239219 A1 9/2012 Forbes
2012/0245753 A1 9/2012 Forbes
2012/0259760 A1 10/2012 Sgouridis et al.
2012/0296799 A1 11/2012 Playfair et al.
2012/0310800 A1 12/2012 Xia et al.
2012/0316691 A1 12/2012 Boardman et al.
2012/0316697 A1 12/2012 Boardman et al.
2013/0006435 A1 1/2013 Berrios et al.
2013/0031201 A1 1/2013 Kagan et al.
2013/0035802 A1 2/2013 Khaitan et al.
2013/0036311 A1 2/2013 Akyol et al.
2013/0038468 A1 2/2013 Wang et al.
2013/0079939 A1 3/2013 Thomas et al.
2013/0079943 A1 3/2013 Darden
2013/0090935 A1* 4/2013 Uselton ................. G06Q 50/06 705/1.1
2013/0110297 A1 5/2013 Reichmuth et al.
2013/0123998 A1 5/2013 King et al.
2013/0144768 A1 6/2013 Rohrbaugh
2013/0173360 A1 7/2013 Thatcher
2013/0191260 A1 7/2013 Michael

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0018969 | A1 | 1/2014 | Forbes |
| 2014/0025486 | A1 | 1/2014 | Bigby et al. |
| 2014/0039699 | A1 | 2/2014 | Forbes |
| 2014/0039701 | A1 | 2/2014 | Forbes |
| 2014/0039703 | A1 | 2/2014 | Forbes |
| 2015/0303691 | A1 | 10/2015 | Forbes |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2001306839 | A | 11/2001 |
| JP | 2004180412 | A | 6/2004 |
| JP | 2004248174 | A | 9/2004 |
| JP | 2006060911 | A | 3/2006 |
| JP | 2007132553 | A | 5/2007 |
| KR | 20050011584 | A | 1/2005 |
| KR | 20050045272 | A | 5/2005 |
| KR | 20060011584 | A | 2/2006 |
| KR | 20060036171 | A | 4/2006 |
| KR | 20070008321 | A | 1/2007 |
| KR | 100701298 | B1 | 3/2007 |
| KR | 20070098172 | A | 10/2007 |
| KR | 20080112692 | A | 12/2008 |
| WO | 2007136456 | A2 | 11/2007 |
| WO | 2008125696 | A2 | 10/2008 |

OTHER PUBLICATIONS

Byers J. Risk Management and Monetizing the Commodity Storage Option. Natural Gas & Electricity [serial online]. Jul. 2005; 21 (12):1-8. Available from: Business Source Complete, Ipswich, MA.
C.W. Gellings and W.M. Smith, Integrating Demand-Side Management into Utility Planning, Proceedings of the IEEE, vol. 77, Issue: 6, Jun. 1989, pp. 908-918 (Abstract only).
Eric Hirst and Brendan Kirby, Opportunities for Demand Participation in New England Contingency-Reserve Markets, New England Demand Response Initiative, Feb. 2003 (15 pages).
Eric Hirst and Richard Cowart, Demand Side Resources and Reliability, New England Demand Response Initiative, Mar. 20, 2002 (32 pages).
Galvin Electricity Institute: Frequently Asked Questions, printed Apr. 23, 2014, same page available through archive.org unchanged Mar. 1, 2008.
GE Digital Energy Residential Electrical Metering Brochure. Sep. 12, 2012. https://web.archive.org/web/20120912144353/http://www.gedigitalenergy.com/products/brochures/1210-Family.pdf.
Illinois General Assembly: Public Act 094-0977, Effective Date: Jun. 30, 2006.
Kamat R., Oren S. Two-Settlement Systems for Electricity Markets under Network Uncertainty and Market Power Journal of Regulatory Economics [serial online]. Jan. 2004; 25(1):5-37.
Kathleen Spees and Lester B. Lave, Demand Response and Electricity Market Efficiency, The Electricity Journal, vol. 20, Issue 3, Apr. 2007 (online Mar. 27, 2007), pp. 69-85 (Abstract only).
L.T. Anstine, R.E. Burke, J.E. Casey, R. Holgate, R.S. John, and H.G. Stewart, Application of Probability Methods to the Determination of Spinning Reserve Requirements for the Pennsylvania-New Jersey-Maryland Interconnection; IEEE Transactions on Power Apparatus and Systems, vol. 82, Issue 68, Oct. 1963, pp. 726-735 (Abstract only).
Lobsenz G. Maryland Regulators Reject BG&E Smart Grid Proposal. Energy Daily [serial online]. Jun. 23, 2010; (118): 3. Available from: Business Source Complete, Ipswich, MA.
M. Rashidi-Nejad, Y.H. Song, and M.H. Javidi-Dasht-Bayaz, Operating Reserve Provision in Deregulated Power Markets, IEEE Power Engineering Society Winter Meeting, vol. 2, 2002, pp. 1305-1310 (Abstract only).
Michael Ahlheim and Friedrich Schneider; "Allowing for Household Preferences in Emission Trading, A Contribution to the Climate Policy Debate"; Environmental and Resource Economics, vol. 21, pp. 317-342; Kluwer Academic Publishers; The Netherlands; 2002.
Olivier Rousse; "Environmental and economic benefits resulting from citizens' participation in CO.sub.2 emissions trading: An efficient alternative solution to the voluntary compensation of CO.sub.2 emissions", Energy Policy 36(2008), pp. 388-397; Oct. 29, 2007 (online).
Pablo A. Ruiz and Peter W. Sauer, Valuation of Reserve Services, IEEE Proceedings of the 41 .sup.st Hawaii International Conference on System Sciences, 2008 (9 pages).
Paul Darbee, Insteon Compared, SmartLabs, Inc., Jan. 2, 2006, 69 pages.
Paul Darbee, Insteon The Details, Smarthome, Inc., Aug. 11, 2005, 68 pages.
Zhu Jinxiang, G. Jordan, and S. Ihara, The Market for Spinning Reserve and Its Impacts on Energy Prices, IEEE Power Engineering Society Winter Meeting, vol. 2, 2000, pp. 1202-1207 (Abstract Only).

* cited by examiner


10
90
20
80
400
BPL, Ethernet, or RF Control
Residential or Smart Breaker Load Center
Network
Active Load Client
300
60
Smart Appliance
100
Active Load Director Server
Washer/ Dryer
Hot Water Heater
HVAC Unit
70
Pool Pump
200
Utility (s) Data Energy Control Center
30
40
50

FIG. 1




*FIG. 2*



PETITIONER ECOBEE
EX. 1001


To/From ALD Server 100
308
Communications Interface
320
IP Layer 3 Router
310
Security Interface
312
IP Based Communication Converter
302
Linux
304
Status Response
314
Device Control Manager
306
Smart Breaker Module Controller
316
B1-BN Counter Manager
318
Report Trigger
324
Smart Device Interface
322
Smart Meter Interface
452
Current Sensor
450
460
Smart Meter
300
Security Device Interface
328
IP Device Interface
330
Active Load Client
Local IP Connected Device(s)
440
One or More Power Management Enabled Devices
420
400
B1
402
B2
404
B3
406
B4
408
B5
410
B6
412
SMART BREAKER MODULE

FIG. 3


ENTER
500
502
RECEIVE TRANSACTION
503
TRANSACTION TYPE?
NEW SERVICE
SERVICE
504
SCHEDULE SERVICE PERSON FOR INITIAL INSTALLATION
512
SCHEDULE SERVICE PERSON FOR SERVICE CALL
506
NOTIFY SERVICE PERSON OF SERVICE CALL VIA EMAIL OR INSTANT MESSAGING
514
SEND "DIAGNOSE" TRANSACTION TO ALC DIAGNOSTIC MANAGER
508
RECEIVE INSTALLATION COMPLETE REPORT FROM SERVICE PERSON
516
NOTIFY SERVICE PERSON OF SERVICE CALL AND RESULTS OF DIAGNOSTIC PROCEDURE USING TROUBLE TICKET
510
SEND "UPDATE" TRANSACTION TO ALC MANAGER
EXIT

*FIG. 4*



600
ENTER
602
RECEIVE "UPDATE" TRANSACTION FROM SERVICE DISPATCH MANAGER
604
SEND QUERY REQUEST TO ALC AT SPECIFIED IP ADDRESS
606
RECEIVE REPLY TO QUERY REQUEST
608
UPDATE ALD DATABASE WITH LATEST STATUS INFORMATION OBTAINED FROM ALC
610
IS ALC FUNCTIONING PROPERLY?
NO
YES
612
SET CUSTOMER STATE TO ACTIVE
614
SEND "SERVICE" TRANSACTION TO SERVICE DISPATCH MANAGER
EXIT


