**No. 2024-1958**

# In The United States Court of Appeals

# For The Federal Circuit

CAUSAM ENTERPRISES, INC.,

*Appellant,*

v.

ECOBEE TECHNOLOGIES ULC,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2022-01339*

**BRIEF OF APPELLEE**

Justin J. Oliver
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
joliver@venable.com
Tel: 202-344-4000

Manny Caixeiro
VENABLE LLP
2049 Century Park East
Suite 2300
Los Angeles, CA 90067
mjcaixeiro@venable.com
Tel: 310-229-9900

Steven M. Lubezny
VENABLE LLP
227 W. Monroe St.,
Suite 1900
Chicago, IL 60606
smlubezny@venable.com
Tel:312-820-3400

*Counsel for Appellee ecobee Technologies ULC*

FILED: February 10, 2025

## REPRESENTATIVE PATENT CLAIM AT ISSUE

**Claim 1 of U.S. Patent No. 10,394,268**

1. A method for managing an electric power flow within an electric power grid, comprising:

[1a] a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

[1b] the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

[1c] generating measurement and verification data corresponding to the reduction in consumed power.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1958

**Short Case Caption** Causam Enterprises, Inc. v. ecobee Technologies ULC

**Filing Party/Entity** ecobee Technologies ULC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/10/2025

Signature: /s/ Justin J. Oliver

Name: Justin J. Oliver

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| ecobee Technologies ULC dba, ecobee | | Generac Holdings Inc.<br>Generac Acquisition Corp.<br>Generac Power Systems, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

Representative Patent Claim at Issue .......... ii
Certificate of Interest .......... iii
Table of Abbreviations and Conventions .......... x
Statement of Related Cases .......... xi
Introduction .......... 1
Statement of the Issues .......... 4
Statement of the Case .......... 5
I. The ’268 Patent .......... 5
II. “Measurement And Verification Data” .......... 9
III. The Prior Art – Ehlers .......... 12
IV. Procedural History .......... 15
A. The Board’s Findings Regarding ecobee’s Service Of The Petition And Causam’s “Ownership” Of The ’268 Patent .......... 15
B. Causam’s Arguments Before The Board Regarding The “Measurement And Verification” Limitation .......... 17
C. The Board’s Construction Of “Measurement And Verification Data Corresponding To A Reduction In Consumed Power” .......... 21
D. The Board’s Analysis Of Ehlers .......... 24
Summary of the Argument .......... 28
I. Causam’s Due Process Argument Fails .......... 28
II. The Board’s Claim Construction Is Proper .......... 29
III. Substantial Evidence Supports The Board’s Factual Findings .......... 30
Argument .......... 31
I. Standard Of Review .......... 31

II. The Board Correctly Determined That ecobee Complied With The Statutory Requirements And Did Not Need To Independently Determine The ’268 Patent’s “Ownership” ................32

A. Causam Lacks Standing To Raise Its Constitutional Challenge ..........................................................................33

B. The Board Properly Decided The Question Of Service In Accordance With The Statute, Rules, And USPTO Practice..........................................................................35

C. Causam Forfeited Appeal Of Its Argument By Not Requesting The Board To Determine Ownership ....................39

III. The Board Correctly Determined That The Claimed “Measurement And Verification” Need Not Occur *During* A Power Reduction Event..........................................................40

IV. Causam Does Not Dispute That, Under The Board’s Claim Construction, Ehlers Discloses “Generating Measurement And Verification Data Corresponding To The Reduction In Consumed Power”..........................................................................44

V. Substantial Evidence Supports The Board’s Finding Of Unpatentability Even Under Causam’s Improper Construction .........46

A. Ehlers Describes Determining “Actual Energy Savings,” Including Using Measurements Made “During” A Power Reduction Event........................................................................47

B. Ehlers Describes Performing Measurement And Verification, Which A Person Of Ordinary Skill In The Art Would Understand As Describing The Same Concept As In The ’268 Patent ...............................................................50

Conclusion ..........................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Activision Blizzard, Inc. v. Acceleration Bay, LLC*,
No. IPR2015-01951, 2016 WL 8969284 (P.T.A.B. July 13, 2016)....................35

*Am. Nat'l Mfg. Inc. v. Sleep No. Corp.*,
52 F.4th 1371 (Fed. Cir. 2022) ....................31

*In re Baxter Int'l, Inc.*,
678 F.3d 1357 (Fed. Cir. 2012) ....................31

*Bell Semiconductor LLC v. Adv. Semiconductor Eng'g Inc.*,
No. 2022-2048, 2023 WL 7974927 (Fed. Cir. Nov. 17, 2023) ................2, 29, 37

*Consol. Edison Co. of New York v. N.L.R.B.*,
305 U.S. 197 (1938)....................31

*Cuozzo Speed Techs. v. Commerce for Intellectual Prop.*,
579 U.S. 261 (2016)....................32

*In re Elsner*,
381 F.3d 1125 (Fed. Cir. 2004) ....................31

*FedEx Corp. v. Patent Owner*,
No. IPR2017-01786, 2018 WL 3870035 (P.T.A.B. Aug. 13, 2018)............36, 39

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................31

*HD Silicon Sols. LLC v. Microchip Tech. Inc.*,
No. 2023-1397, 2025 WL 409798 (Fed. Cir. Feb. 6, 2025)....................47

*Legend3D, Inc. v. Prime Focus Creative Servs. Canada Inc.*,
No. IPR2015-01350, 2015 WL 7301808 (P.T.A.B. Nov. 19, 2015)........2, 29, 36

*McGowan v. Maryland*,
366 U.S. 420 (1961)....................33

*McIntosh v. Dep't of Def.*,
53 F.4th 630 (Fed. Cir. 2022) ....................45, 49

*Medtronic Inc. v. Robert Bosch Healthcare Sys.*,
839 F.3d 1382 (Fed. Cir. 2016) ....................................................................32

*Mishara Constr. Co. v. United States*,
230 Ct. Cl. 1008 (1982) ..............................................................................31

*In re NuVasive Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................................................................39

*Shealey v. Wilkie*,
946 F.3d 1294 (Fed. Cir. 2020) ....................................................................33

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................................................................42

*The Jewelry Channel, Inc. USA v. America's Collectibles Network, Inc.*,
No. CBM2014-00119, 2014 WL 5386840 (P.T.A.B. Oct. 20, 2014)
..................................................................................................................36

*Transcom, Inc. v. United States*,
182 F.3d 876 (Fed. Cir. 1999) ......................................................................34

*In re W.R. Grace & Co.*,
729 F.3d 332 (3d Cir. 2013) .........................................................................34

**Statutes**

35 U.S.C. § 312 .............................................................................................4

35 U.S.C. § 312(a)(5)...................................................................16, 37, 38, 39

35 U.S.C. § 314(d) ...............................................................................*passim*

**Other Authorities**

37 C.F.R. § 3.73(c)(1) ..................................................................................35

37 C.F.R. § 42.105(a)...................................................................15, 16, 37, 38

# TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| ’268 patent | U.S. Patent No. 10,394,268 |
| Blue Br. at *xx* | Opening Brief of Appellant, page *xx* |
| Causam | Appellant Causam Enterprises, Inc. |
| ecobee | Appellee ecobee Technologies ULC |
| Ehlers | U.S. Patent Application Publication US 2004/0117330 |
| Chen | U.S. Patent Application Publication US 2004/0095237 |
| IPR | *Inter Partes* Review |
| Inst. Dec. | Institution Decision in IPR2022-01339 |
| ITC | U.S. International Trade Commission |
| USPTO | U.S. Patent and Trademark Office |
| PetR | Petitioner's Reply Brief in IPR2022-01339 |
| POPR | Patent Owner’s Preliminary Response Brief in IPR2022-01339 |
| POR | Patent Owner’s Response Brief in IPR2022-01339 |
| PO Sur-Reply | Patent Owner’s Sur-Reply Brief in IPR2022-01339 |
| PTAB | Patent Trial and Appeal Board |

## STATEMENT OF RELATED CASES

This appeal concerns the Final Written Decision issued by the Board in IPR2022-01339. No other appeal from that proceeding was previously before this Court.

*Causam Enterprises, Inc. v. U.S. International Trade Commission*, Case No. 23-1769, and *Causam Enterprises, Inc. v. Unified Patents, LLC,* Case No. 23-2410, are currently pending before this Court and have been designated companion cases to the current case by Order issued July 19, 2024.

Additionally, the following cases may be directly affected by this Court's decision in this appeal: *Causam Enterprises, Inc. v. ecobee, Inc.*, No. 6:21-cv-00748 (W.D. Tex.); *Causam Enterprises, Inc. v. Resideo Technologies, Inc.*, No. 6:21-cv-00749 (W.D. Tex.); *Causam Enterprises, Inc. v. Itron, Inc.*, No. 6:21-cv-00750 (W.D. Tex.); and *Causam Enterprises, Inc. v. Alarm.com Incorporated*, No. 6:21-cv-00751 (W.D. Tex.). These cases are currently stayed.

