No. 24-1958

# United States Court of Appeals for the Federal Circuit

**CAUSAM ENTERPRISES, INC.,**
*Appellant,*

**v.**

**ECOBEE TECHNOLOGIES ULC,**
*Appellee*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2022-01339*

## REPLY BRIEF FOR APPELLANT

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(650) 351-7248
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant Causam Enterprises, Inc.*

MARCH 17, 2025

## CERTIFICATE OF INTEREST

In accordance with Federal Circuit Rule 47.4(a) and (b), counsel for Appellant Causam Enterprises, Inc. certifies the following:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)): Causam Enterprises, Inc.

2. The real party in interest (Fed. Cir. R. 47.4(a)(2)): None/Not Applicable

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)): Causam Holdings, LLC

4. Legal Representatives (Fed. Cir. R. 47.4(a)(4)):

   None/Not Applicable

5. Related Cases (Fed. Cir. R. 47.4(a)(5)):

   *See* Notice of Related Case Information filed by Appellant Causam Enterprises, Inc. on June 26, 2024.

6. Organizational Victims and Bankruptcy Cases (Fed. Cir. R. 47.4(a)(6)): None/Not Applicable

Dated: March 17, 2025

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314

(650) 351-7248
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ iv

I. INTRODUCTION ........ 1

II. THE *INTER PARTES* REVIEW WAS CONDUCTED WITHOUT DUE PROCESS ........ 3

III. THE BOARD ALSO REACHED AN IMPROPER CLAIM CONSTRUCTION AND FAILED TO CONDUCT A MERITS ANALYSIS UNDER THE PROPER CONSTRUCTION ........ 11

A. The Board Incorrectly Interpreted Claim 1 by Eliminating the Claimed Requirement That "Measurement and Verification Data" Must be Generated During a Demand Response Event for that Data to Correspond to the Reduction in Consumed Power Occurring During That Event ........ 11

B. Substantial Evidence Does Not Support Petitioner's Challenges Under the Proper Interpretation of Element [1c] ........ 18

IV. CONCLUSION AND RELIEF REQUESTED ........ 26

# TABLE OF AUTHORITIES

***Page(s)***

**Cases**

*Bell Semiconductor LLC v. Adv. Semiconductor Eng'g Inc.*,
No. 2022-2048, 2023 WL 7974927 (Fed. Cir. Nov. 17, 2023)............ 10, 11

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016)........................................................................... 3, 4

*FedEx Corp. v. Patent Owner*,
IPR2017-01786, Paper 28, 2018 WL 3870035 (PTAB Aug. 13, 2018) ...... 8

*Jewelry Channel, Inc. USA v. America's Collectibles Network, Inc.*,
CBM2014-00119, Paper 10, 2014 WL 5386840 (PTAB Oct. 20, 2014)..... 9

*Legend3D, Inc. v. Prime Focus Creative Servs. Canada Inc.*,
IPR2015-01350, Paper 12, 2015 WL 7301808
(PTAB Nov. 19, 2015) ........................................................................ 9, 10

*Medtronic Inc. v. Robert Bosch Healthcare Sys.*,
839 F.3d 1382 (Fed. Cir. 2016) .................................................................. 4

*Mullane v. Central Hanover Bank Trust Co.*,
339 U.S. 306 (1950)..................................................................................... 4

*Nelson v. Adams USA, Inc.*,
529 U.S. 460 (2000)..................................................................................... 5

*Thryv, Inc. v. Click-To-Call Techs., LP,*
590 U.S. 45 (2020)....................................................................................... 4

*Transcom, Inc. v. United States*,
182 F.3d 876 (Fed. Cir. 1999) .................................................................... 6

**Statutes**

35 U.S.C. § 103 .......................................................................................... 25

35 U.S.C. § 312 ....................................................................................... 1, 7, 8

35 U.S.C. § 314(d) .......................................................................................... 4

35 U.S.C. § 318(b) .......................................................................................... 1

AIA § 18(a)(1)(B) ............................................................................................ 9

**Rules**

37 C.F.R. § 42.8(b)(1) .......... 8
Fed. Cir. R. 47.4 .......... 8
Fed. R. Civ. P. G(4)(b)(i) .......... 7

## I. INTRODUCTION

ecobee has already told this Court in a companion case that Causam does not own the ’268 patent, but ecobee makes no such pronouncement regarding ownership in this case. Rather, ecobee continues in its Opposition Brief (“Red Brief,” cited as “Red Br.”) to obscure and tiptoe around its steadfast denial that Causam owns the ’268 patent, a position it has consistently taken since before drawing Causam into the IPR proceeding below. Rather than revealing to the Court who ecobee believes owns the patent, ecobee instead responds that Causam cannot complain about the process by which the IPR proceeding was conducted, or about ecobee’s attempt to hide behind procedures designed for usual cases.