*FIG. 5*



ENTER
700
702
TRACK CURRENT POWER USAGE WITHIN EACH UTILITY
704
RECEIVE TRANSACTION
706
TRANSACTION TYPE?
"CUT"
"END EVENT"
"HOW MUCH"
708
PLACE UTILITY IN MANAGED STATE
712
DETERMINE AMOUNT OF POWER THAT MAY BE REMOVED BY ACCESSING CURRENT USAGE INFORMATION FOR UTILITY
714
SET STATE OF EVENT AS "PENDING"
716
SEND "END EVENT" TRANSACTION TO ALC MANAGER
718
RECEIVE "EVENT ENDED" TRANSACTION FROM ALC MANAGER
710
SEND "CUT" TRANSACTION TO ALC MANAGER WITH NUMBER OF MEGAWATTS TO BE REMOVED FROM SYSTEM
720
SET STATE OF UTILITY TO "NOT MANAGED"
722
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT HAS ENDED
711
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT IN PROCESS
724
SEND "EVENT ENDED" TRANSACTION TO POWER SAVINGS APPLICATION
EXIT


FIG. 6


ENTER
800
TRACK STATE OF EVERY ALC HAVING AN IP ADDRESS WITHIN SPECIFIED UTILITY
802
LOG INFORMATION RECEIVED FROM EACH ALC IN ALS DATABASE IN RECORD CORRESPONDING TO SPECIFIC ALC
804
RECEIVE TRANSACTION
806
TRANSACTION?
808
"CUT"
"END EVENT"
"TURN ON"
ENTER "MANAGE STATE"
810
DETERMINE WHICH ALC AND ASSOCIATED DEVICES TO TURN OFF
812
SEND "TURN OFF" TRANSACTION TO SELECTED ALC'S WITH LIST OF INDICATED DEVICES TO TURN OFF
814
LOG AMOUNT OF POWER AND TIMESTAMP IN ALS DB FOR EACH ALC REDUCED
816
SCHEDULE "TURN ON" TRANSACTION TO ALC MANAGER
818
FIND ONE OR MORE ALC'S IN "ON" STATE WHICH WILL SAVE THE EQUIVALENT POWER AS ALC CURRENTLY IN "OFF" STATE
820
SEND "TURN OFF" TRANSACTION TO EACH ALC NECESSARY TO SAVE EQUIVALENT POWER
822
SEND "TURN ON" TRANSACTION TO ALC FOR WHICH ORIGINAL "TURN ON" TRANSACTION WAS RECEIVED
824
LOG "TURN ON" TRANSACTION TIME IN ALD DATABASE
826
SEND "TURN ON" TRANSACTION TO EACH ALC CURRENTLY IN "OFF" STATE
828
ALL ALC'S ON?
830
NO
YES
SEND "EVENT ENDED" TRANSACTION TO MASTER EVENT MANAGER
832
EXIT

FIG. 7


900
ENTER
902
RECEIVE "EVENT ENDED" TRANSACTION FROM MASTER EVENT MANAGER
904
ACCESS ALS DATABASE FOR EACH ALC MANAGED DURING "CUT" TRANSACTION
906
STORE TOTAL AMOUNT OF POWER SAVED AND RELATED INFORMATION FOR SPECIFIC UTILTY DURING PREVIOUS "CUT" TRANSACTION IN UTILITY P&C DATABASE
908
INVOKE CARBON SAVINGS APPLICATION
EXIT

*FIG. 8*

# METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application relates to and claims priority from the following U.S. patent Applications. This application is a continuation of U.S. patent application Ser. No. 14/456,306 filed on Aug. 11, 2014, and issued as U.S Pat. No. 9,678,522, which is a continuation of U.S. patent application Ser. No. 13/463,761 filed on May 3, 2012 and issued as U.S. Pat. No. 8,805,552, which is a continuation-in-part of U.S. patent application Ser. No. 13/172,389 filed on Jun. 29, 2011 and issued as U.S. Pat. No. 8,315,717, which is a continuation of U.S. patent application Ser. No. 12/715,195 filed on Mar. 1, 2010 and issued as U.S. Pat. No. 8,032,233, which is a divisional of U.S. patent application Ser. No. 11/895,909 filed on Aug. 28, 2007 and issued as U.S. Pat. No. 7,715,951, all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to the field of electrical power load control systems and more particularly to a method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility.

2. Description of Related Art

The increased awareness of the impact of carbon emissions from the use of fossil fueled electric generation combined with the increased cost of producing peak power during high load conditions has increased the need for alternative solutions utilizing load control as a mechanism to defer, or in some cases eliminate, the need for the deployment of additional generation capacity by electric utilities. Existing electric utilities are pressed for methods to defer or eliminate the need for construction of fossil-based electricity generation. Today, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize "one-way" transmit only methods of communication. Under these programs, RF controlled relay switches are typically attached to a customer's air conditioner, water heater, or pool pump. A blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility. After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off

While tele-metering has been used for the express purpose of reporting energy usage, no techniques exist for calculating power consumption, carbon gas emissions, sulfur dioxide (SO.sub.2) gas emissions, and/or nitrogen dioxide (NO.sub.2) emissions, and reporting the state of a particular device under the control of a two-way positive control load management device. In particular, one way wireless communications devices have been utilized to de-activate electrical appliances, such as heating, ventilation, and air-conditioning (HVAC) units, water heaters, pool pumps, and lighting, from an existing electrical supplier or distribution partner's network. These devices have typically been used in combination with wireless paging receivers that receive "on" or "off" commands from a paging transmitter. Additionally, the one-way devices are typically connected to a serving electrical supplier's control center via landline trunks, or in some cases, microwave transmission to the paging transmitter. The customer subscribing to the load management program receives a discount for allowing the serving electrical supplier (utility) to connect to their electrical appliances and deactivate those appliances during high energy usage periods.

While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.

One exemplary tele-metering system is disclosed in U.S. Pat. No. 6,891,838 B1. This patent describes details surrounding a mesh communication of residential devices and the reporting and control of those devices, via WANs, to a computer. The stated design goal in this patent is to facilitate the "monitoring and control of residential automation systems." This patent does not explain how a serving utility or customer could actively control the devices to facilitate the reduction of electricity. In contrast, this patent discloses techniques that could be utilized for reporting information that is being displayed by the serving utility's power meter (as do many other prior applications in the field of tele-metering).

An additional exemplary tele-metering system is disclosed in U.S. Patent Application Publication No. 2005/0240315 A1. The primary purpose of this published application is not to control utility loads, but rather "to provide an improved interactive system for remotely monitoring and establishing the status of a customer utility load." A stated goal of this publication is to reduce the amount of time utility field personnel have to spend in the field servicing meters by utilizing wireless technology.

Another prior art system is disclosed in U.S. Pat. No. 6,633,823 B2, which describes, in detail, the use of proprietary hardware to remotely turn off or turn on devices within a building or residence. While initially this prior art generally describes a system that would assist utilities in managing power load control, the prior art does not contain the unique attributes necessary to construct or implement a complete system. In particular, this patent is deficient in the areas of security, load accuracy of a controlled device, and methods disclosing how a customer utilizing applicable hardware might set parameters, such as temperature set points, customer preference information, and customer overrides, within an intelligent algorithm that reduces the probability of customer dissatisfaction and service cancellation or churn.

Attempts have been made to bridge the gap between one-way, un-verified power load control management systems and positive control verified power load control management systems. However, until recently, technologies such as smart breakers and command relay devices were not considered for use in residential and commercial environments primarily due to high cost entry points, lack of customer demand, and the cost of power generation relative to the cost of implementing load control.

One such gap-bridging attempt is described in U.S. Patent Application Publication No. US 2005/0065742 A1. This publication discloses a system and method for remote power management using IEEE 802 based wireless communication links. The system disclosed in this publication includes an on-premise processor (OPP), a host processor, and an end device. The host processor issues power management commands to the OPP, which in turn relays the commands to the end devices under its management. While the disclosed OPP does provide some intelligence in the power management system, it does not determine which end devices under its control to turn-off during a power reduction event, instead relying on the host device to make such decision. For example, during a power reduction event, the end device must request permission from the OPP to turn on. The request is forwarded to the host device for a decision on the request in view of the parameters of the on-going power reduction event. The system also contemplates periodic reading of utility meters by the OPP and storage of the read data in the OPP for later communication to the host device. The OPP may also include intelligence to indicate to the host processor that the OPP will not be able to comply with a power reduction command due to the inability of a load under the OPP's control to be deactivated. However, neither the host processor nor the OPP determine which loads to remove in order to satisfy a power reduction command from an electric utility, particularly when the command is issued by one of several utilities under the management of a power management system. Further, neither the host processor nor the OPP tracks or accumulates power saved and/or carbon credits earned on a per customer or per utility basis for future use by the utility and/or customer. Still further, the system of this publication lacks a reward incentive program to customers based on their participation in the power management system. Still further, the system described in this publication does not provide for secure communications between the host processor and the OPP, and/or between the OPP and the end device. As a result, the described system lacks many features that may be necessary for a commercially viable implementation.