# INTRODUCTION

The ’268 patent claims a method for “managing an electric power flow within an electric power grid” by, among other things, issuing a command to “disable the electric power flow to at least one [] power consuming device” and then “generating measurement and verification data corresponding to the reduction in consumed power.” The Board found all challenged claims unpatentable under two different grounds—one based on Ehlers alone (Ground 1) and one based on Ehlers in combination with Chen (Ground 2). For both grounds, the Board determined that Ehlers teaches the step of “generating measurement and verification data corresponding to the reduction in consumed power.”

Causam’s appeal begins by arguing that the Board erred in instituting the IPR. Causam contends that, in doing so, the Board erred by relying on Causam’s own claim and representation that it owns the ’268 patent, because ecobee (and its co-respondents) had asserted a challenge to Causam’s claim of title to the patent in a separate proceeding before the ITC. Causam argues that due process required the Board to make findings about who owns the ’268 patent—Causam or an unidentified third party—before the Board could proceed to consider the Petition.

Setting aside the lack of substance to Causam’s due process argument, Causam does not have the right to raise its argument for at least three independent reasons. First, its argument is a challenge to the Board’s application and

interpretation of statutes in deciding whether to institute *inter partes* review, which is nonappealable under 35 U.S.C. § 314(d). Second, Causam lacks standing to assert the alleged due process rights of another party. Causam speculates that a hypothetical third party, which may have ownership rights in the '268 patent, may have had its due process rights violated. But those alleged rights would belong to a different party, and Causam has no authority to assert or enforce another party's alleged rights. Third, Causam forfeited this argument by never asking the Board to resolve the ownership issue.

Regardless, the Board appropriately applied the statutory requirements for service and notice of IPR proceedings. Under the Board's rules, a party's affirmative representation of ownership is deemed sufficient—particularly where no other party sought to appear in the proceeding and claim ownership. *Bell Semiconductor LLC v. Adv. Semiconductor Eng'g Inc.*, No. 2022-2048, 2023 WL 7974927, at *2 (Fed. Cir. Nov. 17, 2023) (non-precedential); *Legend3D, Inc. v. Prime Focus Creative Servs. Canada Inc.*, No. IPR2015-01350, 2015 WL 7301808 (P.T.A.B. Nov. 19, 2015). That is precisely the scenario here, in view of Causam's repeated affirmative representations that it owns the '268 patent.

Causam's challenge to the substance of the Board's Final Written Decision also fails. Causam contends that the Board erred in rejecting Causam's argument that the claim phrase "generating measurement and verification data corresponding

to a reduction in consumed power" (Appx0103) must occur "during a power reduction event" (Blue Br. at 13). But nothing in the claim language provides a temporal requirement as to when measurement and verification data must be generated, let alone that it must be generated *during* a power reduction event. The claim language recites only that the measurement and verification data must "correspond[] to the reduction in consumed power." Nor does the specification provide a basis to limit the claim scope in this regard. To the contrary, the specification describes calculating power savings without using any measurements obtained during the event. Appx0102, 21:42-59. The Board, therefore, properly determined that the claim language has no "timing constraint." Appx0026. Affirming that proper construction resolves this appeal, as Causam does not challenge the Board's finding of unpatentability under the applied construction.

Nevertheless, Ehlers renders the challenged claims unpatentable even under Causam's preferred construction. Causam mischaracterizes Ehlers as only describing a process for forecasting power savings. But Ehlers explains that rebates are provided based on "actual energy savings" and that measurements can be taken during a demand response event to verify that power has been disabled. Appx1188, ¶ 16; Appx1190, ¶¶ 80, 81. As the Board found, Ehlers describes using "measurement and verification" processes in the same manner as the '268 patent. Appx0041-0042 (citing Appx1190, ¶ 79 (Ehlers)). So, even under Causam's

interpretation of the "measurement and verification" limitation, substantial evidence supports the Board's finding of unpatentability.

For these and other reasons addressed below, Causam's appeal fails.

## STATEMENT OF THE ISSUES

1. In connection with Causam's due process argument:

a. whether Causam may challenge the Board's application of 35 U.S.C. § 312 in deciding to institute *inter partes* review where institution decisions are "nonappealable" under 35 U.S.C. § 314(d);

b. whether Causam has standing to allege a due process violation of the alleged rights of a third party; and

c. should this Court entertain Causam's due process argument, whether the Board properly treated Causam as the patent owner for purposes of the IPR proceeding when (i) Causam represented that it is the sole owner, (ii) no other party sought to appear in the IPR proceeding as the patent owner; and (iii) ecobee complied with the relevant statutory requirements concerning notice and service of an IPR petition.

2. Whether the Board properly determined that "generating measurement and verification data corresponding to the reduction in consumed power" does not require the generating step to occur *during a* power reduction event, where the plain

language of the claims does not include a timing requirement and the specification describes an embodiment that conflicts with such a requirement.

3. Should this Court adopt Causam's claim construction, whether substantial evidence supports the Board's finding that Ehlers teaches or suggests "generating measurement and verification data corresponding to the reduction in consumed power" during a power reduction event, when Ehlers describes measuring energy usage during a power reduction event.

## STATEMENT OF THE CASE

ecobee's Petition for *inter partes* review sought cancellation of claims 1-11 and 13-19 of the '268 patent as obvious over Ehlers alone (Ground 1) and Ehlers in combination with Chen (Ground 2). Appx0265. After reviewing the arguments and the evidence, the Board found that ecobee had shown by a preponderance of the evidence that all challenged claims were unpatentable under both Grounds. Appx0076.

### I. The '268 Patent

The '268 patent is directed to a "method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility." Appx0092, 1:26-32. The '268 patent describes systems for implementing a "demand response" program, where participating customers allow a utility to control their

appliances so that, for example, the utility can shut off the appliances during peak periods of electricity usage or other "high load conditions," thus reducing the energy demand shouldered by the utility. Appx0092, 1:34-55. The '268 patent acknowledges that these programs were known in the field and explains that the typical devices to be controlled during demand response events were "a customer's air conditioner, water heater, [and] pool pump." Appx0092, 1:34-2:58.

As an incentive to participate in such programs, utilities often reward customers by providing, for example, rebates based on the "measurement and verification of the reduction in consumed power," with the "measurement and verification methods … [being] determined by the appropriate governing body or authority for the electrical power grid(s)." Appx0094, 7:28-37.

The '268 patent acknowledges that these programs were known but alleges that the prior systems used "one-way devices" (from the utility to the customer) that lacked "information on the actual devices connected to the receiver." Appx0092, 2:12-17. The '268 patent states that, by comparison, its two-way system determines "the amount of steady-state power each device consumes when turned on," "logs the information in a database," and "transmits the power consumption" to a server. Appx0095, 7:11-20. By obtaining details on the usage of specific appliances at a customer site, the utility can "determine precisely which loads to turn off." Appx0095, 7:23-27.

Figure 1 of the ’268 patent, reproduced below, illustrates a block diagram of the disclosed demand response system, or as the ’268 patent calls it, “active power load management system.” Appx0084, Fig. 1; Appx0095, 7:66-67; Appx0093, 3:49-50. “Each active load client 300 is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances 60 installed in the business or residence 20.” Appx0095, 8:29-34.




*FIG. 1*

Appx0084, Fig. 1.

Figure 8, reproduced below, depicts an exemplary process to “calculate and allocate power savings.” Appx0091, Fig. 8; Appx0102, 21:33-38. In this

embodiment, a power savings application receives an "Event Ended" message when a "power savings event has ended." Appx0102, 21:42-46. The application then accesses a "database record" that contains "the actual amount (or average amount) of power that would have been used" in the absence of the power savings event (i.e. if the active load client had not been turned off), along with "the amount of time each controllable device … associated with the active load client 300 was turned off." Appx0102, 21:46-53. The application uses this information to "calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client 300." Appx0102, 21:53-56. The amount of power savings is then stored and used to provide "carbon credits" to the customer. Appx0102, 21:56-22:15.




*FIG. 8*

Appx0091, Fig. 8.

Representative claim 1 of the ’268 patent is directed to a method for “managing an electric power flow within an electric power grid.” Under this claim, a “client device” receives from a “load manager server” a “power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device.” Appx0102, cl. 1. After receiving the power control message, the client device issues to “at least one controllable device” a “power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power.” Appx0102-0103, cl. 1. The system then “generat[es] measurement and verification data corresponding to the reduction in consumed power.” Appx0103, cl. 1.

## II. “Measurement And Verification Data”

The ’268 patent does not define “measurement and verification data,” but it makes clear that this concept was known because the patent states that “measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s).” Appx0095, 7:34-37. During the IPR proceeding, Causam asserted that the meaning of this term was well known to those of ordinary skill in the art. Appx0703. Causam relied on a document entitled

"Demand Response Measurement & Verification" by the AEIC Load Research Committee ("AEIC"), which provides the following figure illustrating measurement and verification for a demand response event:




Appx0700; Appx3686.