But these arguments fail because the blame here lies with ecobee and its lack of candor with the PTAB. ecobee should not be permitted to treat the fail-safe procedures of 35 U.S.C. § 312 as a box to check, rather than procedures to ensure that the proper parties are before the PTAB in accordance with due process. If ecobee and the Board had followed these procedures, Causam’s due process issues could have been resolved. Without this Court’s intervention to require the PTAB comply with due process, the Director will issue a certificate under 35 U.S.C. § 318(b) without the procedural safeguards designed to ensure all parties interested in the ’268 patent had notice and an opportunity to participate in the IPR process.

ecobee also presents a distorted view of the Board's merits decision. The first step of the Board's invalidity journey was to erroneously construe the claims to cover the generation of the claimed "measurement and verification data" before a demand response event—and the concomitant reduction of consumed power—even occurs. That construction was supported by two conflicting and inconsistent findings. The Board correctly recognized that "data corresponding to the reduction in consumed power" refers to "the reduction caused by disabling the electric power flow to 'the at least one associated power consuming device' having antecedent basis in limitation 1b." Appx0036-37. Despite recognizing this cause-and-effect aspect of the claim, the Board inconsistently determined that the claim language of element [1c] has no "timing constraint," thereby allowing the effect to exist before the cause. Appx0026. These conflicting statements cannot be reconciled, and highlight the Board's legally erroneous construction.

The Board's second improper step was evaluating the merits only in view of the Board's incorrect construction of element [1c], and making findings relating to "measurement and verification data" in the Ehlers reference only before a demand response event occurs. The Board did not evaluate Ehlers' disclosures according to the proper construction of this element. ecobee's Red Brief tries to bolster the Board's merits analysis by emphasizing disclosures in Ehlers that the Board did not rely on. ecobee's retreat from the Board's analysis demonstrates that Board erred in

its claim construction as a matter of law, and that substantial evidence does not support the Board's decision under the proper interpretation of the challenged claims.

## II. THE *INTER PARTES* REVIEW WAS CONDUCTED WITHOUT DUE PROCESS

ecobee initiated an unusual *inter partes* review and now seeks to retreat behind a veil of normalcy. Still avoiding its own advocacy against Causam's ownership of the '268 patent and still failing to accept that *inter partes* reviews are *in rem* proceedings, ecobee wants to Court to believe it acted by-the-book when petitioning the Director to cancel the '268 patent's claims. But at the time ecobee filed its petition for IPR, ecobee had a specific, evidence-based argument that another entity owned the'268 patent, and did not reveal its position or evidence to the Board. Further perpetuating the charade, ecobee characterized its own position to the Board as an "understanding," as if it were simply recounting a rumor that ecobee overheard somewhere. Appx0260 n.1. The due process violation occurred here because the proceeding did not take into account the unique circumstances of this case, and it resulted in an *in rem* proceeding that was constitutionally flawed.

Relying on *Cuozzo Speed Techs. v. Commerce for Intellectual Prop.*, 579 U.S. 261, 274-75 (2016) and *Medtronic Inc. v. Robert Bosch Healthcare Sys.*, 839

F.3d 1382, 1384-85 (Fed. Cir. 2016), ecobee argues that "pursuant to 35 U.S.C. § 314(d), this Court should decline to consider Causam's [due process] argument." Red Br., 32. But as noted in *Thryv, Inc. v. Click-To-Call Techs., LP,* 590 U.S. 45, 53 (2020), the Court in *Cuozzo*, 579 U.S. at 275, "declined to 'decide the precise effect of §314(d) on,' for example, 'appeals that implicate constitutional questions.'" Indeed, in *Medtronic*, this Court acknowledged Medtronic's argument based on *Cuozzo* that "§ 314(d) would not categorically bar review of a due process challenge based on insufficient notice that affects an entire proceeding," and concluded that Medtronic's position regarding the real party in interest requirement presented "no colorable constitutional issue," without placing constitutional issues complete beyond the Court's review. *Medtronic*, 839 F.3d at 1385-86. A constitutional issue is what is presented here, and Causam's due process challenge should be considered.