Therefore, a need exists for a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility to thereby overcome the shortcomings of the prior art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an IP-based active power load management system in accordance with an exemplary embodiment of the present invention.

FIG. **2** is a block diagram illustrating an exemplary active load director (ALD) server as shown in the system of FIG. **1**.

FIG. **3** is a block diagram illustrating an exemplary active load client and smart breaker module as shown in the system of FIG. **1**.

FIG. **4** is an operational flow diagram illustrating a method for automatically scheduling service calls in an active power load management system in accordance with one exemplary embodiment of the present invention.

FIG. **5** is an operational flow diagram illustrating a method for activating new subscribers in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **6** is an operational flow diagram illustrating a method for managing events occurring in an active power load management system in accordance with yet another exemplary embodiment of the present invention.



FIG. **7** is an operational flow diagram illustrating a method for actively reducing consumed power and tracking power savings on an individual customer basis in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **8** is an operational flow diagram illustrating a method for tracking cumulative power savings of an electric utility in an active power load management system during a power savings event in accordance with yet another exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Before describing in detail exemplary embodiments that are in accordance with the present invention, it should be observed that the embodiments reside primarily in combinations of apparatus components and processing steps related to actively managing power loading on an individual subscriber basis and optionally tracking power savings incurred by both individual subscribers and an electric utility. Accordingly, the apparatus and method components have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present invention so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

In this document, relational terms, such as "first" and "second," "top" and "bottom," and the like, may be used solely to distinguish one entity or element from another entity or element without necessarily requiring or implying any physical or logical relationship or order between such entities or elements. The terms "comprises," "comprising," or any other variation thereof are intended to cover a non-exclusive inclusion, such that a process, method, article, or apparatus that comprises a list of elements does not include only those elements, but may include other elements not expressly listed or inherent to such process, method, article, or apparatus. The term "plurality of" as used in connection with any object or action means two or more of such object or action. A claim element proceeded by the article "a" or "an" does not, without more constraints, preclude the existence of additional identical elements in the process, method, article, or apparatus that includes the element. Additionally, the term "ZigBee" refers to any wireless communication protocol adopted by the Institute of Electronics & Electrical Engineers (IEEE) according to standard 802.15.4 or any successor standard(s), the term "Wi-Fi" refers to any communication protocol adopted by the IEEE under standard 802.11 or any successor standard(s), the term "WiMax" refers to any communication protocol adopted by the IEEE under standard 802.16 or any successor standard(s), and the term "Bluetooth" refers to any short-range communication protocol implementing IEEE standard 802.15.1 or any successor standard(s). Additionally or alternatively to WiMax, other communications protocols may be used, including but not limited to a "1 G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1XRTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO), any accepted 4G standard such as "IEEE, ITU standards that

include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that communicate to a client device or any controllable device that sends and receives an IP based message.

It will be appreciated that embodiments of the invention described herein may be comprised of one or more conventional processors and unique stored program instructions that control the one or more processors to implement, in conjunction with certain non-processor circuits, some, most, or all of the functions for managing power load distribution and tracking individual subscriber power consumption and savings in one or more power load management systems as described herein. The non-processor circuits may include, but are not limited to, radio receivers, radio transmitters, antennas, modems, signal drivers, clock circuits, power source circuits, relays, meters, smart breakers, current sensors, and user input devices. As such, these functions may be interpreted as steps of a method to distribute information and control signals between devices in a power load management system. Alternatively, some or all functions could be implemented by a state machine that has no stored program instructions, or in one or more application specific integrated circuits (ASICs), in which each function or some combinations of functions are implemented as custom logic. Of course, a combination of the two approaches could be used. Thus, methods and means for these functions have been described herein. Further, it is expected that one of ordinary skill in the art, notwithstanding possibly significant effort and many design choices motivated by, for example, available time, current technology, and economic considerations, when guided by the concepts and principles disclosed herein, will be readily capable of generating such software instructions, programs and integrated circuits (ICs), and appropriately arranging and functionally integrating such non-processor circuits, without undue experimentation.

Recently, the IEEE has released improved WiMax wireless standards that have facilitated the consideration of new technologies to improve the response and control of power load control devices employing smart breaker technologies. Embodiments of the present invention expand upon and enhance prior technologies by, among other things, employing WiMax or IP-based load control in a system with the ability to monitor, in real time, the amount of power deferred (or carbon, SO.sub.2, or NO.sub.2 eliminated). These improvements allow new options for electric utilities to defer or invest in new power generation that is friendlier to the environment.

IP-based power management is advantageous over existing systems for many reasons. For example, positive control allows a system controller to receive a response from an end device installed at a customer location, which indicates that the actual target device has turned "off" or "on." Additionally, each equipment identifier is unique and each IP address is either dynamically assigned when the device is activated (e.g., through use of the dynamic host configuration protocol (DHCP)) or statically assigned by the serving IP network, thereby providing enhanced security to protect against an act of random terrorism or sabotage inadvertently shutting down power services. Existing power management systems, including those utilizing radio subsystems, do not address security problems adequately and thus are more likely susceptible to hostile or malicious acts.

IP-based systems are also bandwidth or network efficient. For example, IP devices are controlled via the 7-layer Open Systems Interconnection (OSI) model whereby the payload of each packet can contain a message or "change in state" and does not require synchronous communication. This method of transmission allows for very minimum overhead and low data rates on a broadband network. Additionally, IP devices can report many states, including "no power." For example, the active load client **300** may be implemented with a battery backup mechanism to provide backup or auxiliary power to the active load client **300** when AC power is lost. In this case, when battery backup is invoked, the active load client **300** can report a "no power" condition. Alternatively, a "no power" condition may be assumed if an active load client **300** fails to timely respond to a message (e.g., a poll or other message) from the ALD server **100**, particularly where multiple active load clients **300** in a geographic area fail to timely respond to the ALD server messaging. Because the geographic location of each customer premises and active load client **300** may be known at the time of installation or thereafter (e.g., using GPS coordinates), such network outages may be located on a per meter basis.

One of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis. Embodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate. Furthermore, embodiments of the present invention provide means for tracking the actual amount of deferred load and pollutants according to generation mix, serving utility and geographic area.

Embodiments of the present invention include an exemplary system for supporting a serving utility or power distributor (e.g., such as a municipality, electric cooperative, or any other wholesale or retail producer of electric power), methods for providing continuous, real time active power control in the system, and a method for determining how much actual load may be controlled at any given time for the purposes of conservation, alternative power generation and the creation of carbon (and other gaseous emissions) credits.

Additional embodiments of the present invention provide a system that implements the exemplary methods through the unique use of load information, location of customers consuming electricity, changes in state of controlled devices, current sensing, customer set points/preferences and artificial intelligence (e.g., as implemented through software) to optimize the presentation of load available to the serving utility for control.

Generally, the embodiments disclosed in the present invention are directed towards the real time (active) control of residential and commercial electrical devices that generally are 240V or less. However, specific features and functions may also be applicable to larger commercial installations that are greater than 240V. The description herein is intended to provide a practical implementation of real time load management for either voluntary or involuntary participants over large geographies and ideally for many serving electrical power producers, wholesalers or distributors. The exemplary methods and systems disclosed in the present invention may be implemented by an individual utility provider, or a third party monitoring service that tracks and manages power loading for one or more utilities. This application describes the necessary methods and generally describes software subsystems for both a host function (e.g., an active load director (ALD) server) and a companion active load client (ALC).

One embodiment of the present invention controls power distribution for a variety of electric utility companies or any

other electric power grid operator(s) by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating customers. In this embodiment, customers agree to allow the power management system to disable certain power-consuming devices during peak loading times of the day. Smart breakers, which have the ability to be switched on or off remotely, are installed for specific devices in an electric service control panel accessed by a known IP address. Alternatively, IP-addressable smart appliances may be used. The power management system determines the amount of steady-state power each device consumes when turned on and logs the information in a database for each subscriber. For example, a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption, and transmits the power consumption to the ALD server. When the serving utility needs more power than it is currently able to supply, the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis. Because the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage.