In the above figure from AEIC, the dark gray rectangle represents the "actual load" during an exemplary one hour event. Appx3686. This is a "metered value" of the energy used by a device during a demand response event—which Causam's expert, Dr. Goosen, acknowledged can be zero in scenarios where the demand response event involves cutting all power to a device. Appx3038-3039, 20:20-21:1.

The line depicted at the top of the figure is the "Expected kW" or "baseline," which AEIC explains is the "amount of energy the customer would have used had

the program not been enacted." Appx3686, Appx3688. Causam's expert, Dr. Goosen, referred to the baseline as an expected value for what would have been used had the device not participated in the event, e.g., had not been turned off. Appx3038 ("measurement and verification is primarily concerned with predicting the baseline, which is the predicted or expected consumption of the load had you not curtailed it"). This is because, according to Causam and its expert, it is "not possible to directly measure the hypothetical load that would have been used in absence of the demand response event." Appx0699; Appx3531.

The reduction in consumed power is depicted as the light gray rectangle in the figure, which represents the difference between the actual metered value and the baseline. Appx3686.

Relying on both AEIC and Dr. Goosen's testimony, Causam asserted that "measurement and verification data" would have been understood to mean "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." Appx0703; Appx3535. Because Causam's proposed construction did not substantively affect the parties' disputes with respect to the Grounds in the Petition, ecobee accepted this construction "for purposes of this proceeding only." Appx0767; Appx0015 (citing Appx0767 (PetR)).

## III. The Prior Art – Ehlers

Ehlers describes a system and method to "manage delivery of energy from a distribution network to one or more sites." Appx1168, Abstract. Figure 1A, reproduced below, shows a system described in Ehlers:




Appx1169, Fig.1A.

Ehlers teaches that a utility 1.06 may "monitor and control the usage of electricity by controlling nodes 1.10 and/or devices 1.08" using a Power Supply Program (also referred to in Ehlers as PROGRAM or PSP). Appx1190, ¶ 78. Ehlers discloses a two-way system where a gateway node 1.10D and other nodes 1.10 can "shut-off, i.e. power cut off" to specified devices 1.08 and "report the status of each device 1.08 back to the system." Appx1193-1194, ¶¶ 137-138.

Ehlers teaches that the system is "'always on', connecting the nodes 1.10 to the utility control system 1.02." Appx1191, ¶ 96. Ehlers explains that this "allows the system 1.02 to provide much higher levels of monitoring and management of loads." For example, it "allows the utility 1.06 to know exactly how much load is available" from each participating device, obtain "verification of control requests as curtailment commands are initiated," and "pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions." Appx1191, ¶ 96.

One exemplary method for managing energy delivery in the Ehlers system is depicted in Figure 1C:



Figure 1C

Appx1169, Fig. 1C.

In reference to this Figure, Ehlers describes a method of "shifting energy requirements from a first period of time" that involves "measuring energy usage of a device 1.08 operated by a customer" and then "cut[ting] off" energy to the device

1.08 "during the first time period." Appx1190, ¶ 80; *see also* Appx1188, ¶ 16. For example, Ehlers explains that a "PROGRAM may be defined to include all pool pumps for a given set of customers." Appx1190, ¶ 81. Customers with pool pumps may subscribe to the PROGRAM, which is "further defined by not allowing pool pumps to run" during the set time period. Appx1190, ¶ 81. Prior to the cut-off event, the system would "measur[e] the energy usage of a device 1.08 operated by the customer," as well as store the "power rating" for the customer's device (e.g., pool pump). Appx1190, ¶¶ 80-81. At the start of the event, a load control node 1.10C associated with a subscribing customer's pool pump would "receive[] a signal from the utility control system 1.12 to disable the pool pump *during* the first time period." Appx1190, ¶ 81 (emphasis added). During the event, the load control node 1.10C would "measure[] energy usage of the pool pump during the first time period to confirm that the pool pump is not running." Appx1190, ¶ 81.

After the event, Ehlers teaches that a rebate is provided to the customer "based on actual energy savings as a function of the first time period, the measured energy usage, and known power requirements." Appx1190, ¶ 80; *see also* Appx1188, ¶ 16. As Ehlers explains, consumers who participate in the PROGRAM are credited "based on their actual (measured & verified) contributions." Appx1190, ¶ 79.

## IV. Procedural History

### A. The Board's Findings Regarding ecobee's Service Of The Petition And Causam's "Ownership" Of The '268 Patent

In its POPR, Causam argued that trial should not be instituted because ecobee did not provide copies of the Petition documents "to the patent owner." Appx0426 (citing 35 U.S.C. § 312(a)). According to Causam, because ecobee had disputed, in a proceeding before the ITC, whether Causam holds proper title to the '268 patent, ecobee's service of the Petition was not "to the patent owner." Appx0426-0428. Notably, however, Causam did not ask the Board to decide the issue of patent ownership. Causam did not dispute the presence of an assignment of record in the USPTO, in which Causam was the assignee. Appx0260. Nor did Causam contend that it was not the patent owner.[1] Rather, Causam argued that because ecobee had disputed whether Causam was the patent owner in the ITC proceeding, ecobee should be precluded from identifying Causam as a patent owner for purposes of service of the Petition. Appx0428-0429.

The Board rejected Causam's argument in its Institution Decision. Appx0496-0497. The Board explained that, under 37 C.F.R. § 42.105(a), "proper service of a Petition under the Board's rules is made through the correspondence

[1] To the contrary, Causam has consistently argued that it *is* the patent owner. For example, Causam argues that very position to this Court in companion Appeal No. 2023-1769. *See, e.g.*, Blue Br. (Appeal No. 2023-1769) at 18 ("Causam owns the '268 Patent, and it therefore has standing to pursue this appeal.").

address of record for the subject patent," and the Board found no dispute that ecobee "followed this procedure" when ecobee served Neo IP—the law firm listed in the USPTO's correspondence address of record for the '268 patent. Appx0497; *see also* Appx0327 (Petition certificate of service). The Board also noted that Causam had identified itself as the "sole Patent Owner and Real-Party-In-Interest." Appx0497. The Board thus determined that ecobee's challenge in a separate ITC proceeding as to whether Causam holds proper title to the '268 patent was "unrelated to service in this proceeding" and did "not negate that Causam has asserted full ownership here and [ecobee] followed the service requirements." Appx0497.

Causam repeated these arguments in its POR (Appx0743-0745), which the Board rejected again in its Final Written Decision. Appx0004-0005. The Board explained that there was no dispute that ecobee appropriately followed the procedures required by 35 U.S.C. § 312(a)(5) (requiring documents to be provided "to the patent owner or, if applicable, the designated representative of the patent owner") and 37 C.F.R. § 42.105(a) (stating that proper service of a Petition is made through the "correspondence address of record for the subject patent"). Appx0004. The Board also stated, as it did in its Institution Decision, that Causam had "unequivocally" identified itself "as owner of the challenged patent." Appx0004 (citing Appx0336 (Mandatory Notice)). The Board thus reiterated that ecobee's "challenge in another forum as to whether Causam holds proper title to the '268

patent 'does not negate that Causam has asserted full ownership here and that [ecobee] followed the service requirements.'" Appx0005 (citing Appx0497 (Inst. Dec.)).

### B. Causam's Arguments Before The Board Regarding The "Measurement And Verification" Limitation

In its POR, Causam's argument focused on the meaning of "Measurement & Verification" and, in particular, the use of baselines as measurement and verification data. Appx0698-0708. The parties did not dispute that measurement and verification would include establishing a baseline. Nor was there any dispute that Ehlers disclosed and utilized a baseline in determining the amount of energy savings. However, in an effort to distinguish Ehlers, Causam argued that the baseline used in Ehlers was not sufficiently "accurate" to constitute "measurement and verification data" for purposes of the '268 patent claims. Appx0701 ("more accurate baseline"); Appx0702 ("baseline accuracy"); Appx0722 ("more accurately refining the baseline"). Causam asserted that Ehlers "measures energy usage of a device prior to implementation of the PROGRAM, and assumes that the device's energy usage would have remained consistent but for the power shut-off." Appx0711. According to Causam, Ehlers does not "disclose or suggest any method or technique for accounting for any deviation or baseline adjustment resulting from conditions occurring once a power reduction begins." Appx0720. For instance, in the context of Ehlers' pool pump embodiment, Causam implied that, to meet the "measurement

and verification" limitation, Ehlers' baseline energy measurement would need to be adjusted to account for theoretical differences in the pool pump's workload (had it not been turned off) due to changed conditions at the time of the cut-off event—e.g., changes in ambient temperatures or potential for the filters to clog. Appx3197-3198, 179:5-180:13; Appx3203-3205, 185:8-187:17.