A tenet of procedural due process is notice to persons having a potential interest in the property, particularly notice to persons *known* to have a potential interest in the property. *See Mullane v. Cent. Hanover & Bank Trust Co.*, 339 U.S. 306, 314, 318-320 (1950). ecobee argues that there are only two scenarios when unnamed, interested party is omitted from the proceeding below: either the named party—here, Causam—is the owner of the patent-at-issue and was not harmed, or the named party has no interest in the patent and was not harmed. Red

Br., 33-34. But a fair process is one that invites all interested parties to participate. A process that excludes known persons who may have interest in the property is a harm in it itself and invites speculation about what would have occurred if all interested parties had participated. *See Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000) ("judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords *every party against whom a claim is stated*") (emphasis added). And that is what ecobee asks the Court to do, namely speculate as to what would happen if ecobee's unnamed owner had proper notice and an opportunity to be heard.

Since ecobee invites speculation, it should be noted that the circumstances here suggest that another entity's participation would have aided Causam and hurt ecobee. Beginning with its petition to the Board, ecobee has remained repeatedly coy regarding its knowledge about who this purported owner is. *See* Appx0260 n.1. Throughout the Red Brief, ecobee does not admit that Causam owns the '268 patent. Instead, ecobee states it "had asserted a challenge to Causam's claim of title in a separate proceeding before the ITC" (Red Br., 1), argues that Causam merely "speculates" about "a hypothetical third party, which may have ownership rights in the '268 patent" (Red Br., 2); *see also* Red Br., 28 ("some third party"), and uses passive voice to describe that ownership "has been challenged in

*another* proceeding" (Red Br., 28), all the while without admitting that it continues to press the challenge before this Court after prevailing on that challenge before the ITC's administrative law judge. Blue Br., 7 (Appx0452-0453). Causam's claim of ownership (Red. Br., 2) does nothing to minimize or resolve the issue, as there would be no dispute in ownership without it.

It must be remembered that the IPR is a challenge of the '268 patent's validity regardless of who owns the '268 patent. Thus, while ecobee would limit *Transcom, Inc. v. United States*, 182 F.3d 876, 880-81 (Fed. Cir. 1999) to only allow "importers" of *in rem* products to make challenges based on "procedural flaws in the administrative proceeding," including a lack of notice to "unnamed exporters," ecobee's distinction fails to acknowledge that the "importers" had no interest in the process until after they decided to become "importers," that is, after the administrative proceeding had been conducted. This Court permitted a party to challenge due process by simply seeking to import a product, and this holding also supports allowing Causam, a party who actually participated in the administrative proceeding, to challenge the "procedural flaws in the administrative proceeding."

Moreover, ecobee does not challenge that Causam's ownership interest provides standing to appeal the Board's merits analysis in the Final Written Decision. Causam similarly has standing to challenge the Board's process for

reaching that decision. And the relief Causam requests—vacating a decision that would affect the ’268 patent—is the same relief Causam seeks for its appeal of the merits decision.

It is also notable that adherence to the IPR statute and rules and candor by ecobee could have avoided this due process issue. Causam’s citation to 35 U.S.C. § 312(a)(2) was not to argue a statutory violation, but merely to point out that following the statute could have avoided the issue. 35 U.S.C. § 312(a)(2) is not limited to “represented” parties. Rather, it requires a petition to identify “all real parties in interest.” While ecobee suggests that having to provide notice to possible interested parties would present an undue burden for petitioners, this suggestion again fails to account for the circumstances of this case. Again, it is ecobee who contends that there is an owner other than Causam, and ecobee knows who it believes that owner to be.[1] 35 U.S.C. § 312(a)(2) requires notice to be provided to that *known* person. In this regard, 35 U.S.C. § 312(a)(2) is more akin to other statutory notice provisions in civil forfeiture actions *in rem* requiring notice to known persons (*see, e.g.*, Fed. R. Civ. P. G(4)(b)(i) (requiring direct notice to “to any person who reasonably appears to be a potential claimant on the

[1] ecobee criticizes Causam for stating that the Petition was served on Causam and not saying the Petition was served on “NEO IP.” Red Br. at 37 n.4. But in evidence ecobee submitted, the record reflects that NEO IP was serving as Causam’s attorney, so there is no meaningful difference. Appx1477-1479 (power of attorney from Causam Energy, Inc. to NEO IP).

facts known to the government”)) than to this Court’s “real party in interest” rules for represented parties (Fed. Cir. R. 47.4 applies to “every entity represented in the case by the counsel filing the certificate”). And the mandatory notice provisions of 37 C.F.R. § 42.8(b)(1), which require counsel for a party to identify known real-parties interest for ***that*** party, do not supplant the statutory requirement of 35 U.S.C. § 312(a)(2) and the beneficial result of that requirement in assuring that proper notice is provided to all known interested parties.