Furthermore, based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power by the power consuming device(s). Importantly, the PSV is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid. PSV variations may depend on operating tolerances, operating standard for accuracy of the measurement. The PSV enables transformation of curtailment or reduction in power at the device level by any system that sends or receives an IP message to be related to or equated to supply as presented to the governing entity that accepts these values and award supply equivalence, for example of a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC, NERC, etc.

PSV may be provided in units of electrical power flow, monetary equivalent, and combinations thereof. Thus, the PSV provides an actual value that is confirmed by measurement and/or verification, thereby providing for a curtailment value as a requirement for providing supply to the power grid, wherein the supply to the power electric power grid is provided for grid stability, voltage stability, reliability, and combinations thereof, and is further provided as responsive to an energy management system or equivalent for providing grid stability, reliability, frequency as determined by governing authority for the electric power grid and/or grid operator(s).

The present invention can be more readily understood with reference to FIGS. **1-8**, in which like reference numerals designate like items. FIG. **1** depicts an exemplary IP-based active power load management system **10** in accordance with one embodiment of the present invention. The exemplary power management system **10** monitors and manages power distribution via an active load director (ALD) server **100** connected between one or more utility control centers (UCCs) **200** (one shown) and one or more active load clients (ALCs) **300** (one shown). The ALD server **100** may communicate with the utility control center **200** and each active load client **300** either directly or through a network **80** using the Internet Protocol (IP) or any other connection-based protocols. For example, the ALD server **100** may communicate using RF systems operating via one or more base stations **90** (one shown) using one or more wireless communication protocols, such as Global System for Mobile communications (GSM), Enhanced Data GSM Environment (EDGE), High Speed Packet Access (HSDPA), Time Division Multiple Access (TDMA), or Code Division Multiple Access data standards, including CDMA 2000, CDMA Revision A, and CDMA Revision B. Alternatively, or additionally, the ALD server **100** may communicate via a digital subscriber line (DSL) capable connection, cable television based IP capable connection, or any combination thereof. In the exemplary embodiment shown in FIG. **1**, the ALD server **100** communicates with one or more active load clients **300** using a combination of traditional IP-based communication (e.g., over a trunked line) to a base station **90** and a wireless channel implementing the WiMax protocol for the “last mile” from the base station **90** to the active load client **300**.

Each active load client **300** is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances **60** installed in the business or residence **20** to which the active load client **300** is associated (e.g., connected or supporting). Each active load client **300** is associated with a single residential or commercial customer. In one embodiment, the active load client **300** communicates with a residential load center **400** that contains smart breaker modules, which are able to switch from an “ON” (active) state to an “OFF” (inactive), and vice versa, responsive to signaling from the active load client **300**. Smart breaker modules may include, for example, smart breaker panels manufactured by Schneider Electric SA under the trademark “Square D” or Eaton Corporation under the trademark “Cutler-Hammer” for installation during new construction. For retro-fitting existing buildings, smart breakers having means for individual identification and control may be used. Typically, each smart breaker controls a single appliance (e.g., a washer/dryer **30**, a hot water heater **40**, an HVAC unit **50**, or a pool pump **70**).

Additionally, the active load client **300** may control individual smart appliances directly (e.g., without communicating with the residential load center **300**) via one or more of a variety of known communication protocols (e.g., IP, Broadband over PowerLine (BPL) in its various forms, including through specifications promulgated or being developed by the HOMEPLUG Powerline Alliance and the IEEE, Ethernet, Bluetooth, ZigBee, Wi-Fi, WiMax, etc.). Typically, a smart appliance **60** includes a power control module (not shown) having communication abilities. The power control module is installed in-line with the power supply to the appliance, between the actual appliance and the power source (e.g., the power control module is plugged into a power outlet at the home or business and the power cord for the appliance is plugged into the power control module). Thus, when the power control module receives a command to turn off the appliance **60**, it disconnects the actual power supplying the appliance **60**. Alternatively, a smart appliance



PETITIONER ECOBEE
EX. 1001

60 may include a power control module integrated directly into the appliance, which may receive commands and control the operation of the appliance directly (e.g., a smart thermostat may perform such functions as raising or lowering the set temperature, switching an HVAC unit on or off, or switching a fan on or off).

Referring now to FIG. **2**, the ALD server **100** may serve as the primary interface to customers, as well as to service personnel. In the exemplary embodiment depicted in FIG. **2**, the ALD server **100** includes a utility control center (UCC) security interface **102**, a UCC command processor **104**, a master event manager **106**, an ALC manager **108**, an ALC security interface **110**, an ALC interface **112**, a web browser interface **114**, a customer sign-up application **116**, customer personal settings **138**, a customer reports application **118**, a power savings application **120**, an ALC diagnostic manager **122**, an ALD database **124**, a service dispatch manager **126**, a trouble ticket generator **128**, a call center manager **130**, a carbon savings application **132**, a utility P & C database **134**, a read meter application **136**, and a security device manager **140**.

Using the web browser interface **114**, in one embodiment, customers interact with the ALD server **100** and subscribe to some or all of the services offered by the power load management system **10** via a customer sign-up application **116**. In accordance with the customer sign-up application **116**, the customer specifies customer personal settings **138** that contain information relating to the customer and the customer's residence or business, and defines the extent of service to which the customer wishes to subscribe. Additional details of the customer sign-up application **116** are discussed below. Customers may also use the web browser interface **114** to access and modify information pertaining to their existing accounts.

The ALD server **100** also includes a UCC security interface **102** which provides security and encryption between the ALD server **100** and a utility company's control center **200** to ensure that no third party is able to provide unauthorized directions to the ALD server **100**. A UCC command processor **104** receives and sends messages between the ALD server **100** and the utility control center **200**. Similarly, an ALC security interface **110** provides security and encryption between the ALD server **100** and each active load client **300** on the system **10**, ensuring that no third parties can send directions to, or receive information from, the active load client **300**. The security techniques employed by the ALC security interface **110** and the UCC security interface **102** may include conventional symmetric key or asymmetric key algorithms, such as Wireless Encryption Protocol (WEP), Wi-Fi Protected Access (WPA and WPA2), Advanced Encryption Standard (AES), Pretty Good Privacy (PGP), or proprietary encryption techniques.

In one embodiment, the commands that can be received by the UCC command processor **104** from the electric utility's control center **200** include a "Cut" command, a "How Much" command, an "End Event" command, and a "Read Meters" command. The "Cut" command instructs the ALD server **100** to reduce a specified amount of power for a specified amount of time. The specified amount of power may be an instantaneous amount of power or an average amount of power consumed per unit of time. The "Cut" command may also optionally indicate general geographic areas or specific locations for power load reduction. The "How Much" command requests information for the amount of power (e.g., in megawatts) that can be reduced by the requesting utility control center **200**. The "End Event" command stops the present ALD server **100** transaction. The



"Read Meters" command instructs the ALD server **100** to read the meters for all customers serviced by the requesting utility.

The UCC command processor **104** may send a response to a "How Much" command or an "Event Ended" status confirmation to a utility control center **200**. A response to a "How Much" command returns an amount of power that can be cut. An "Event Ended" acknowledgement message confirms that the present ALD server transaction has ended.

The master event manager **106** maintains the overall status of the power load activities controlled by the power management system **10**. The master event manager **106** maintains a separate state for each utility that is controlled and tracks the current power usage within each utility. The master event manager **106** also tracks the management condition of each utility (e.g., whether or not each utility is currently being managed). The master event manager **106** receives instructions in the form of transaction requests from the UCC command processor **104** and routes instructions to components necessary to complete the requested transaction, such as the ALC manager **108** and the power savings application **120**.

The ALC manager **108** routes instructions between the ALD server **100** and each active load client **300** within the system **10** through an ALC interface **112**. For instance, the ALC manager **108** tracks the state of every active load client **300** serviced by specified utilities by communicating with the active load client **300** through an individual IP address. The ALC interface **112** translates instructions (e.g., transactions) received from the ALC manager **108** into the proper message structure understood by the targeted active load client **300** and then sends the message to the active load client **300**. Likewise, when the ALC interface **112** receives messages from an active load client **300**, it translates the message into a form understood by the ALC manager **108** and routes the translated message to the ALC manager **108**.