Causam contended that Ehlers' baseline measurements were not adjusted during the cut-off event, which in Causam's view made Ehlers' measurements mere "projections" or "estimates" that do not qualify as "measurement or verification data." Appx0726-0727. Even though the '268 patent does not require any specialized definition of "measurement and verification," and even though Ehlers expressly discloses crediting consumers "based on their actual (measured & verified) contributions," Causam insisted that a skilled artisan would not understand Ehlers to suggest generating the measurement and verification data claimed in the '268 patent. Appx0725.

In reply, ecobee explained that Causam's arguments were not supported by intrinsic or extrinsic evidence. Appx0767-0775. ecobee demonstrated that the '268 patent does not describe performing baseline adjustments. Appx0771-0775. ecobee showed that the '268 patent describes the very concept that Causam was trying to exclude—using historical data prior to the demand response event to determine power savings. Appx0775 (citing Appx0095-102, 7:11-21, 11:28-37, 15:39-43,

21:42-56 ('268 patent)). ecobee also showed that AEIC, which Causam relied upon as evidence of how one of ordinary skill would understand measurement and verification, does not require baseline adjustments. Appx0767-0770.

Moreover, ecobee explained that, to the extent any claim construction of "measurement and verification" could require that measurements or adjustments be performed *during* the cut-off event, Ehlers also suggested the same. Appx0778-0782. First, ecobee showed how Ehlers explicitly states that customers are credited "based on their actual (measured & verified) contributions." Appx0778 (citing Appx1190, ¶ 79 (Ehlers)). ecobee explained that, to the extent persons of ordinary skill would have understood measurement and verification to require baseline adjustments (as Causam suggested), they also would have understood Ehlers to suggest the same process, particularly given its usage of the same terminology. Appx0778-0779. Second, ecobee demonstrated that Ehlers describes (i) making measurements during the cut-off event to verify that the pool pump was indeed off and (ii) verifying its calculations as needed to obtain the correct reduction calculation. Appx0780-0781 (citing Appx1194, ¶ 141 (Ehlers) ("verified as needed to ensure that the reductions that are calculated are correct")); Appx0777 (citing Appx1190, ¶ 81 (Ehlers) ("further measures energy usage of the pool pump during the first time period to confirm that the pool pump is not running")); *see also* Appx0868-0869.

Finally, ecobee showed that Causam's arguments on the meaning of "measurement and verification" did not match its own expert's explicit construction of the phrase. Appx0767.

Causam then filed a Sur-Reply, in which Causam altered its arguments. Causam contended in the Sur-Reply that the claims do *not* require "an adjustment to the baseline during a power reduction event." Appx0817. Instead, under its new theory, Causam asserted that the claims require "the generation of measurement and verification ('M&V data') *corresponding to the reduction in consumed power*, or during a power reduction event." Appx0817 (emphasis in original). Causam argued that because "in Ehlers, all information needed to establish the value of a power reduction event … can be known before the event occurs," Ehlers allegedly did not disclose generating measurement and verification data corresponding to a reduction in consumed power. Appx0818-0819.

ecobee addressed Causam's new argument during the hearing before the Board. Appx0864, 10:2-17; Appx0867-0869; 13:3-15:18. ecobee explained that Causam's interpretation was wrong because it would improperly exclude the use of baseline measurements—which are necessarily "projections" because they are measured in advance of a demand response event—from measurement and verification data. Appx0864, 10:2-17. Moreover, ecobee demonstrated that Causam's argument failed to distinguish Ehlers. ecobee explained that, contrary to

Causam's assertion, Ehlers' approach was not limited to measurements made before a power reduction event; rather, Ehlers also described the use of actual measurement during a power reduction event. Appx0868-0869, 14:7-15:18. As in its Reply, ecobee again pointed to Ehlers' disclosure of "measur[ing] energy usage of the pool pump during the first time period to confirm that the pool pump is not running." Appx0868-0869, 14:14-15:4; Appx3398 (citing Appx1190, ¶ 81 (Ehlers)). ecobee also noted that, when Causam's expert was asked about this disclosure during his deposition, he acknowledged that Ehlers was describing an "actual measurement of energy of the pool pump during the event." Appx0868, 14:14-22; Appx3398 (citing Appx3286, 268:2-13 (Goosen Dep.)).

### C. The Board's Construction Of "Measurement And Verification Data Corresponding To A Reduction In Consumed Power"

In its Final Written Decision, the Board construed the term "measurement and verification data" to mean "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." Appx0012-0021. However, the Board noted that this construction did not resolve the parties' disputes concerning the scope of the measurement and verification limitation. Appx0021. As such, the Board separately addressed the construction of

the larger phrase "measurement and verification data corresponding to a reduction in consumed power." Appx0021-0027.[2]

The Board first determined that "measurement and verification data corresponding to a reduction in consumed power" does not exclude the use of "power usage measured before a demand reduction event." Appx0021-0025; *see also* Appx0026 ("To the extent that [Causam] is arguing here that the claim precludes using estimates or projections of savings based on information collected prior to the power savings event, we disagree …."). The Board relied on Causam's admission that "'generating measurement and verification data corresponding to the reduction in consumed power' 'defines the difference between the *expected use/baseline* and the actual amount of power consumed (i.e. the power consumption that actually occurred) during the demand response period in order to accurately determine the reduced power consumed as a result of the demand response event.'" Appx0022-0023 (emphasis added). The Board found that such baseline measurements are "estimates or projections" because, "[a]s [Causam] and its expert Dr. Goosen also recognize, direct measurement of 'the hypothetical load that would have been used in absence of the demand response event' is not possible." Appx0023.

---

[2] Despite focusing most of its arguments on this larger phrase, Causam did not provide an express construction of this phrase.

The Board also rejected Causam's argument that "measurement and verification data" requires a particular "level of precision or accuracy." Appx0025 ("[Causam] has not identified any claim language that requires a particular level of accuracy."). The Board further disagreed with Causam that the claim limitations require adjustments be made to a baseline measurement during or after the power reduction event. Appx0026; Appx0043. On this latter point, the Board noted that Causam had "clarified" in its Sur-reply that the "claims do not require a baseline estimated before a power savings or demand response event to be adjusted later, i.e. during the event." Appx0026, (citing Appx0817 (PO Sur-Reply)).

The Board also considered and rejected Causam's timing argument—i.e., that "'generating measurement and verification data corresponding to the reduction in consumed power' must occur *during* a power reduction event." Appx0025-0026 (emphasis in original). The Board determined that "nothing in the plain language of the claims or any portion of the specification identified by [Causam] would limit the generation of measurement and verification to be performed during the power reduction event." Appx0026. In support, the Board also pointed to Causam's own admission that the '268 patent specification "describes an embodiment in the challenged patent that [Causam] indicates calculates 'after a power savings event has ended' an actual or average amount of power that would have been used by an active load client during a power cut event, which [Causam's expert] testifies would

be 'comparable to the baseline shown in [AEIC] Figure 1.3.'" Appx0026 (citing Appx0707 (citing Appx0102, 21:44-56 ('268 patent), Appx3537-3538, ¶ 55 (Goosen Decl.))). The Board further relied on the fact that power savings during a period in which a device is turned off cannot be "directly measured" and, instead, energy usage measurements are made "before a demand reduction event." Appx0026-0027.

**D. The Board's Analysis Of Ehlers**

The Board determined that Ehlers teaches "generating measurement and verification data corresponding to a reduction in consumed power." Appx0036-0048. The Board found that Ehlers' method "includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements." Appx0037-0038 (citing Appx1188, ¶ 16 (Ehlers); Appx1190, ¶ 80 (Ehlers)) (emphasis in original). The Board noted that "Ehlers explains the method in the context of Figure 1C and states that the controlled device to which energy is cut off is device 1.08 operated by the customer." Appx0038 (citing Appx1190, ¶ 80 (Ehlers)).

The Board also found that Ehlers describes that Power Supply Programs may "credit consumers who participate with KWH [kilowatt hour] rebates based on *their*

*actual (measured & verified) contributions.*" Appx0038 (citing Appx1190, ¶ 79 (Ehlers)) (emphasis in original). And, as the Board stated, Ehlers further "notes that the Power Supply Program 'provides a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate.'" Appx0038, (citing Appx1190, ¶ 79 (Ehlers)).

The Board also referred to Ehlers' statements that an advantage of its "always on" connectivity to utility 1.06 is that it "provide[s] much higher levels of monitoring and management of loads" and, more specifically, "allows the utility 1.06 to know exactly how much load is available from each participating end use device 1.08 at a customer site 1.04." Appx0038 (citing Appx1191, ¶ 96 (Ehlers)). As the Board explained, the utility 1.06 in Ehlers is thus able to "manage demand more closely by getting verification of control requests as curtailment commands are initiated" and "can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions." Appx0038 (citing Appx1191, ¶ 96 (Ehlers)).