ecobee cites *FedEx Corp. v. Patent Owner*, IPR2017-01786, Paper 28, 2018 WL 3870035, at *4 (PTAB Aug. 13, 2018) for guidance on how an assignee can establish standing in an IPR proceeding. Red Br., 35-36. But that is not the issue here. The issue here is ensuring that notice is given to known potential owners of a patent. And in that regard, *FedEx* is instructive. In *FedEx*, the Board dismissed Petitions where “the identity of the patent owner is unclear on the current record,” *id*., IPR2017-01786, Paper 28 at 1 n.1, 2108 WL 3870035, at n.1, after the Board determined that a party who appeared, Human Sciences, “has not established that it has standing to take action as patent owner in these proceedings.” *Id*., Paper 28 at 16, 2108 WL 3870035, at *7. Thus, because the patent owner was not able to be known, the IPR was dismissed, thereby avoiding any questions about an IPR going forward with uncertainty in ownership.

ecobee argues that "no other party sought to appear in the IPR proceeding as the patent owner," but this cannot substitute for the requirement of providing actual notice to ecobee's purported owner. Red Br., 4; *see also id*. at 2. One purpose of proper notice is to allow a party to decide whether to appear in the proceeding. In this vein, *Jewelry Channel, Inc. USA v. America's Collectibles Network, Inc.*, CBM2014-00119, Paper 10, 2014 WL 5386840 (PTAB Oct. 20, 2014) was also not a notice case, and is distinguished from the facts of this case. In *Jewelry Channel*, American's Collectibles Network (ACN) sued the Jewelry Channel and The Genuine Gemstone Company Limited (Gemstone) in separate district court cases. *Id*., at *2. Jewelry Channel filed a CBM petition under the now-defunct portion of the AIA, § 18(a)(1)(B), and Gemstone contended that it, not ACN, owned the patent. Gemstone knew of the existence of the CBM review, *id*., at *2, but apparently decided for itself—without asking the PTAB—that it could not participate in the CBM unless the district court ruled that it owned the patent.

Similarly, ecobee contends that the present case follows the facts of *Legend3D, Inc. v. Prime Focus Creative Servs. Canada Inc.*, IPR2015-01350, Paper 12, 2015 WL 7301808 (PTAB Nov. 19, 2015), but the situations could not be more different. In *Legend3D*, petitioner Legend3D served its petition on Prime Focus Creative Services Canada, Inc. ("PFCSC") and PFCSC filed its

preliminary response to the petition. *Id*., Paper 12 at 2. Later, Legend3D sought permission to file a motion to strike PFCSC's preliminary response, alleging that another entity, Suntrust, was the only entity who could file a preliminary response. *Id*., at 4. That request was denied (*id*., at 5-7), and the Board later determined not to institute *inter partes* review. Thus, *Legend3D* did not involve a situation where the petitioner failed to name a possibly omitted party. Rather, central to Legend3D's position was that only the true owner could participate in the *inter partes* review. *Legend3D* also did not address the question of who must receive notice of the *inter partes* review consistent with due process requirements.

The situation in *Bell Semiconductor LLC v. Adv. Semiconductor Eng'g Inc.*, No. 2022-2048, 2023 WL 7974927 (Fed. Cir. Nov. 17, 2023) also did not involve questions of proper notice of an *inter partes* review proceeding. In *Bell Semiconductor*, the Board deemed Bell Semiconductor to be the patent owner, and this Court permitted Bell Semiconductor to bring an appeal of the Board's decision. *Id*., at *2. As to the other possible interested party—Rohm, the original assignee—the PTO notified Rohm's counsel of record that counsel's power of attorney had been revoked. *Id*., at *3. In fact, this Court in *Bell Semiconductor* made clear it was not addressing a situation such as the one that exists between Causam and ecobee. This Court specifically stated in Bell Semiconductor that

"we have no occasion to address issues that could arise if a nonparty seeks to assert ownership of a patent that is the subject of an IPR." *Id*.

Finally, Causam did not forfeit the due process issue. As recounted in the Blue Brief, Causam raised the issue of ecobee's failure to provide notice to the party ecobee believed had an interest in the '268 patent in its Preliminary Response to the Petition and in its Response to the Petition. Blue Br., at 6-8 (citing Appx0426-0429; Appx0743-0745). There was no forfeiture of Causam's ownership arguments below.

For the foregoing reasons, the Board's failure to resolve the ownership dispute before it was error. Not only did it provide no findings on proper ownership for this Court to review, but the Board's inaction resulted in a failure to ensure that the handling of ecobee's Petition complied with statutory and procedural due process requirements.