The ALC manager **108** receives from each active load client **300** that it services, either periodically or responsive to polling messages sent by the ALC manager **108**, messages containing the present power consumption and the status (e.g., "ON" or "OFF") of each device controlled by the active load client **300**. Alternatively, if individual device metering is not available, then the total power consumption and load management status for the entire active load client **300** may be reported. The information contained in each status message is stored in the ALD database **124** in a record associated with the specified active load client **300**. The ALD database **124** contains all the information necessary to manage every customer account and power distribution. In one embodiment, the ALD database **124** contains customer contact information, such as names, addresses, phone numbers, email addresses, and associated utility companies for all customers having active load clients **300** installed at their residences or businesses, as well as a description of specific operating instructions for each managed device (e.g., IP-addressable smart breaker or appliance), device status, and device diagnostic history.

There are several types of messages that the ALC manager **108** may receive from an active load client **300** and process accordingly. One such message is a security alert message. A security alert message originates from an optional security or safety monitoring system installed in the residence or business and coupled to the active load client **300** (e.g., wirelessly or via a wired connection). When a security alert message is received, the ALC manager **108** accesses the ALD database **124** to obtain routing information for determining where to send the alert, and then sends

the alert as directed. For example, the ALD manager **108** may be programmed to send the alert or another message (e.g., an electronic mail message or a pre-recorded voice message) to a security monitoring service company and/or the owner of the residence or business.

Another message communicated between an active load client **300** and the ALC manager **108** is a report trigger message. A report trigger message alerts the ALD server **100** that a predetermined amount of power has been consumed by a specific device monitored by an active load client **300**. When a report trigger message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124** for the customer associated with the information-supplying active load client **300**. The power consumption information is then used by the ALC manager **108** to determine the active load client(s) **300** to which to send a power reduction or "Cut" message during a power reduction event.

Yet another message exchanged between an active load client **300** and the ALC manager **108** is a status response message. A status response message reports the type and status of each device controlled by the active load client **300** to the ALD server **100**. When a status response message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124**.

In one embodiment, upon receiving instructions (e.g., a "Cut" instruction) from the master event manager **106** to reduce power consumption for a specified utility, the ALC manager **108** determines which active load clients **300** and/or individually controlled devices to switch to the "OFF" state based upon present power consumption data stored in the ALD database **124**. The ALC manager **108** then sends a message to each selected active load client **300** containing instructions to turn off all or some of the devices under the active load client's control.

In another embodiment, a power savings application **120** may be optionally included to calculate the total amount of power saved by each utility during a power reduction event (referred to herein as a "Cut event"), as well as the amount of power saved for each customer whose active load client **300** reduced the amount of power delivered. The power savings application **120** accesses the data stored in the ALD database **124** for each customer serviced by a particular utility and stores the total cumulative power savings (e.g., in megawatts per hour) accumulated by each utility for each Cut event in which the utility participated as an entry in the utility Power and Carbon ("P&C") database **134**.

In a further embodiment, an optional carbon savings application **132** uses the information produced by the power savings application **120** to determine the amount of carbon saved by each utility and by each customer for every Cut event. Carbon savings information (e.g., type of fuel that was used to generate power for the customer set that was included in the just completed event, power saved in the prior event, governmental standard calculation rates, and/or other data, such as generation mix per serving utility and geography of the customer's location and the location of the nearest power source) is stored in the ALD database **124** for each active load client **300** (customer) and in the utility P&C database **134** for each utility. The carbon savings application **132** calculates the total equivalent carbon credits saved for each active load client **300** (customer) and utility participating in the previous Cut event, and stores the information in the ALD database **124** and the utility P&C database **134**, respectively.

Additionally, the ALC manager **108** automatically provides for smooth operation of the entire power load management system **10** by optionally interacting with a service dispatch manager **126**. For example, when a new customer subscribes to participate in the power load management system **10**, the service dispatch manager **126** is notified of the new subscription from the customer sign-up application **116**. The service dispatch manager **126** then sends an activation request to the ALC manager **108**. Upon receiving the activation request from the service dispatch manager **126**, the ALC manager **108** may sends a query request for information to the new active load client **300** and, upon receipt of the information, provides it to the service dispatch manager **126**. Additionally, if at any time the ALC manager **108** detects that a particular active load client **300** is not functioning properly, the ALC manager **108** may send a request for service to the service dispatch manager **126** to arrange for a service call to correct the problem.

In another embodiment, the service dispatch manager **126** may also receive requests for service from a call center manager **130** that provides support to an operations center (not shown), which receives telephone calls from customers of the power load management system **10**. When a customer calls the operations center to request service, the call center manager **130** logs the service call in the ALD database **124** and sends a "Service" transaction message to the service dispatch manager **126**. When the service call has been completed, the call center manager **130** receives a completed notification from the service dispatch manager **126** and records the original service call as "closed" in the ALD database **124**.

In yet another embodiment, the service dispatch manager **126** may also instruct an ALC diagnostic manager **122** to perform a series of diagnostic tests for any active load client **300** for which the service dispatch manager **126** has received a service request. After the ALC diagnostic manager **122** has performed the diagnostic procedure, it returns the results to the service dispatch manager **126**. The service dispatch manager **126** then invokes a trouble ticket generator **128** to produce a report (e.g., trouble ticket) that includes information (some of which was retrieved by the service dispatch manager **126** from the ALD database **124**) pertaining to the required service (e.g., customer name, address, any special consideration for accessing the necessary equipment, and the results of the diagnostic process). A residential customer service technician may then use the information provided in the trouble ticket to select the type of equipment and replacement parts necessary for performing a service call.

A read meter application **136** may be optionally invoked when the UCC command processor **104** receives a "Read Meters" or equivalent command from the utility control center **200**. The read meter application **136** cycles through the ALD database **124** and sends a read meter message or command to each active load client **300**, or those active load clients **300** specifically identified in the UCC's command, via the ALC manager **108**. The information received by the ALC manager **108** from the active load client **300** is logged in the ALD database **124** for each customer. When all the active load client meter information has been received, the information is sent to the requesting utility control center **200** using a business to business (e.g., ebXML) or other desired protocol.

The optional security device management block **140** includes program instructions for handling security system messages received by the security interface **110**. The security device management block **140** includes routing information for all security system messages and may further

include messaging options on a per customer or service company basis. For example, one security service may require an email alert from the ALD server **100** upon the occurrence of a security event; whereas, another security service may require that the message sent from the in-building system be passed on by the active load client **300** and the ALD server **100** directly to the security service company.

In a further embodiment, the ALD server **100** also includes a customer reports application **118** that generates reports to be sent to individual customers detailing the amount of power saved during a previous billing cycle. Each report may contain a cumulative total of power savings over the prior billing cycle, details of the amount of power saved per controlled device (e.g., breaker or appliance), power savings from utility directed events, power savings from customer directed events, devices being managed, total carbon equivalents used and saved during the period, and/or specific details for each Cut event in which the customer's active load client **300** participated. Customers may also receive incentives and awards for participation in the power load management system **10** through a customer rewards program **150**. For example, the utilities or a third party system operator may enter into agreements with product and/or service providers to offer system participants discounts on products and services offered by the providers based upon certain participation levels or milestones. The rewards program **150** may be setup in a manner similar to conventional frequent flyer programs in which points are accumulated for power saved (e.g., one point for each megawatt saved or deferred) and, upon accumulation of predetermined levels of points, the customer can select a product or service discount. Alternatively, a serving utility may offer a customer a rate discount for participating in the system **10**.

FIG. **3** illustrates a block diagram of an exemplary active load client **300** in accordance with one embodiment of the present invention. The depicted active load client **300** includes a Linux-based operating system **302**, a status response generator **304**, a smart breaker module controller **306**, a smart device interface **324**, a communications interface **308**, a security interface **310**, an IP-based communication converter **312**, a device control manager **314**, a smart breaker (B**1**-BN) counter manager **316**, a report trigger application **318**, an IP router **320**, a smart meter interface **322**, a security device interface **328**, and an IP device interface **330**. The active load client **300**, in this embodiment, is a computer or processor-based system located on-site at a customer's residence or business. The primary function of the active load client **300** is to manage the power load levels of controllable devices located at the residence or business, which the active load client **300** oversees on behalf of the customer. In an exemplary embodiment, the software running on the active load client **300** operates using the Linux embedded operating system **302** to manage the hardware and the general software environment. One skilled in the art will readily recognize that other operating systems, such as Microsoft's family of operating systems, Mac OS, and Sun OS, among others, may be alternatively used. Additionally, the active load client **300** may include DHCP client functionality to enable the active load client **300** to dynamically request IP addresses for itself and/or one or more controllable devices **402-412**, **420**, **460** managed thereby from a DHCP server on the host IP network facilitating communications between the active load client **300** and the ALD server **100**. The active load client **300** may further include router functionality and maintain a routing table of assigned IP addresses in a memory of the active load client **300** to facilitate delivery of messages from the active load client **300** to the controllable devices **402-412**, **420**, **460**.