The Board next rejected Causam's attempts to differentiate Ehlers, finding that many of Causam's arguments were predicated on an incorrect claim construction (as discussed above). Appx0039 ("Many of Patent Owner's arguments rely on its improperly narrow construction of 'measurement and verification data

corresponding to the reduction in consumed power.”). The Board also disagreed with Causam’s depiction of Ehlers, as explained below.

Causam asserted that “[o]nce Ehlers cuts power off to a device … Ehlers assumes a power savings based on a duration of the energy cut-off … and a projected energy usage established before the demand response period.” Appx0709-0710; Appx0040 (citing Appx0709-0710 (POR)). As such, Causam argued that, in Ehlers, the “projected contribution is established prior to [when] a device’s actual power reduction occurs and does not correspond to an actual reduction.” Appx0717; Appx0040 (citing Appx0717 (POR)). The Board disagreed, finding no reason why “Ehlers’ clear disclosures of ‘actual energy savings’ and rebates based on ‘actual contributions’ would have been understood by one of ordinary skill as anything other than ‘actual.’” Appx0041.

The Board stated that Causam’s arguments were “still further undermined by Ehlers’ descriptions in paragraph 96 of providing utilities with ‘much higher levels of monitoring and management of loads’; billing and rebates based on actual contributions; and ‘getting verification of control requests as curtailment events are initiated.” Appx0044 (citing Appx1191, ¶ 96 (Ehlers)). The Board reasoned that these “descriptions teach and suggest that Ehlers’ use of ‘actual contributions’ refers to power savings resulting from cutting off power to the device,” as required by claim 1 of the ’268 patent. Appx0044.

The Board also considered and rejected Causam's assertion that Ehlers' disclosure of "measured and verified" would "not have suggested to one of ordinary skill 'generating measurement and verification data' as required by claim 1." Appx0041. As the Board explained, Causam and its expert took the position that "the concept of measurement and verification would have been well-understood to one of ordinary skill and in the demand response industry at the time of the invention." Appx0042 (citing Appx0698 (POR); Appx3530-3531, ¶ 43 (Goosen Decl.)). Thus, the Board found that "one of ordinary skill would have understood both 'measurement and verification' in the challenged patent and Ehlers' use of 'measured & verified' (which is parenthetically used to modify the description of actual contributions of consumers participating in a Power Supply Program) to refer to the same well-known concept of measurement of verification." Appx0042. The Board noted that its finding was also bolstered by "the context of Ehlers' description … of 'higher levels of monitoring and management of loads,' 'manag[ing] demand more closely by getting verification,' and providing rebates" (Appx0042 (citing Appx1191, ¶ 96 (Ehlers))) as well as ecobee's expert's testimony explaining that "Ehlers suggests that measurement and verification methods are used" (Appx0042 (citing Appx1082-1083, ¶ 54 (Auslander Decl.))).

# SUMMARY OF THE ARGUMENT

## I. Causam's Due Process Argument Fails

The Board properly treated Causam as the "patent owner" for purposes of the IPR proceeding because Causam affirmatively represented that it is the patent owner. On appeal, Causam argues that, because its ownership claim has been challenged in *another* proceeding, due process required the Board to resolve the ownership dispute (raised in that other proceeding) before the Board could institute the *inter partes* review. Causam's argument fails for several independent reasons.

*First*, Causam's challenge is directed to the application and interpretation of the statutes relating to the Board's decision to institute *inter partes* review, which is nonappealable under 35 U.S.C. § 314(d). Thus, Causam's due process argument is an improper attempt to circumvent § 314(d).

*Second*, Causam lacks standing to raise a due process challenge that rests on the possibility that some third party may hold title to the '268 patent and that such party, to the extent it does hold title, was not provided adequate notice of the IPR proceeding. Even if a third party owned the '268 patent, any due process violation would be a harm to that unidentified party and not to Causam. Thus, even if the due process argument had merit, Causam lacks standing to raise it.

*Third*, the Board properly applied the relevant statutes and rules. Both this Court and the Board have consistently determined that, for purposes of IPR

proceedings, the Board may accept a party's identification of itself as the patent owner, even where there is an ownership dispute in another forum. *See Bell Semiconductor*, 2023 WL 7974927, at *2 (non-precedential); *Legend3D*, 2015 WL 7301808. Here, Causam itself declared that it was the sole owner of the patent, no other party asserted ownership before the Board, and ecobee fully complied with the rules for service of the Petition on the correspondence address of record.

*Fourth,* Causam never asked the Board to resolve ownership. Causam's misguided argument is, therefore, forfeited.

## II. The Board's Claim Construction Is Proper

On the substance of the Board's findings, Causam has abandoned most of the arguments it made before the Board. Causam challenges only a single issue in this appeal: whether "generating measurement and verification data corresponding to the reduction in consumed power" must be construed to require a timing requirement—specifically, whether the generation of the measurement and verification data must occur "during" a power reduction event. Causam's argument is, at best, an attempt to improperly narrow the claims to avoid the prior art. The Board correctly rejected Causam's interpretation because neither the claim language nor the specification requires any such timing requirement. In fact, as detailed below, the specification of the '268 patent discloses an embodiment in which measurement and verification data is not generated during the event but instead calculates power savings based on

an average amount of power that would have been used by a device had it not been turned off along with the amount of time the device was off. Appx0102, 21:42-59.

## III. Substantial Evidence Supports The Board's Factual Findings

Causam does not challenge the Board's finding of unpatentability under the Board's construction. As such, if this Court affirms the Board's construction it can should affirm the Board's ultimate finding of unpatentability.

Causam argues that Ehlers would not apply under its construction because Ehlers allegedly only "forecasts" power savings based on a measurement taken before a power reduction event begins. That is wrong. Ehlers explains that rebates are provided based on "actual energy savings." Appx1188, ¶ 16; Appx1190, ¶ 80. Ehlers also describes taking measurements *during* a demand response event to verify that power to a device has been disabled. Appx1190, ¶ 81. And, as the Board found, Ehlers describes using "measurement and verification" processes in the same manner as the '268 patent. Appx0041-0042 (citing Appx1190, ¶ 79 (Ehlers)). Consequently, even if this Court were to conclude that the Board erred in its construction of the "measurement and verification" limitation, substantial evidence still supports the Board's existing finding that one of ordinary skill in the art would have understood Ehlers to teach the same "measurement and verification" concept as claimed in the '268 patent.

# ARGUMENT

## I. Standard Of Review

This Court's review of a Board decision is limited. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012). This Court reviews the Board's legal determinations de novo, *In re Elsner*, 381 F.3d 1125, 1127 (Fed. Cir. 2004), but reviews the Board's factual findings underlying those determinations for substantial evidence, *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support the finding. *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "Where there is adequate and substantial evidence to support either of two contrary findings of fact, the one chosen by the Board is binding on the court regardless of how we might have decided the issue if it had been raised *de novo*." *Mishara Constr. Co. v. United States*, 230 Ct. Cl. 1008, 1009 (1982).

This Court also reviews statutory and constitutional issues de novo. *Am. Nat'l Mfg. Inc. v. Sleep No. Corp.*, 52 F.4th 1371, 1380 (Fed. Cir. 2022). However, under 35 U.S.C. § 314(d), the Board's determination "whether to institute an inter partes review" is "final and nonappealable."

## II. The Board Correctly Determined That ecobee Complied With The Statutory Requirements And Did Not Need To Independently Determine The '268 Patent's "Ownership"

The Board considered Causam's challenges to the statutory service and notice provisions, determined that ecobee had properly complied with the statutory requirements, and appropriately instituted the IPR. Appx0496-0497; Appx0004-0005. Causam appears to recognize that, under 35 U.S.C. § 314(d), a determination of whether to institute *inter partes* review is nonappealable under the relevant statute, so it instead insists that its appeal presents a "constitutional issue." Blue Br. at 33. Causam's arguments, however, merely repackage its disagreement with the Board's application and interpretation of the statutes in deciding to institute *inter partes* review. As such, pursuant to 35 U.S.C. § 314(d), this Court should decline to consider Causam's argument. *See, e.g., Cuozzo Speed Techs. v. Commerce for Intellectual Prop.*, 579 U.S. 261, 274–75 (2016) (§ 314(d) applies "where the grounds for attacking the decision to institute inter partes review consist of questions that are closely tied to the application and interpretation of statutes related to the Patent Office's decision to initiate inter partes review"); *Medtronic Inc. v. Robert Bosch Healthcare Sys.*, 839 F.3d 1382, 1384–85 (Fed. Cir. 2016) ("It is difficult to conceive of a case more closely related to a decision to institute proceedings than a reconsideration of that very decision." (internal quotation marks omitted)).

In any event, Causam's argument fails for numerous reasons, including Causam's lack of standing to bring its due process challenge and because no party asked the Board to rule on ownership of the patent. The statute, rules and USPTO practice support the Board's actions.