## III. THE BOARD ALSO REACHED AN IMPROPER CLAIM CONSTRUCTION AND FAILED TO CONDUCT A MERITS ANALYSIS UNDER THE PROPER CONSTRUCTION

### A. The Board Incorrectly Interpreted Claim 1 by Eliminating the Claimed Requirement That "Measurement and Verification Data" Must be Generated During a Demand Response Event for that Data to Correspond to the Reduction in Consumed Power Occurring During That Event

The Board improperly interpreted element [1c], which recites "generating measurement and verification data corresponding to the reduction in consumed

power," in a manner such that measurement and verification data has no correlation to the "reduction in consumed power." Appx0021-0027. In its claim construction analysis, the Board agreed with Causam "that the plain language of the claim requires generating the measurement and verification data that corresponds to the reduction in consumed power provided when the electric power flow to the device is disabled." Appx0026. However, the Board then found that "[n]othing in the plain language of the claims or any portion of the specification identified by Patent Owner would limit the generation of measurement and verification to be performed during the power reduction event." *Id*. By doing so, the Board eliminated the claimed requirement that the "measurement and verification data" must "correspond[]" to "the reduction in consumed power," and that this reduction in consumed power is provided as a result of the claimed disabling the electric power flow. This was legal error.

As Causam explained to the Board, the plain language of claim 1, viewed in its entirety, forecloses the Board's interpretation of element [1c]. Appx0817-0819, Appx0820-0822. As also noted in the Blue Brief, element [1b] of claim 1 requires a client device to issue a power management command to a controllable device, which causes the controllable device to disable the electric power flow to a power consuming device "to provide a reduction in consumed power." Element [1c] then requires "generating measurement and verification data corresponding to the

reduction in consumed power." The antecedence found in element [1b] for element [1c]'s "the reduction in consumed power" mandates that the claimed "measurement and verification data" cannot be generated before the demand response period, i.e. prior to issuance of the power management command and before the reduction in consumed power. The plain language of this claim dictates that the "measurement and verification data" that is generated corresponding to a reduction in consumed power must have some correlation to that reduction.

The Board recognized the antecedence found in element [1b], and construed "data corresponding to the reduction in consumed power" to refer "to the reduction caused by disabling the electric power flow to 'the at least one associated power consuming device' having antecedent basis in limitation 1b." Appx0036-37. However, the Board also determined that the claim language of element [1c] has no "timing constraint." Appx0026. These conflicting statements cannot be reconciled. The Board's interpretation of element [1c] is flatly inconsistent with the recognized antecedent basis contained in the claim.

Further, ecobee has no answer to the express antecedent basis in claim 1. Specifically, Causam presented this claim construction argument based on the antecedence in its Blue Brief (Blue Br., 35-36), but ecobee's response does not address the Board's antecedence finding. ecobee instead leans into the Board's "no timing" finding, alleging that "nothing in the claim language provides a temporal

requirement as to when measurement and verification data must be generated, let alone that it must be generated *during* a power reduction event." Red Br., 3; *see also id*., 41. Not only does this fail to address the Board's inconsistent findings, it is also false because element [1b] must occur before element [1c] in order to "provide [the] reduction in consumed power" that appears in element [1c].

ecobee also emphasizes the Board's off-topic discussion of when a computation of the power reduction occurs. Red Br., 41. ecobee points out that in an embodiment of the '268 patent, a power savings *calculation* occurs after the demand response has ended. *Id*. (citing Appx0026). After describing the embodiment in more detail, ecobee concludes: "this embodiment does not support Causam's position that generating measurement and verification data must occur *during* a power reduction event, let alone provide the type of clear statement required to limit claim scope." Red Br., 42 (emphasis in original). But ecobee confuses two different concepts, namely the *claimed* requirement of "generating measurement and verification data corresponding to the reduction of consumed power," and the *unclaimed* calculation of a power consumption reduction. When and how the calculation is performed to determine power savings does not alter the claimed requirement that the measurement and verification data must correspond to the reduction of consumed power.

Further, while ecobee does not acknowledge it, this claimed requirement of element [1c] is expressly supported by another embodiment in the ’268 patent. As disclosed in the ’268 patent specification, “based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply value (PSV) *corresponding to the reduction in consumed power* by the power consuming device(s).” Appx0095, 7:28-32 (emphasis added); Appx0708 (Causam’s patent owner response to the Board, addressing this “PSV” disclosure of the specification). Connecting this disclosed PSV to the claimed “measurement and verification,” the ’268 patent specification also discloses that the “the PSV is an actual value that *includes measurement and verification* of the reduction in consumed power.” Appx0095, 7:32-34 (emphasis added); Appx00706-0707 (noting that ecobee’s proposed construction of PSV acknowledges that the PSV includes “‘measurement and verification of the reduction in consumed power.’”).