A communications interface **308** facilitates connectivity between the active load client **300** and the ALD server **100**. Communication between the active load client **300** and the ALD server **100** may be based on any type of IP or other connection protocol, including but not limited to, the WiMax protocol. Thus, the communications interface **308** may be a wired or wireless modem, a wireless access point, or other appropriate interface.

A standard IP Layer-3 router **320** routes messages received by the communications interface **308** to both the active load client **300** and to any other locally connected device **440**. The router **320** determines if a received message is directed to the active load client **300** and, if so, passes the message to a security interface **310** to be decrypted. The security interface **310** provides protection for the contents of the messages exchanged between the ALD server **100** and the active load client **300**. The message content is encrypted and decrypted by the security interface **310** using, for example, a symmetric encryption key composed of a combination of the IP address and GPS data for the active load client **300** or any other combination of known information. If the message is not directed to the active load client **300**, then it is passed to the IP device interface **330** for delivery to one or more locally connected devices **440**. For example, the IP router **320** may be programmed to route power load management system messages as well as conventional Internet messages. In such a case, the active load client **300** may function as a gateway for Internet service supplied to the residence or business instead of using separate Internet gateways or routers.

An IP based communication converter **312** opens incoming messages from the ALD server **100** and directs them to the appropriate function within the active load client **300**. The converter **312** also receives messages from various active load client **300** functions (e.g., a device control manager **314**, a status response generator **304**, and a report trigger application **318**), packages the messages in the form expected by the ALD server **100**, and then passes them on to the security interface **310** for encryption.

The device control manager **314** processes power management commands for various controllable devices logically connected to the active load client **300**. The devices can be either smart breakers **402-412** or other IP based devices **420**, such as smart appliances with individual control modules (not shown). The device control manager **314** also processes "Query Request" or equivalent commands or messages from the ALD server **100** by querying a status response generator **304** which maintains the type and status of each device controlled by the active load client **300**, and providing the statuses to the ALD server **100**. The "Query Request" message may include information other than mere status requests, such as temperature set points for thermally controlled devices, time intervals during which load control is permitted or prohibited, dates during which load control is permitted or prohibited, and priorities of device control (e.g., during a power reduction event, hot water heater and pool pump are turned off before HVAC unit is turned off). If temperature set points or other non-status information are included in a "Query Request" message and there is a device attached to the active load client **300** that can process the information, the temperature set points or other information are sent to that device **420** via a smart device interface **324**.

The status response generator **304** receives status messages from the ALD server **100** and, responsive thereto, polls each controllable device **402-412**, **420**, **460** under the active load client's control to determine whether the controllable device **402-412**, **420**, **460** is active and in good operational order. Each controllable device **402-412**, **420**, **460** responds to the polls with operational information (e.g., activity status and/or error reports) in a status response message. The active load client **300** stores the status responses in a memory associated with the status response generator **304** for reference in connection with power reduction events.

The smart device interface **324** facilitates IP or other address-based communications to individual devices **420** (e.g., smart appliance power control modules) that are attached to the active load client **300**. The connectivity can be through one of several different types of networks, including but not limited to, BPL, ZigBee, Wi-Fi, Bluetooth, or direct Ethernet communications. Thus, the smart device interface **324** is a modem adapted for use in or on the network connecting the smart devices **420** to the active load client **300**. The smart device interface **324** also allows the device control manager **314** to manage those devices that have the capability to sense temperature settings and respond to temperature variations.

The smart breaker module controller **306** formats, sends, and receives messages, including power control instructions, to and from the smart breaker module **400**. In one embodiment, the communications is preferably through a BPL connection. In such embodiment, the smart breaker module controller **306** includes a BPL modem and operations software. The smart breaker module **400** contains individual smart breakers **402-412**, wherein each smart breaker **402-412** includes an applicable modem (e.g., a BPL modem when BPL is the networking technology employed) and is preferably in-line with power supplied to a single appliance or other device. The B**1**-BN counter manager **316** determines and stores real time power usage for each installed smart breaker **402-412**. For example, the counter manager **316** tracks or counts the amount of power used by each smart breaker **402-412** and stores the counted amounts of power in a memory of the active load client **300** associated with the counter manager **316**. When the counter for any breaker **402-412** reaches a predetermined limit, the counter manager **316** provides an identification number corresponding to the smart breaker **402-412** and the corresponding amount of power (power number) to the report trigger application **318**. Once the information is passed to the report trigger application **318**, the counter manager **316** resets the counter for the applicable breaker **402-412** to zero so that information can once again be collected. The report trigger application **318** then creates a reporting message containing identification information for the active load client **300**, identification information for the particular smart breaker **402-412**, and the power number, and sends the report to the IP based communication converter **312** for transmission to the ALD server **100**.

The smart meter interface **322** manages either smart meters **460** that communicate using BPL or a current sensor **452** connected to a traditional power meter **450**. When the active load client **300** receives a "Read Meters" command or message from the ALD server **100** and a smart meter **460** is attached to the active load client **300**, a "Read Meters" command is sent to the meter **460** via the smart meter interface **322** (e.g., a BPL modem). The smart meter interface **322** receives a reply to the "Read Meters" message from the smart meter **460**, formats this information along with identification information for the active load client **300**, and provides the formatted message to the IP based communication converter **312** for transmission to the ALD server **100**.

A security device interface **328** transfers security messages to and from any attached security device. For example, the security device interface **328** may be coupled by wire or wirelessly to a monitoring or security system that includes motion sensors, mechanical sensors, optical sensors, electrical sensors, smoke detectors, carbon monoxide detectors, and/or other safety and security monitoring devices. When the monitoring system detects a security or safety problem (e.g., break-in, fire, excessive carbon monoxide levels), the monitoring system sends its alarm signal to the security interface **328**, which in turn forwards the alarm signal to the IP network through the ALD server **100** for delivery to the target IP address (e.g., the security monitoring service provider). The security device interface **328** may also be capable of communicating with the attached security device through the IP device interface to recognize a notification message from the device that it has lost its line based telephone connection. Once that notification has been received, an alert message is formatted and sent to the ALD server **100** through the IP based communication converter **312**.

Operation of the power management system **10** in accordance with exemplary embodiments will now be described. In one embodiment, customers initially sign up for power load management services using a web browser. Using the web browser, the customer accesses a power management system provider's website through the web browser interface **114** and provides his or her name and address information, as well as the type of equipment he or she would like to have controlled by the power load management system **10** to save energy at peak load times and to accumulate power savings or carbon credits (which may be used to receive reward incentives based upon the total amount of power or carbon saved by the customer). The customer may also agree to allow management of power consumption during non-peak times to sell back excess power to the utility, while simultaneously accumulating power savings or carbon credits.

The customer sign up application **116** creates a database entry for each customer in the ALD database **124**. Each customer's contact information and load management preferences are stored or logged in the database **124**. For example, the customer may be given several simple options for managing any number of devices or class of devices, including parameters for managing the devices (e.g., how long each type of device may be switched off and/or define hours when the devices may not be switched off at all). In particular, the customer may also be able to provide specific parameters for HVAC operations (e.g., set control points for the HVAC system specifying both the low and high temperature ranges). Additionally, the customer may be given an option of receiving a notification (e.g., an email message, Instant Message, Text Message, or recorded phone call, or any combination thereof) when a power management event occurs. When the customer completes entering data, a "New Service" or equivalent transaction message or command is sent to the service dispatch manager **126**.

FIG. **4** illustrates an exemplary operational flow diagram **500** providing steps executed by the ALD server **100** (e.g., as part of the service dispatch manager **126**) to manage service requests in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **4** are preferably implemented as a set of computer instructions (software) stored in

a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the service dispatch manager **126** receives (**502**) a transaction message or command and determines (**503**) the type of transaction. Upon receiving a "New Service" transaction message, the service dispatch manager **126** schedules (**504**) a service person (e.g., technician) to make an initial installation visit to the new customer. The service dispatch manager **126** then notifies (**506**) the scheduled service person, or dispatcher of service personnel, of an awaiting service call using, for example, email, text messaging, and/or instant messaging notifications.