### A. Causam Lacks Standing To Raise Its Constitutional Challenge

The "due process" issue that Causam raises is, in fact, an improper attempt to have this Court review the Board's unappealable institution decision. Even if this Court were to entertain Causam's due process argument, Causam lacks standing to raise it.

Fundamentally, Causam's position is that (i) due process requires the "true" patent owner to receive notice of the IPR petition and (ii) that might not have occurred if, hypothetically, an entity other than Causam is the true owner of the patent. Blue Br. at 26-34. But there are only two possible scenarios. The first is that Causam owns the patent, in which case there can be no due process violation as Causam does not dispute that it had notice and the opportunity to participate (and did participate). The second is that another entity owns the patent, in which case Causam has no standing to raise a purported violation of *another entity's* due process rights. *McGowan v. Maryland*, 366 U.S. 420, 429 (1961) ("the general rule is that 'a litigant may only assert its own constitutional rights or immunities'" (citations omitted)); *Shealey v. Wilkie*, 946 F.3d 1294, 1298 (Fed. Cir. 2020) ("[A] party

'generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties.'" (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004))); *see, e.g.*, *In re W.R. Grace & Co.*, 729 F.3d 332, 340 n.5 (3d Cir. 2013) (litigant "lacks standing" to assert "constitutional rights of others").

Causam's reliance on *Transcom*—which Causam contends stands for the proposition that "any party may challenge" due process—is misplaced. Blue Br. at 30. In *Transcom*, a case involving antidumping laws, this Court considered whether an importer of goods had the right to challenge the government's failure to provide notice to exporters. *Transcom, Inc. v. United States*, 182 F.3d 876 (Fed. Cir. 1999). The government contended that the importer had no right to raise the issue "because an importer agrees in advance to pay whatever antidumping duties are ultimately assessed." *Id.* at 879. This Court rejected the government's argument, holding that the importer was entitled to challenge the lack of notice to the exporters because the flawed procedure resulted in the imposition of an improper rate on the *importer's* products. *Id.* As this Court explained, "an importer that is directly affected by an administrative determination of the proper antidumping duties is entitled to complain of procedural flaws in the administrative proceeding." *Id.*

*Transcom* is far different from the situation here where the only rights that could be implicated are those held by a hypothetical third party, as Causam identifies

no harm to itself. Indeed, if Causam owns the patent (as it has repeatedly represented) it was not harmed because it fully participated in these proceedings. If someone else owns the patent, Causam lacks standing to seek an adjudication of the potential harm (if any) that entity may have experienced by not participating in the adjudication of the IPR.

### B. The Board Properly Decided The Question Of Service In Accordance With The Statute, Rules, And USPTO Practice

Causam's substantive arguments against the Board's procedural decisions are meritless.

***First***, in instituting and considering the IPR, the Board did not err by relying on Causam's own claim of sole ownership merely because Causam's title has been challenged in other proceedings.[3] Blue Br. at 27-28. As the PTAB has explained, standing requirements to sue for infringement in district court do not apply in IPR proceedings. *Activision Blizzard, Inc. v. Acceleration Bay, LLC*, No. IPR2015-01951, 2016 WL 8969284, at *2 (P.T.A.B. July 13, 2016) ("We determine that there is not the same standing requirement for a party to prosecute an *inter partes* review [as there is to sue for infringement]."). Under 37 C.F.R. § 3.73(c)(1), a party seeking to establish standing as an assignee need only "establish its ownership of the patent

[3] To be clear, the ITC did not resolve the issue of Causam's ownership. Although the Chief Administrative Law Judge determined that Causam did not own the '268 patent, the Commission took no position on the issue. *See* Appx4198.

property ... *to the satisfaction of the Director*." *FedEx Corp. v. Patent Owner*, No. IPR2017-01786, 2018 WL 3870035, at *4 (P.T.A.B. Aug. 13, 2018) (emphasis in original).

Thus, under the Board's rules, a party's affirmative representation of ownership is deemed sufficient, particularly when no other party appears in the proceeding claiming ownership. *See, e.g., Legend3D*, 2015 WL 7301808 (P.T.A.B. Nov. 19, 2015) ("PFCSC's affirmative representation of ownership, and Mr. Glucoft's appearance as lead counsel indicating that he has full authority of the rightful patent owner, are sufficient. Further, to our knowledge, no other party has requested to appear in this proceeding claiming an ownership interest in the [] patent"). The PTAB has reached the same determination even in cases where, as here, an ownership dispute is pending in another forum. *See The Jewelry Channel, Inc. USA v. America's Collectibles Network, Inc.*, No. CBM2014-00119, 2014 WL 5386840, at *2 (P.T.A.B. Oct. 20, 2014) (rejecting argument that institution should be denied "because of the possibility that the actual owner will not be a party to this proceeding should the U.S. District Court ... determine that Gemstone and not Patent Owner ... is the actual owner").

This Court has previously noted (in a non-precedential opinion) that "'[i]n *inter partes* review proceedings, the Board generally accepts a party's identification of itself as the patent owner,' particularly when the party seeking to proceed as patent

owner is the assignee and patent owner of record and when no other party purporting to be the patent owner appears before the Board." *Bell Semiconductor*, 2023 WL 7974927, at *2 (citations omitted). This Court ruled that there was "*no error* in the Board's treatment [of a party as the patent owner]," even though other parties had claimed to have an interest in the patent in separate district court proceedings. *Id.* (emphasis added).

Here, Causam affirmatively represented that it was the owner of the '268 patent. Appx0336. And no other party sought to appear claiming ownership. Under these facts, just as in *Bell*, it was proper for the Board to treat Causam as the patent owner for purposes of the IPR.

***Second***, Causam wrongly suggests that the Board failed to make evidentiary findings and explain its legal conclusions in determining that the Petition met all statutory requirements. Blue Br. at 29. The Board considered ecobee's service of the Petition on the law firm listed in the USPTO's correspondence address of record and explained that such service was "proper" under 35 U.S.C. § 312(a)(5) and 37 C.F.R. § 42.105(a). Appx0004.[4] Indeed, the statute makes clear that service must be made "on the patent owner *or*, if applicable, *the designated representative* of the

---

[4] Causam incorrectly continues to claim, as it did before the Board, that ecobee served the Petition on Causam. Blue Br. at 38. The Petition was served on Neo IP, the law firm identified in the USPTO's correspondence of record. Appx0327.

patent owner" (35 U.S.C. § 312(a)(5) (emphasis added)), and the rules require service on the correspondence address of record (37 C.F.R. § 42.105(a)), which in this case was a law firm acting as the designated representative (Appx0327).[5]

Further, in treating Causam as the "patent owner," the Board properly relied on the fact that Causam had "unequivocally identified itself, Causam, as owner of the challenged patent." Appx0004 (citing Appx0336 (Mandatory Notice)); Appx0497 (citing Appx0336 (Mandatory Notice)). It strains credibility for Causam to complain that the Board treated Causam as the patent owner when that is what Causam said it was (and, notably, continues to say it is).

***Third***, Causam complains that, by not requiring ecobee to identify the "true owner," the "Board improperly shifted the burden of compliance" to Causam. Blue Br. at 32. Under Causam's theory, the statute and Board rules pertaining to real parties-in-interest require a petition to identify not only the real parties-in-interest for the petitioner, but also all real parties-in-interest for *the patent owner*. Blue Br.

[5] Under Causam's theory, for a petition to be accepted, the petitioner must know with absolute certainty the precise holder of the title to the patent and serve that entity, regardless of the current USPTO assignment records and correspondence address of record for the patent. Or, when serving the agent of record, as the statute permits, the petitioner would be burdened with knowing precisely which entity (or entities) that agent represents at the moment of the filing of the petition. The implications of Causam's theory present improper burdens on a petitioner far beyond those set forth in the relevant statutes—and could create situations where non-public facts about a patent's true ownership make it effectively impossible to institute an IPR of that patent.

at 32. But, as with standard practice in most tribunals, including this Court and the USPTO, a party is required to identify real parties-in-interest *for its side*. 37 C.F.R. § 42.8. ("[i]dentify each real party-in-interest *for the party*" (emphasis added)). Causam would have this Court rule that a petitioner must identify all real parties-in-interest *for the patent owner* to be entitled to seek institution of an IPR—an illogical and impossible standard. Each party is required to identify only its own real parties-in-interest. 37 C.F.R. § 42.8; *cf. FedEx Corp.*, 2018 WL 3870035, at *4 ("the burden of persuasion remains with the party asserting standing as patent owner to demonstrate ownership of the challenged patent"). Causam provides no credible theory or legal citation for the proposition that 35 U.S.C. § 312(a)(5) requires a petitioner to identify the real parties-in-interest for the patent owner. Indeed, a party is rarely if ever in a position to identify the real parties-in-interest for a different party. And, in any event, since this issue goes to the propriety of institution, it is not an appealable issue. 35 U.S.C. § 314(d).