Additionally, the ’268 patent expressly discloses that estimating reduced power usage, such as Ehlers performs, was a problem in the existing prior art. As Causam explained to the Board, the ’268 patent noted that “assuming a projected power savings is insufficient for ‘providing supply to the power grid,’ ([Appx0095], 7:55-57), and estimating reduced load usage is a problem that the ’268 Patent identifies as a shortcoming of prior art techniques.” Appx0695-0696 (citing

Appx0092, 2:12-21). Thus, the Board's construction conflicts with one of the stated improvements of the '268 patent's invention over the prior art.

Finally, ecobee's discussion of the expert testimony presented to the Board below is off-topic. ecobee alleges that the testimony of Dr. Goosen, Causam's expert, "contradicts Causam's claim construction theory" because "Dr. Goosen did not opine that measurement and verification data must, by definition, be generated *during* a demand response event." Red Br., 44 (emphasis in original). But it is not Causam's theory that the term "measurement and verification data" must be construed in this manner. Rather, the antecedent basis in element [1b], and the plain language requiring that the claimed "measurement and verification data" must correspond to "the reduction in consumed power," compels that measurement and verification data must be generated *during* a demand response event. Appx0820-0821. Data generated before a reduction in consumed power does not correspond to the reduction in consumed power occurring during that demand response event. Dr. Goosen's testimony does not contradict this plain language of the claim.

Additionally, as explained to the Board, the testimony of Dr. Auslander, ecobee's expert, is consistent with Causam's claim construction interpretation. Appx0826. At deposition, Dr. Auslander was asked when "the measurement and verification data [would] need to be generated" in order to practice the "generating" step of claim 1. His response was that "at minimum, *it would have to be generated*

*at the end of the event*." Appx4067, 10:1-8 (emphasis added). He also noted that "the full data would not be available until the end of the event, [and] could be available later." *Id*., 10:12-14. He then explained that "if you look at verification as measuring how much power was actually used, one part of verification, as measuring what power was actually used during the event, that's not known *until the event ends*." *Id*., 10:18-22 (emphasis added). Dr. Auslander was also asked whether he agreed that "you don't know what the actual reduction in power is for a power reduction event until the event has concluded?" His response was that "you certainly can't even make an estimate, if that is closer to what you're asking, until the end because you don't – you haven't finished your measurements yet." Appx4075-4076, 18:14-19:1.

The proper construction of element [1c] requires measurement and verification *during* a demand response period to give meaning to the antecedence for "the reduction in consumed power," and to satisfy the requirement for correspondence between the generation of measurement and verification data and the reduction in consumed power. Only Causam's rejected construction gives full credit to this claim language. The Board's conclusion to the contrary was wrong and should be reversed.

### B. Substantial Evidence Does Not Support Petitioner's Challenges Under the Proper Interpretation of Element [1c]

ecobee argues that even under Causam's construction of element [1c], substantial evidence supports the Board's finding of unpatentability. Red Br., 46. ecobee argues that "Ehlers explains that rebates are provided based on 'actual energy savings,' and describes measurements taken during a demand response event to verify that power has been disabled." Red Br., 46 (citing Appx1190, Ehlers ¶¶ 80, 81, and Appx1188, Ehlers ¶ 16). While ecobee may wish that the Board looked for and found that Ehlers had "measurements taken during a demand response event," that is not what the Board did in its merits analysis, where it made findings only under its erroneous claim construction when addressing Causam's positions. *See* Appx0038-39 (rejecting Causam's arguments in light of the Board's claim construction in Section II.C of the final written decision (Appx0012-27)); Appx0043 (same); Appx0046 (rejecting Causam's argument as "predicated on Patent Owner's unduly narrow view of limitation 1c"); Appx0047 (referencing Section II.C of the final written decision).

Undercutting ecboee's argument regarding "actual energy savings," the Board expressly relied upon Ehlers' process for determining "actual" energy savings in Figure 1C, which characterizes the forecasted energy savings as "actual." Appx0037-0038; Appx1169 (Figure 1C); Appx1190, ¶ 80 (disclosing that the "actual energy savings" is a function of energy usage measured before power is cut

off to the controlled device). Thus, Ehlers' Figure 1C values a demand response event purely on pre-event estimates and not on any data generated during the demand response event.