In one embodiment, responsive to the service call notification, the service person obtains the new customer's name and address, a description of the desired service, and a service time from a service dispatch manager service log. The service person obtains an active load client **300**, all necessary smart breaker modules **402-412**, and all necessary smart switches to install at the customer location. The service person notes any missing information from the customer's database information (e.g., the devices being controlled, type make and model of each device, and any other information the system will need to function correctly). The service person installs the active load client **300** and smart breakers **402-412** at the new customer's location. A global positioning satellite (GPS) device may optionally be used by the service person to determine an accurate geographic location of the new customer building, which will be added to the customer's entry in the ALD database **124** and may be used to create a symmetric encryption key to facilitate secure communications between the ALD server **100** and the active load client **300**. The physical location of the installed active load client **300** is also entered into the customer's entry. Smart switch devices may be installed by the service person or left at the customer location for installation by the customer. After the active load client **300** has been installed, the service dispatch manager **126** receives (**508**) a report from the service person, via a service log, indicating that the installation is complete. The service dispatch manager **126** then sends (**510**) an "Update" or equivalent transaction message to the ALC manager **108**.

Returning to block **503**, when a "Service" or similar transaction message or command is received, the service dispatch manager **126** schedules (**512**) a service person to make a service call to the specified customer. The service dispatch manager **126** then sends (**514**) a "Diagnose" or similar transaction to the ALC diagnostic manager **122**. The ALC diagnostic manager **122** returns the results of the diagnostic procedure to the service dispatch manager **126**, which then notifies (**516**) the service person of the service call and provides him or her with the results of the diagnostic procedure using a conventional trouble ticket. The service person uses the diagnostic procedure results in the trouble ticket to select the type of equipment and replacement parts necessary for the service call.

FIG. **5** illustrates an exemplary operational flow diagram **600** providing steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to confirm customer sign-up to the power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **5** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** receives (**602**) an "Update" or similar transaction message or command from the service dispatch manager **126** and uses the IP address specified in the "Update" message to send (**604**) out a "Query Request" or similar message or command to the active load client **300**. The "Query Request" message includes a list of devices the ALD server **100** expects to be managed. If the customer information input at customer sign-up includes temperature set points for one or more load-controllable devices, that information is included in the "Query Request" message. The ALC manager **108** receives (**606**) a query reply containing information about the active load client **300** (e.g., current WiMax band being used, operational state (e.g., functioning or not), setting of all the counters for measuring current usage (e.g., all are set to zero at initial set up time), status of devices being controlled (e.g., either switched to the "on" state or "off" state)). The ALC manager **108** updates (**608**) the ALD database **124** with the latest status information obtained from the active load client **300**. If the ALC manager **108** detects (**610**), from the query reply, that the active load client **300** is functioning properly, it sets (**612**) the customer state to "active" to allow participation in ALD server activities. However, if the ALC manager **108** detects (**610**) that the active load client **300** is not functioning properly, it sends (**614**) a "Service" or similar transaction message or command to the service dispatch manager **126**.

FIG. **6** illustrates an exemplary operational flow diagram **700** providing steps executed by the ALD server **100** (e.g., as part of the master event manager **106**) to manage events in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **6** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the master event manager **106** tracks (**702**) current power usage within each utility being managed by the ALD server **100**. When the master event manager **106** receives (**704**) a transaction message or command from the UCC command processor **104** or the ALC manager **108**, the master event manager **106** determines (**706**) the type of transaction received. Upon receiving a "Cut" transaction from the UCC command processor **104** (resulting from a "Cut" command issued by the utility control center **200**), the master event manager **106** places (**708**) the utility in a managed logical state. The master event manager then sends (**710**) a "Cut" transaction or event message or command to the ALC manager **108** identifying the amount of power (e.g., in megawatts) that must be removed from the power system supplied by the utility. The amount of power specified for reduction in a "Cut" command may be an instantaneous amount of power or an average amount of power per unit time. Finally, the master event manager **106** notifies (**711**) every customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification technique) that a power management event is in process.

Returning to block **706**, when the master event manager **106** receives a "How Much" or other equivalent power inquiry transaction message or command from the UCC command processor **104** (resulting from a "How Much" or equivalent power inquiry command issued by the utility control center **200**), the master event manager **106** determines (**712**) the amount of power that may be temporarily removed from a particular utility's managed system by accessing the current usage information for that utility. The current usage information is derived, in one embodiment, by aggregating the total available load for the serving utility, as

determined from the customer usage information for the utility stored in the ALD database **124**, based on the total amount of power that may have to be supplied to the utility's customers in view of the statuses of each of the active load clients **300** and their respectively controllable load devices **402-412**, **420**, **460** during the load control interval identified in the "How Much" message.

Each utility may indicate a maximum amount of power or maximum percentage of power to be reduced during any power reduction event. Such maximums or limits may be stored in the utility P&C database **134** of the ALD server **100** and downloaded to the master event manager **106**. In one embodiment, the master event manager **106** is programmed to remove a default one percent (1%) of the utility's current power consumption during any particular power management period (e.g., one hour). In alternative embodiments, the master event manager **106** may be programmed to remove other fixed percentages of current power consumption or varying percentages of current power consumption based on the current power consumption (e.g., 1% when power consumption is at system maximum and 10% when power consumption is at only 50% of system maximum). Based on the amount of power to be removed, the master event manager **106** sends (**710**) a "Cut" or equivalent event message to the ALC manager **108** indicating the amount of power (e.g., in megawatts) that must be removed from the utility's power system (e.g., 1% of the current usage), and notifies (**711**) all customers that have chosen to receive a notification that a power management event is in process. The master event manager **106** also sends a response to the utility control center **200** via the UCC command processor **104** advising the utility control center **200** as to the quantity of power that can be temporarily reduced by the requesting utility.

Returning once again to block **706**, when the master event manager **106** receives an "End Event" or equivalent transaction message or command from the UCC command processor **104** (resulting from an "End Event" command issued by the utility control center **200**), the master event manager **106** sets (**714**) the state of the current event as "Pending" and sends (**716**) an "End Event" or equivalent transaction message or command to the ALC manager **108**. When the ALC manager **108** has performed the steps necessary to end the present event (e.g., a power reduction or Cut event), the master event manager **106** receives (**718**) an "Event Ended" or equivalent transaction from the ALC manager **108** and sets (**720**) the utility to a logical "Not Managed" state. The master event manager **106** then notifies (**722**) each customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification mechanism) that the power management event has ended. Finally, the master event manager **106** sends an "Event Ended" or equivalent transaction message or command to the power savings application **120** and the utility control center **200** (via the UCC command processor **104**).

Turning now to FIG. **7**, exemplary operational flow diagram **800** illustrates steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to manage power consumption in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **7** are preferably implemented as a set of computer instructions (software) stored in a memory of the ALD server **100** and executed by one or more processors of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** tracks (**802**) the state of each managed active load client **300** by receiving messages, periodically or responsive to polls issued by the ALC manager **108**, from every active load client **300** that the ALC manager **108** manages. These messages indicate the present states of the active load clients **300**. The state includes the present consumption of power for each controllable device **402-412**, **420** controlled by the active load client **300** (or the total power consumption for all controllable devices **402-412**, **420** controlled by the active load client **300** if individual device metering is not available) and the status of each device **402-412**, **420** (e.g., either "Off" or "On"). The ALC manager **108** stores or logs (**804**) the power consumption and device status information in the ALD database **124** in a record corresponding to the specified active load client **300** and its associated customer and serving utility.

When the ALC manager **108** receives (**806**) a transaction message from the master event manager **106**, the ALC manager **108** first determines (**808**) the type of transaction received. If the ALC manager **108** receives a "Cut" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** enters (**810**) a "Manage" logical state. The ALC manager **108** then determines (**812**) which active load clients **300** and associated devices **402-412**, **420** operating on the utility specified in the "Cut" message to switch to the "Off" state. If a location (e.g., list of GPS coordinates, a GPS coordinate range, a geographic area, or a power grid reference area) is included in the "Cut" transaction message, only those active load clients **300** within the specified location are selected for switching to the "Off" state. In other words, the ALC manager **108** selects the group of active load client devices **300** to which the issue a "Turn Off" transaction message based at least partially on the geographic location of each active load client **300** as such location relates to any location identified in the received "Cut" transaction message. The ALD database **124** contains information on the present power consumption (and/or the average power consumption) for each controllable device **402-412**, **420** connected to each active load client **300** in the system **10**. The ALC manager **108** utilizes the stored power consumption information to determine how many, and to select which, devices **402-412**, **420** to turn off to achieve the power reduction required by the "Cut" message. The ALC manager **108** then sends (**814**) a "Turn Off" or equivalent transaction message or command to each active load client **300**, along with a list of the devices to be turned off and a "change state to off" indication for each device **402-412**, **420** in the list. The ALC manager **108** then logs (**816**) the amount of power (either actual or average), as determined from the ALD database **124**, saved for each active load client **300**, along with a time stamp indicating when the power was reduced. The ALC manager **108** then schedules (**818**) transactions for itself to "Turn On" each turned-off device after a predetermined period of time (e.g., which may have been set from a utility specified default, set by instructions from the customer, or otherwise programmed into the ALC manager **108**).