### C. Causam Forfeited Appeal Of Its Argument By Not Requesting The Board To Determine Ownership

To the extent Causam suggests that the Board was required to "resolve the ownership issue" (Blue Br. at 30), Causam has forfeited that issue because it did not request it below. *In re NuVasive Inc.*, 842 F.3d 1376, 1380 (Fed. Cir. 2016) (finding that argument not made to PTAB was forfeited). Causam never asked the Board to resolve Causam's ownership dispute. Causam merely pointed the Board to ecobee's

arguments in a different forum—the ITC—and asserted that the existence of those arguments necessitated a conclusion that ecobee had not complied with statutory requirements for institution. Appx0426-0429; Appx0743-0745. Indeed, it is unclear how Causam believes the Board could have performed a fulsome ownership analysis when neither Causam nor any other party presented the Board with factual evidence or arguments pertaining to the issue. This is especially true because, all along, it was and has been Causam's position that it is the one true owner of the '268 patent.

## III. The Board Correctly Determined That The Claimed "Measurement And Verification" Need Not Occur *During* A Power Reduction Event

Claim element [1c] recites "generating measurement and verification data corresponding to the reduction in consumed power." Causam argues that the term "corresponding" requires that data be generated *during* the demand response event, as opposed to before or after the demand response event. Blue Br. at 35 ("claim 1 requires the system to take measurements during a demand response event."); *id. at* 36 ("element 1[c] requires measurement and verification *during* a demand response period"). The Board considered and properly rejected that argument, finding that "[t]o the extent [] that [Causam] is arguing a timing constraint that "'generating measurement and verification data corresponding to the reduction in consumed power' must occur *during* a power reduction event and not after the power reduction event, we disagree." Appx0026 (emphasis in original).

"[T]he claim construction inquiry [] begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Here, as the Board explained, "the plain language of the claim requires generating the measurement and verification data that corresponds to the reduction in consumed power when the electric flow to the device is disabled." Appx0026. The claim language provides no temporal limitation as to when the measurement and verification data must be generated, let alone require it to occur *during* the event. As such, the Board did not "ignore" or "eliminate" any claim language, as Causam contends. Blue Br. at 36. The Board properly recognized that the measurement and verification data need only "correspond" to the reduction in consumed power, and thus correctly determined that "nothing in the plain language of the claims … would limit the generation of measurement and verification to be performed during the power reduction event." Appx0026.

Causam urges that an embodiment described at 21:42-22:15 of the '268 patent supports its construction. Blue Br. at 37. However, nothing in the embodiment requires that generating measurement and verification data must occur *during* a power reduction event. Appx0026. Rather, as the Board explained, this embodiment describes a process that, by Causam's own admission, calculates the amount of power saved "after a power savings event has ended." Appx0026 (citing Appx0707); Appx0102, 21:42-21:56. The calculation is performed using "an actual

amount (or average amount) of power that would have been used … during the last 'Cut' event." Appx0102, 21:42-59; *see also* Appx0707 (Causam acknowledging that "actual amount of power that would have been used is comparable to the baseline as shown in [AEIC document] Figure 1.3"). More specifically, the '268 patent explains that the "average" amount of power used by a device is measured in advance of an event and saved in a database such that the calculation of savings by participating in the program is determined based on the stored average power usage and the time period during which the device was turned off. Appx0102, 21:42-59; *see also* Appx0101, 20:33-37 ("The ALD database 124 contains information on the present power consumption (and/or the average power consumption) for each controllable device [] connected to each load client 300 in the system 10."). Accordingly, this embodiment does not support Causam's position that generating measurement and verification data must occur *during* a power reduction event, let alone provide the type of clear statement required to limit claim scope. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327-28 (Fed. Cir. 2002) (absent "clear statement of scope," claim scope is not limited to a preferred embodiment).

Causam's attempt to support its position with the experts' testimony likewise fails. Contrary to Causam's insinuation, ecobee's expert, Dr. Auslander, never testified that the claim language should be construed to require measurements *during* a demand response event. Blue Br. at 37-38. Rather, Dr. Auslander explained that

a system may "*perhaps* measure power during the event *depending on how the event is* in terms of whether the device is shut off or whether the device is running at partial power." Appx3603, 17:8-17 (emphasis added). In other words, Dr. Auslander explained that, whether a system would require measurements during the power reduction event to generate measurement and verification data depends on the nature of that particular system.

The testimony of Causam's expert, Dr. Goosen, also does not aid Causam. Blue Br. at 37 (citing Appx3542-3546). Dr. Goosen had opined that Ehlers' baseline data was insufficient to practice the claim because, in his view, Ehlers' system did not "refine a baseline [to] account[] for changes occurring during 'the reduction in consumed power." Appx3551 at ¶ 79; *see also* Appx3542-3546 at ¶¶ 65-70 (discussing purported deficiencies in Ehlers' baseline measurements). That "adjusted baseline" argument, however, pertained to a position that Causam subsequently abandoned below and does not contest in this appeal. Appx0817. Indeed, the Board explained that Causam "clarified in its Sur-reply that the claims do not require a baseline estimated before a power savings event or demand response event to be adjusted later, i.e. during the event." Appx0026 (citing Appx0817 (PO Sur-Reply)). So, Dr. Goosen's opinions concerning the need for baseline refinement are of no import.

If anything, Dr. Goosen's testimony contradicts Causam's claim construction theory. When addressing the construction of "measurement and verification data," Dr. Goosen opined that "measurement and verification data" would be understood by those of ordinary skill in the art simply to mean "data used to measure and verify the impact of the load reduction resulting from the utilization of a Demand Response program." Appx3535, ¶ 51. Dr. Goosen did not opine that measurement and verification data must, by definition, be generated *during* a demand response event.

This Court should affirm the Board's construction that "generating measurement and verification data corresponding to a reduction in consumed power" need not occur "during a power reduction event."

## IV. Causam Does Not Dispute That, Under The Board's Claim Construction, Ehlers Discloses "Generating Measurement And Verification Data Corresponding To The Reduction In Consumed Power"

After addressing claim construction, the Board performed a detailed analysis of unpatentability based on Ehlers. Appx0027-0076. With respect to the "measurement and verification" limitation, the Board relied on Ehlers' disclosure of "measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements." Appx0037-0038 (citing Appx1188, ¶ 16 (Ehlers); Appx1190, ¶ 80 (Ehlers)) (emphasis in original).

As the Board explained, Ehlers describes that power supply programs can "credit consumers who participate with KWH [kilowatt hour] rebates based on *their actual (measured & verified) contributions*" and "provide[] a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate." Appx0038, (citing Appx1190, ¶ 79 (Ehlers)) (emphasis in original). Ehlers also describes that the utility "know[s] exactly how much load is available from each participating end use device," is able to "manage demand more closely by getting verification of control requests as curtailment commands are initiated" and can "pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions." Appx0038 (citing Appx1191, ¶ 96 (Ehlers)). Based on this, and other evidence discussed in the Board's analysis, the Board concluded that "Ehlers teaches or suggests 'generating measurement and verification data corresponding to the reduction in consumed power,' recited in limitation 1c." Appx0047-0048.

Causam's principal brief does not challenge the Board's determination that Ehlers teaches or suggests "generating measurement and verification data corresponding to the reduction in consumed power" under the Board's construction, and so Causam has forfeited any argument in this regard. *See, e.g.*, *McIntosh v. Dep't of Def.*, 53 F.4th 630, 641 (Fed. Cir. 2022) ("'Our law is well established that arguments not raised in the opening brief are' forfeited." (quoting *Smithkline*

*Beecham Corp. v. Apotex Corp.*, 439 F.3d 1213, 1319 (Fed. Cir. 2006))). In any event, even if Causam had not forfeited this issue, affirmance is warranted because the finding is support by substantial evidence, as discussed above.

## V. Substantial Evidence Supports The Board's Finding Of Unpatentability Even Under Causam's Improper Construction

Causam's argument that Ehlers would not apply under its proposed claim construction also fails. Causam insists that Ehlers is distinguishable because it "forecasts" power savings based on a measurement taken before a power reduction event begins. Blue Br. at 24 ("forecasted based on measurements taken before an event begins"); 39 ("the only measurement [in Ehlers] occurs before a demand response event, not during a demand response event"); 41 ("forecasts the value of a demand response period prior to the start of any savings, but does not take measurements during a demand response period"). But, contrary to Causam's assertions, Ehlers explains that rebates are provided based on "actual energy savings," and describes measurements taken during a demand response event to verify that power has been disabled. Appx1190, ¶¶ 80, 81; Appx1188, ¶ 16. For instance, Ehlers provides an example whereby energy savings are calculated based on "[t]he power rating for a customer's pool pump" and the time period that the pool pump is disabled, and the energy savings are verified based on a measurement of the energy usage of the pool pump during the same time period to "confirm that the pool pump is not running." Appx1190, ¶ 81.