ecobee's Red Brief attempts to diminish the Board's reliance on Ehlers' Figure 1C. But the Board specifically relied upon Ehlers' Figure 1C and corresponding description to explain how Ehlers determines the effect of a demand response event. As found by the Board, Ehlers' method of Figure 1C "includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on *actual energy savings* as a function of the first time period, the measured energy usage, and the known power requirements." Appx0037-0038 (emphasis in original) (citing Appx1188 at ¶ 16 and Appx1190 at ¶ 80 (describing the method steps in the context of Figure 1C)). As indicated in this method, Ehlers' "actual" energy savings has nothing to do with any measurements that actually occur during the demand response period, which Ehlers refers to as the "first time period." Instead, as recounted by the Board at Appx0031, Ehlers includes a "'first step 1.32A'" that "measure[s] energy usage of a device 1.08 operated by a customer," a "a second step 1.32B" where "energy to the device 1.08 is cut off during the first time period," and "a third step 1.32C" where "a rebate is provided to the customer based on actual energy savings as a function of the first

time period, the measured energy usage, and the known power requirements." (quoting Appx1190, ¶ 80). Further, the Board made no finding that Ehlers generates any measurement and verification data during the "first time period," which is Ehlers' period of reduced power consumption.

ecobee points to Ehlers' description "that Power Supply Programs may 'credit consumers who participate with KWH [kilowatt hour] rebates based on their *actual (measured & verified) contributions*'" and provide "a variable rebate based on a customers [sic] actual contribution, instead of a fixed rebate." Red Br., 24-25, (citing Appx0038 (emphasis in original) (citing Appx1190 at ¶ 79)). But these additional disclosures did not alter the Board's reliance on the measurement process in Ehlers' forecasting method of Figure 1C that occurs before the demand response event. Appx0037-0038. Even with Ehler's description of "measured & verified" in its passage discussing crediting consumers with kilowatt hour rebates "based on their actual (measured & verified) contributions," Ehlers does not describe when the "measurement and verification" occurs or what measurement and verification data is generated to yield these values except with regard to Figure 1C.

Still struggling with the Board's reliance on Ehlers' Figure 1C, ecobee improperly characterizes Ehlers' paragraph 81 as providing "an example of how the method described in Ehlers' Figure 1C can be used with a 'PROGRAM' for pool pumps." Red Br., 48 (citing Appx1190, ¶ 81). ecobee even merges Ehlers'

discussion of the pool pump from paragraph 81 into the steps of Ehlers' Figure 1C in a scenario never examined by the Board. ecobee newly alleges that "Ehlers provides an example whereby energy savings are calculated based on '[t]he power rating for a customer's pool pump' and the time period that the pool pump is disabled, and the energy savings are verified based on a measurement of the energy usage of the pool pump during the same time period to 'confirm that the pool pump is not running.'" Red Br., 46 (citing Appx1190, ¶ 81).

Not only is this scenario new, but it wildly overstates Ehlers' disclosure in paragraph 81. Ehlers' paragraph 81 describes a PROGRAM with respect to Figure 1B, not the process of determining an "actual energy savings" of Figure 1C. Specifically, while Ehlers discloses that a "load control node 1.10C further measures energy usage of the pool pump during the first time period to confirm that the pool pump is not running," Ehlers never relates that measurement to the "actual energy savings" determined according to the method of Figure 1C. Further, it is these "actual" energy savings determined per Figure 1C that Ehlers characterizes as "(measured & verified) contributions." Appx1190, ¶ 79. Thus, there is no disclosed relationship between Ehlers' pool pump measurement in paragraph 81 and the "actual" energy savings or "(measured & verified) contributions" determined per Figure 1C and corresponding description.

Simply put, the Board made no finding that Ehlers' paragraph 81 provides "an example of how the method described in Ehlers' Figure 1C can be used with a 'PROGRAM' for pool pumps." Red Br., 48. This is ecobee's desire rather than an accurate statement about Ehlers or the Board's findings. Similarly, contrary to ecobee's assertion, the Board made no finding that a measurement to confirm "the pool pump is not running," disclosed in Ehlers' ¶ 81, results in Ehlers generating "measurement and verification data." As such, there is no evidence, much less substantial evidence, that any "measurement and verification data" is generated during Ehlers' reduction in consumed power during the first time period.

Indeed, Ehlers does not account for what actually happens during the demand response period to value the reduction that occurs. A large reduction, a small reduction, or even no reduction at all might yield the same estimated value of the demand response event. This is because Ehlers bases the "actual energy savings" on data generated entirely before the demand response period. *See* Appx0710 (arguing that what happens during Ehlers' "first time period does not influence … the evaluation of an amount of energy the customer would have consumed absent a demand response instruction."). Further, while Ehlers discloses an "always on" technology, even Dr. Auslander conceded that an "always on" technology "means a communication channel is open, not that the status of every device powered by a

utility is known by the utility at all times." Appx0714-0715 (citing Appx3618-3619, 32:14-33:5; Appx3619, 33:10-14); Appx3618-3621.