Returning back to block **808**, when the ALC manager **108** receives a "Turn On" or equivalent transaction message or command from the master event manager **106** for a specified active load client **300**, and the ALC manager's state is currently in a "Manage" state, the ALC manager **108** finds (**820**) one or more active load clients **300** that are in the "On" state and do not have any of their managed devices **402-412**, **420** turned off (and are in the specified location if so required by the original "Cut" transaction message), which, when one or more of such devices **402-412**, **420** are turned off, will save the same or substantially the same amount of power that is presently being saved by the specified active load clients that are in the "Off" state. Upon identifying new

active load clients **300** from which to save power, the ALC manager **108** sends (**822**) a "Turn Off" or equivalent transaction message or command to each active load client **300** that must be turned off in order to save the same amount of power as the active load client(s) to be turned on (i.e. to have its or their managed devices **402-412**, **420** turned on) or to save an otherwise acceptable amount of power (e.g., a portion of the power previously saved by the active load client(s) to be turned back on). The ALC manager **108** also sends (**824**) a "Turn On" or equivalent transaction message or command to each active load client **300** to be turned back on. The "Turn On" message instructs all active load clients **300** to which the message was directed to turn on any controllable devices that have been turned off, and causes the affected active load clients **300** to instruct their controllable devices **402-412**, **420** to enable the flow of electric power to their associated power consuming devices (e.g., appliance, HVAC unit, and so forth). Finally, the ALC manager **108** logs (**826**) the time that the "Turn On" transaction message is sent in the ALD database **124**.

Returning once again to block **808**, when the ALC manager **108** receives an "End Event" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** sends (**828**) a "Turn On" or equivalent transaction message or command to every active load client **300** which is currently in the "Off" state and is served by the serving utility identified in the "End Event" message or to which the "End Event" message relates. Upon determining (**830**) that all the appropriate active load clients **300** have transitioned to the "On" state, the ALC manager **108** sends (**832**) an "Event Ended" or equivalent transaction message or command to the master event manager **106**.

Referring now to FIG. **8**, exemplary operational flow diagram **900** illustrates steps executed by the ALD server **100** (e.g., through operation of the power savings application **120**) to calculate and allocate power savings in the power load management system **10**, in accordance with one embodiment of the present invention. The power savings application **120** calculates the total amount of power saved by each utility for each Cut event and the amount of power saved by each customer possessing an active load client **300**.

According to the logic flow of FIG. **8**, the power savings application **120** receives (**902**) an "Event Ended" or equivalent transaction message or command from the master event manager **106** each time a "Cut" or power savings event has ended. The power savings application **120** then accesses (**904**) the ALD database **124** for each active load client **300** involved in the "Cut" event. The database record for each active load client **300** contains the actual amount (or average amount) of power that would have been used by the active load client **300** during the last "Cut" event, along with the amount of time that each controllable device **402-412**, **420** associated with the active load client **300** was turned off. The power savings application **120** uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client **300**. The total power savings for each active load client **300** is stored in its corresponding entry in the ALD database **124**. A running total of power saved is kept for each "Cut" transaction. Each utility that is served by the ALD server **100** has an entry in the utility P&C database **134**. The power savings application **120** stores (**906**) the total amount of power (e.g., in megawatts per hour) saved for the specific utility in the utility's corresponding entry in the utility P&C database **134**, along with other information related to the power savings event (e.g., the time duration of the event, the number of active load clients required to reach the power savings, average length of time each device was in the off state, plus any other information that would be useful in fine tuning future events and in improving customer experience). When all active load client entries have been processed, the power savings application **120** optionally invokes (**908**) the carbon savings application **132** or, analogously, a sulfur dioxide savings application or a nitrogen dioxide savings application, to correlate the power savings with carbon credits, sulfur dioxide credits or nitrogen dioxide credits, respectively, based on the geographic locations of the particular serving utility and customer. Additionally, in one embodiment, the carbon savings application **132** determines carbon credits based on government approved or supplied formulas and stores the determined carbon credits on a per customer and/or per utility basis.

As described above, the present invention encompasses a method for managing and distributing power within a power management system based on real-time feedback from addressable and remotely controllable devices including the actual amount of power currently being individually or collectively consumed by the addressable devices. With this invention, a power management system may pinpoint specific areas of high power usage and more accurately distribute power loads to utilities in need. Additionally, the present invention provides optional participation incentives for customers based on the amount of their actual participation in the power management system.

In the foregoing specification, the present invention has been described with reference to specific embodiments. However, one of ordinary skill in the art will appreciate that various modifications and changes may be made without departing from the spirit and scope of the present invention as set forth in the appended claims. For example, the present invention is applicable for managing the distribution of power from utility companies to subscribing customers using any number of IP-based or other communication methods. Additionally, the functions of specific modules within the ALD server **100** and/or active load client **300** may be performed by one or more equivalent means. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention.

Benefits, other advantages, and solutions to problems have been described above with regard to specific embodiments of the present invention. However, the benefits, advantages, solutions to problems, and any element(s) that may cause or result in such benefits, advantages, or solutions to become more pronounced are not to be construed as a critical, required, or essential feature or element of any or all the claims. The invention is defined solely by the appended claims including any amendments made during the pendency of this application and all equivalents of those claims as issued.

What is claimed is:

**1**. A method for managing an electric power flow within an electric power grid, comprising:

a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one con-

trollable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

generating measurement and verification data corresponding to the reduction in consumed power.

**2**. The method of claim **1**, further comprising generating a power supply value (PSV) corresponding to the reduction in consumed power.

**3**. The method of claim **1**, further comprising communicating a report message to the load management server, the report message including an indication of an amount of power consumed by the at least one associated power consuming device corresponding to the measurement and verification data.

**4**. The method of claim **3**, wherein the report message indicates a compensation associated with the reduction in consumed power.

**5**. The method of claim **4**, wherein the compensation includes at least one of: capacity compensation, energy compensation, operating reserves compensation, ancillary services compensation, compensation for other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**6**. The method of claim **1**, wherein the measurement and verification data is associated with individual power consuming devices.

**7**. The method of claim **1**, further including aggregating the measurement and verification data for a multiplicity of power consuming devices.

**8**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a status of the at least one controllable device.

**9**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a total amount of power consumed by the at least one associated power consuming device and the corresponding measurement and verification data.

**10**. The method of claim **1**, further comprising receiving a subsequent power control message from the load management server instructing the client device to enable the electric power flow to the at least one associated power consuming device with the electric power flow previously disabled.

**11**. The method of claim **1**, further comprising:

the client device receiving a status message from the load management server, the status message requesting status information for the at least one controllable device;

the client device receiving a status response message from the at least one controllable device; and

storing each status response message in a memory for reference in connection with power reduction events.

**12**. The method of claim **1**, wherein at least one Internet-accessible device is coupled to the client device, wherein the client device includes a Layer-3 router operable for:

receiving an Internet Protocol (IP) message that includes an IP address;

determining whether the IP message is directed to the Internet-accessible device coupled to the client device; and



communicating the IP message to the Internet-accessible device.

**13**. The method of claim **1**, wherein the power control message includes a list of controllable devices to be instructed to disable the electric power flow to associated power consuming devices, and wherein the power management command causes the controllable devices identified in the list to disable the electric power flow to the associated power consuming devices to achieve the reduction in consumed power.

**14**. A system for managing electric power on an electric power grid, comprising:

a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power;

wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request.

**15**. The system of claim **14**, wherein a power supply value (PSV) is generated corresponding to the reduction in consumed power, and wherein the PSV indicates a compensation provided for power supply associated with the reduction in consumed power.

**16**. The system of claim **15**, wherein the compensation includes at least one of capacity compensation, energy compensation, operating reserves compensation, compensation to include ancillary services, other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**17**. The system of claim **15**, wherein the PSV is generated based upon a governing entity for the power grid operating region and/or operational regulations.

**18**. The system of claim **14**, wherein the power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device.

**19**. The system of claim **14**, further comprising a communications interface facilitating communications between the remote load management server and the client device, wherein the device control manager communicates at least one power consumption indicator and at least one power management status to the remote load management server via the communications interface.

* * * * *

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on November 26, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be hand-delivered to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

November 26, 2024

Respectfully submitted,

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(571) 208-0186
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

__X__ The brief contains 9,366 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f),

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

__X__ The brief has been prepared in a proportionally spaced typeface using MS Word (Office365) in a 14 point Times New Roman font

Dated: November 26, 2024

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(571) 208-0186
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*