As the Board determined, Ehlers describes using "measurement and verification" processes in the same manner as the '268 patent. Appx0041-0042 (citing Appx1190, ¶ 79 (Ehlers)). So, even if "measurement and verification" would be understood in the art to require measurements during a power reduction event, one of ordinary skill in the art would understand Ehlers to suggest the same concept. Thus, as detailed below, this Court should rule that substantial evidence supports the Board's finding of unpatentability even under Causam's interpretation. *See, e.g.*, *HD Silicon Sols. LLC v. Microchip Tech. Inc.*, No. 2023-1397, 2025 WL 409798, at *9-10 (Fed. Cir. Feb. 6, 2025) (finding that error in claim construction was "harmless" because the prior art disclosed the relevant limitation under either parties' construction).

### A. Ehlers Describes Determining "Actual Energy Savings," Including Using Measurements Made "During" A Power Reduction Event

Causam's depiction of Ehlers as focusing on "estimates" (Blue Br. at 39-43) is wrong. In relation to Figure 1C, Ehlers describes a method that involves the steps of (i) "measuring energy usage of a device 1.08 operated by a customer," (ii) "cut[ting] off" energy to the device 1.08 "during the first time period," and then (iii) providing a rebate to the customer "based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements." Appx1190, ¶ 80 (emphasis added); *see also* Appx1188, ¶ 16. In its

arguments to the Board, Causam asserted that Ehlers' disclosure of "actual energy savings" did not suggest to one skilled in the art the type of "actual" energy savings described in the '268 patent for generating the claimed measurement and verification data. Appx0040 (citing Appx0709-0730 (POR), Appx0817-0834 (PO Sur-Reply)). Causam insisted that Ehlers' "actual energy savings" was not "actual at all," but only a "projected energy savings." Appx0713. The Board rejected Causam's argument, explaining that "[w]e do not agree that Ehlers' clear disclosure of 'actual energy savings' and rebates based on 'actual contributions' would have been understood by one of ordinary skill as anything other than 'actual.'" Appx0041.

Similarly here, Causam contends that Ehlers does not disclose "actual energy savings" because "the only measurement [in Ehlers] occurs before a demand response event, not during a demand response event." Blue Br. at 39. That is plainly a false depiction of Ehlers. Ehlers provides an example of how the method described in Ehlers' Figure 1C can be used with a "PROGRAM" for pool pumps. Appx1190, ¶ 81. Ehlers explains that, before the start of an event, the system "measur[es] the energy usage of a device 1.08 operated by the customer," and stores the "power rating" for the customer's device (e.g., pool pump). Appx1190, ¶¶ 80-81. Ehlers then explains that, after a signal to disable a pool pump during a first time period is received, the system "further *measures energy usage* of the pool pump *during* the first time period to confirm that the pool pump is not running." Appx1190, ¶ 81

(emphasis added). After the event, a customer rebate is then determined "as a function of the first time period, the measured energy usage, and the known power requirements." Appx1190, ¶ 80. Thus, Ehlers describes that rebates are calculated using measurements both before and during a power reduction event.

Indeed, when Causam's expert, Dr. Goosen, was confronted with this disclosure, he agreed that Ehlers describes an "actual measurement of energy … during the event." Appx3286, 268:4-13. Dr. Goosen acknowledged that, in order for Ehlers to "report a curtailment, you need a baseline and an actual load measurement." Appx3286, 268:4-13; *see also* Appx0829 (Causam acknowledging that Ehlers "discloses 'measur[ing] energy usage … during the first time period to confirm that the pool pump is not running") (citing Appx1190, ¶ 81 (Ehlers)).

Thus, even under Causam's improper claim construction, there is substantial evidence that Ehlers describes actual measurements *during* a power reduction event, and this Court should affirm the Board's decision.[6]

[6] Causam argues that "Ehlers' failure to disclose any refinement of a baseline reinforces that Ehlers does not generate measurement and verification data corresponding to the reduced power consumption during the demand response period." Blue Br. at 41. But, as the Board explained, Causam had clarified in its briefing "that the claims do not require a baseline estimated before a power savings or demand response event to be adjusted later, i.e., during the event." Appx0026 (citing Appx0817 (PO Sur-Reply)). And Causam does not challenge that finding here. So Causam's baseline refinement argument—which Causam forfeited both before the Board and in this appeal—is a red herring. *See, e.g.*, *McIntosh*, 53 F.4th at 641 ("'Our law is well established that arguments not raised in the opening brief are' forfeited." (quoting *Smithkline*, 439 F.3d at 1319)).

### B. Ehlers Describes Performing Measurement And Verification, Which A Person Of Ordinary Skill In The Art Would Understand As Describing The Same Concept As In The ’268 Patent

Substantial evidence also shows that Ehlers and the ’268 patent are describing the same concept, however one may choose to define "measurement and verification." The ’268 patent acknowledges that "measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s)." Appx0095, 7:34-37. During the IPR proceeding, Causam and its expert maintained that one of ordinary skill in the art would thus have readily understood the scope of "measurement and verification" simply through seeing that phrase. Appx0698 ("Though not expressly defined in the ’268 patent, the term "measurement and verification" is well-understood by a POSITA and in the industry of demand response."); Appx3059-3060, 41:15-42:7 ("my opinion is that the ’268 patent identifies that the reader should employ measurement and verification … and so expects the reader to look up whatever measurement and verification techniques are accepted"). Ehlers describes the same concept, explaining that customers are credited "based on their actual (*measured & verified*) contributions." Appx1190, ¶ 79 (emphasis added); *see also* Appx1194, ¶ 141 ("The actual usage … may, over time, be known and/or sampled and the offsets can then be computed and verified as needed to ensure that the reductions that are calculated are correct."); Appx1191-1192, ¶ 97 ("the system can monitor and verify load control reductions"); Appx1216,

claim 39 ("verifies curtailment"); Appx3351-3352, ¶¶ 19-20. Therefore, a person of ordinary skill in the art would have appreciated that Ehlers was describing the measurement and verification process known in the field. Appx3351, ¶ 19.

Thus, as the Board correctly found, "one of ordinary skill would have understood both 'measurement and verification' in the challenged patent and Ehlers' use of 'measured and verified' … to refer to the same well-known concept of measurement and verification." Appx0042. The Board explained that its finding was supported by Dr. Goosen's testimony that "measurement and verification was well-known in the industry." Appx0042 (citing Appx3530-3531, ¶ 43 (Goosen Decl.)). Its finding was also bolstered by Dr. Auslander's testimony that "Ehlers suggests that measurement and verification methods are used." Appx0042-0043 (citing Appx1082-1083, ¶ 54 (Auslander Decl.)). And finally, it was reinforced by additional description in Ehlers of "'higher levels of monitoring and managing of loads,' 'manag[ing] demand more closely by getting verification' and providing rebates." Appx0042 (citing Appx1191, ¶ 96 (Ehlers)).

Causam now attempts to escape the Board's analysis of Ehlers' "measured and verified" disclosure by arguing that it was only "relevant to *what* Ehlers' measurements achieve rather than *when* the measurements are performed." Blue Br. at 40 (emphasis added). But the Board made no such distinction. To the contrary, the Board explained that one of ordinary skill in the art would understand the

disclosure of measurement and verification in both Ehlers and the ’268 patent to refer to the same “concept.” Appx0041-0043.

Accordingly, substantial evidence supports the Board’s finding that one of ordinary skill in the art would have understood Ehlers as describing “measurement and verification.” Indeed, as Causam admits, the phrase is defined based on a skilled artisan’s general understanding of “measurement and verification” in the field. *See* Appx0699; Appx3059-3060; Appx0042.

## CONCLUSION

For the reasons discussed, the Board’s decision should be affirmed.

Date: February 10, 2025

Respectfully submitted,

**VENABLE LLP**

/s/ Justin J. Oliver

Justin J. Oliver

*Counsel for Appellee ecobee Technologies ULC*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 10th day of February, 2025, I caused this Brief of Appellees to be filed electronically with the Clerk of the Court using theg CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Wayne Michael Helge
Bunsow De Mory LLP
Suite 210, #1088
277 S Washington Street
Alexandria, VA 22314
571-208-0186
whelge@bdiplaw.com

James Thomas Wilson
Bunsow De Mory LLP
Suite 210, #1088
277 S Washington Street
Alexandria, VA 22314
571-222-1022
jwilson@bdiplaw.com

*Counsel for Appellant Causam Enterprises, Inc.*

/s/ Justin J. Oliver
Justin J. Oliver

*Counsel for Appellee ecobee Technologies ULC*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1958

**Short Case Caption:** Causam Enterprises, Inc. v. ecobee Technologies ULC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 11,360 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 02/10/2025

Signature: /s/ Justin J. Oliver

Name: Justin J. Oliver

Save for Filing