Ehlers' disclosed process for valuing a demand response event confirms why Ehlers' paragraph 81 does not save the day for ecobee. In Ehlers' paragraph 81, Ehlers checks a pool pump to ensure that it is off when it is supposed to be off. But Ehlers does not disclose how the forecasted value of the demand response event would differ based on the results of that check. For example, if Ehlers checks the pool pump every fifteen minutes during an hour in which the pump is supposed to be off, and determines the pump to be on twice during that hour, Ehlers does not disclose any adjustment to the pre-demand response period estimate of the reduction in consumed power determined according to the method of Figure 1C. In fact, Ehlers does not even disclose whether the pool pump check yields any generation of data. This paragraph provides an appealing sound bite for ecobee, but it does not address whether any measurement and verification data is generated corresponding to the reduction in consumed power, as claimed.

ecobee next performs a sleight-of-hand maneuver with regard to the Board's final written decision. ecobee characterizes the Board's decision as finding that "Ehlers describes using 'measurement and verification' processes in the same manner as the '268 patent." Red Br., 47 (citing Appx0041-0042). This overstates the Board's findings with regard to Ehlers' "measured & verified" disclosure. What

the Board actually found was that "one of ordinary skill would have understood both 'measurement and verification' in the challenged patent and Ehlers' use of 'measured & verified' … to refer to the same well-known concept of measurement and verification." Appx0042. In other words, the Board's finding is that Ehlers and the '268 patent both implement "measurement and verification" with regard to a demand response event. But this does not mean that the inputs (*i.e.*, the "data") to the measurement and verification process in Ehlers and the '268 patent are the same or occur at the same time relative to a demand response period. Rather, the record indicates that Ehlers' input to the measurement and verification process is data generated entirely before a reduction in consumed power occurs, while the '268 patent generates its measurement and verification data such that the data corresponds to the reduction in consumed power. Appx0821; Appx0095, 7:28-37 ("the systems and methods of the present invention provide for generating … at power supply value (PSV) corresponding to the reduction in consumed power by the power consuming device(s)."). Simply stated, even the Board's finding regarding a common process of performing measurement and verification between the '268 patent and Ehlers is not substantial evidence that the data used in each process is the same.

ecobee completes its sleight-of-hand with a hypothetical that finds no support in the Board's decision. ecobee states "even if 'measurement and verification'

would be understood in the art to require measurements during a power reduction event, one of ordinary skill in the art would understand Ehlers to suggest the same concept." Red Br., 47. The Board made no such finding. This is required in claim 1 of the '268 patent based on the plain language of that claim, not based on any understanding in the art.

Finally, ecobee alleges that "[s]ubstantial evidence also shows that Ehlers and the '268 patent are describing the same concept, however one may choose to define "measurement and verification." Red Br., 50. Again, this line of argument in the Red Brief is directed to the "measurement and verification" process, without addressing the data that is used for this process. Red Br., 50-52. Whereas Ehlers' data used for determining a power savings contribution is entirely based on forecasts determined and fixed prior to the first time period of reduced power, element [1c] of the '268 requires that the measurement and verification data is generated "corresponding to the reduction in consumed power." Even crediting the Board's finding that Ehlers uses a "measurement and verification" process, the data used in that process in the '268 patent and Ehlers are plainly different.

Accordingly, the Board's invalidation of claims 1-11 and 13-19 based on 35 U.S.C. § 103 in view of Ehlers and in view of Ehlers and Chen applies an improper construction of the claims, and is not supported by substantial. The Board's decision should be vacated.

## IV. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Causam respectfully asks that the Court reverse, or alternatively vacate and remand, the Board's final written decision.

Dated: March 17, 2025

Respectfully submitted,

*/s/ Wayne M. Helge*
WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(650) 351-7248
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that, on March 17, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be hand-delivered to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated: March 17, 2025

Respectfully submitted,

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(650) 351-7248
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1):

__X__ The brief contains 5,885 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2),

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

__X__ The brief has been prepared in a proportionally spaced typeface using MS Word (Office365) in a 14 point Times New Roman font

Dated: March 17, 2025

*/s/ Wayne M. Helge*

WAYNE M. HELGE
JAMES T. WILSON
BUNSOW DE MORY LLP
277 S. Washington St.,
Suite 210 #1088
Alexandria, VA 22314
(650) 351-7248
whelge@bdiplaw.com
jwilson@bdiplaw.com

*Counsel for Appellant*
*Causam Enterprises, Inc.*